1  UNITED STATES DISTRICT COURT
   DISTRICT OF MINNESOTA
2

3  ------------------------------------------------------------

4  IN RE:   TARGET CORPORATION         Case No.: 0:14-md-2522-PAM
            CUSTOMER DATA SECURITY
5           BREACH LITIGATION

6                                      TRANSCRIPT

7                                         OF

8                                      PROCEEDINGS

9                                  (STATUS CONFERENCE)

10  ------------------------------------------------------------

11

12       The above-entitled matter came on for STATUS CONFERENCE

13  before Judge Senior Judge Paul A. Magnus and Magistrate Judge

14  Jeffrey J. Keyes, on May 14th, 2014, at the United States

15  District Courthouse, Devitt Courtroom, 316 N. Robert Street,

16  St. Paul, Minnesota 55101, commencing at approximately

17  11:00 a.m.

18

19  Reported by:   RONALD J. MOEN, OFFICIAL COURT REPORTER, CSR,
                   RMR
20

21

22                             CALIFORNIA CSR NO.:  8674

23                             ILLINOIS CSR NO.:  084-004202

24                               IOWA CSR NO.:  495

25                             RMR NO.:  065111

| | |
|---|---|
| 1 | APPEARANCES |
| 2 | CHESTNUT, CAMBRONNE, PA, 17 Washington Avenue |
| 3 | North, Suite 300, Minneapolis, Minnesota 55401-2048, by |
| 4 | KARL L. CAMBRONNE, Attorney at Law, appointed as the overall |
| 5 | Lead Counsel. |
| 6 | REINHARDT, WENDORF & BLANCHFIELD, 332 Minnesota |
| 7 | Street, Suite E-1250, St. Paul, Minnesota 55101, by GARRETT |
| 8 | D. BLANCHFIELD, JR., Attorney at Law, appointed as the |
| 9 | overall Liaison Counsel. |
| 10 | HEINS, MILLS & OLSON, PLC, 310 Clifton Avenue, |
| 11 | Minneapolis, Minnesota 55403, by VINCENT J. ESADES, Attorney |
| 12 | at Law, appointed as the Consumer Lead Counsel. |
| 13 | NICHOLS, KASTER, PLLP, 80 South Eighth Street, |
| 14 | Suite 4600, Minneapolis, Minnesota 55402-2242, by |
| 15 | E. MICHELLE DRAKE, Attorney at Law, appointed as the |
| 16 | Consumer Liaison Counsel. |
| 17 | ZIMMERMAN, REED, PLLP, 1100 IDS Center, 80 South |
| 18 | Eighth Street, Minneapolis, Minnesota, by CHARLES S. |
| 19 | ZIMMERMAN, Attorney at Law, appointed as the Bank Lead |
| 20 | Counsel. |
| 21 | LOCKRIDGE, GRINDAL, NAUEN, PLLP, 100 Washington |
| 22 | Avenue South, Suite 2200, Minneapolis, Minnesota 55401-2179, |
| 23 | by KAREN HANSON RIEBEL, Attorney at Law, appointed as the |
| 24 | Bank Liaison Counsel. |
| 25 | |

| | |
|---|---|
| 1 | APPEARANCES (Continuing) |
| 2 | ROBBINS, ARROYO, LLP, 600 B Suite 1900, San Diego, |
| 3 | California 92101, by FELIPE J. ARROYO, Attorney at Law, |
| 4 | appointed as the Shareholder Lead Counsel. |
| 5 | WALSH LAW FIRM, 100 South Fifth Street, Suite |
| 6 | 1025, Minneapolis, Minnesota 55402, by CHRISTOPHER R. WALSH, |
| 7 | appointed as Shareholder Liaison Counsel. |
| 8 | FAEGRE, BAKER, DANIELS, LLP, 90 South Seventh |
| 9 | Street, Suite 2200, Minneapolis, Minnesota 55402-3901, by |
| 10 | WENDY J. WILDUNG, Attorney at Law, appeared as counsel on |
| 11 | behalf of Defendants Target and the Target affiliates in the |
| 12 | consumer class actions and the bank class actions, and |
| 13 | appeared as counsel on behalf of Defendants Target and the |
| 14 | individual defendants in the shareholder derivative actions. |
| 15 | MORRISON & FOERSTER, LLP, 425 Market Street, 32nd |
| 16 | Floor, San Francisco, California 94105-2482, by HAROLD J. |
| 17 | McELHINNY, DAVID McDOWELL AND MICHAEL AGOGLIA, Attorneys at |
| 18 | Law, appeared as counsel on behalf of Defendant Target in the |
| 19 | MDL cases. |
| 20 | BERENS & MILLER, P.A., 3720 IDS Center, 80 South |
| 21 | Eighth Street, Minneapolis, Minnesota 55402, by JUSTI RAE |
| 22 | MILLER, Attorney at Law, appeared as counsel on behalf of |
| 23 | Defendant Affiliated Computer Services, Inc. |
| 24 | |
| 25 | |

1          THE COURT:  Good morning, everyone, and welcome to

2     those of you who are on the telephone.  (Phone beeps).

3     Welcome to somebody else, too.  We thank you for joining us

4     this morning.  We have the matter of the Target Corporation

5     Customer Data Security Breach MDL Litigation before us.

6          I've asked that Judge Keyes sit with me because,

7     quite candidly, you'll be seeing as much of him, probably, as

8     you will of me, and I anticipate that you probably will be

9     seeing more of both of us than you really desire.

10          There are a number of people on the telephone, and

11     I'm going to read this list of names, simply to note this

12     factor.  And hopefully everybody is there.  Wendy Behan,

13     Aashish Desai, Cari Laufenberg, Benjamin Lopatin.  Somebody

14     from the Cohen, Milstein, Sellers & Toll firm; I don't have

15     the name there.

16          MR. FRIEDMAN:  Andrew Friedman.

17          THE COURT:  I'm sorry, would you repeat, sir?

18          MR. FRIEDMAN:  It's Andrew Friedman from the Cohen

19     firm.

20          THE COURT:  Okay.  Very good.  Thank you very much.

21          MR. FRIEDMAN:  Thank you, your Honor.

22          THE COURT:  Scott Gilchrist, Michael Smith, Rebecca

23     Quinn or Scott Levy, Tim Howard, Eric Zagrans, Bill Caldes,

24     Cory Nelson, and Steven Murphy.

25          You should also be aware that I've received contact

1     from other lawyers that I've excused from this session this

2     morning, including Paul Geller, Michael Havard, Curtis

3     Warner.   These are all just comments that are made to let you

4     know the status of that.

5              Because it's on the same crib sheet, I'll use this

6     crib sheet.   There may be times this morning that different

7     groups of different people are going to want to break off and

8     have some caucuses.   That's very understandable.   We have a

9     series of rooms throughout the building available for you.

10    It will include the chambers to this courtroom, which is, in

11    fact, behind us; a conference room for this courtroom that

12    also is back behind us; the jury room here behind us.   On

13    this floor, over to your left, my right, Rooms 175, 176 that

14    are conference rooms.   And, then, on the Seventh Floor there

15    are five or six rooms up there -- conference rooms, attorney

16    conference rooms, as well as my courtroom and other

17    courtrooms that are not in use.   That would include Judge

18    Kyle's courtroom.   And on the Sixth Floor, Courtroom 6A and

19    6B are also available.   So there's lots of places for lots of

20    people to go if they desire that type of thing.   We won't

21    make any assignments; we won't do anything of that nature,

22    we'll just pick it up and do as best we can.

23              I'm not going to ask, obviously, plaintiff

24    appearances; we'd miss dinner.   But I think it would be

25    appropriate to ask appearances on behalf of Target, because I

1      think associating names and faces with respect to that are

2      appropriate.   Number one, I don't know.   But, secondly, I

3      don't know that various counsel know the people that are

4      appearing on behalf of Target.   So if we could have the

5      people from Target.

6               Ms. Wildung.

7               MS. WILDUNG:   Thank you, your Honor.   Wendy Wildung

8      from Faegre, Baker, Daniels.   I represent Target and the

9      Target affiliates in the MDL cases, which are the consumer

10     class actions and the bank class actions.   And in the

11     shareholder derivative cases, I represent Target and the

12     individual defendants.

13               THE COURT:   Okay.   Thank you.

14               MR. McELHINNY:   Good morning, your Honor.   My name

15     is Harold McElhinny.   I'm from Morrison & Foerster.   I

16     represent Target in the MDL cases.   I'm here with my partners

17     David McDowell and Michael Agoglia.

18               THE COURT:   Okay.   Thank you.

19               MS. MILLER:   Good morning, your Honor.

20     Justi Miller.   I do not represent Target.   I represent the

21     one and only other defendant, Affiliated Computer Services,

22     Inc.   I thought I should at least say hello.

23               THE COURT:   I welcome you, too.   As a matter of

24     fact, we'll have to someplace have a little discussion with

25     you with respect to all of that.

1          Okay.   Anybody else on the defense side?   Okay.

2     Very well.   Thank you very much.   Now, let's start to visit a

3     bit about the various factors that are involved with today.

4     I think that you've been given an agenda for today, that we

5     may or may not follow, but we'll probably generally be

6     following it.   I do think, as we start out today, that you

7     need to know that I have never experienced, and I would be

8     surprised if I experience it today, an awful lot accomplished

9     on the first day of a meeting of an MDL.   This is a time for

10    people to get to know each other a little bit, it's a time

11    for you to get to know me a little bit, to get to know

12    Judge Keyes a bit.   You've got a pretty good book on both of

13    us by now, but, nevertheless, this will give you an

14    opportunity to get to know us a little bit, and you'll get to

15    know a little bit of the culture of litigation in Minnesota.

16    I don't think it's a lot different than it is anywhere else,

17    but it, nevertheless, is Minnesota.   And we like to refer to

18    ourselves as "Minnesota nice" and, so, we'll try to function

19    and work through our processes of this case in that same

20    attitude and approach.

21          As we look at the case, we've been advised by the

22    plaintiffs that there are a hundred and eleven pending cases.

23    Not surprisingly, the Clerk's Office tells me that there are

24    80.   Sometimes it takes a while to catch up with things,

25    sometimes things are a little different than what they're

1      projected; but through the whole process that will clean out.

2                On the other hand, on the bank cases, there you're

3      telling us that there are 29 bank cases, but the Clerk's

4      Office has got 30.  So somebody snuck in the back door and

5      dropped another case.

6                On the shareholder cases, there are, to the best of

7      my knowledge, only four cases pending.  And in those four

8      cases that are pending, they are, I think, fairly well

9      unified as they are in derivative proceedings.

10               With respect to the subject of motions pending in

11     these transferred actions, to the best of my knowledge, there

12     are no pending motions at this time completely filed.

13     Judge Gettleman had a series of them in Chicago, but, to the

14     best of my knowledge, those were dismissed without prejudice,

15     to be refiled when they got here.

16               Yes, sir.

17               MR. YANCHUNIS:  Should I use the podium?

18               THE COURT:  Please do.  As the first honoree in

19     that regard, if you'd be kind enough, as you step forward, to

20     give your name and cases you're representing, so that the

21     reporter would have the information and I'll have the

22     information.  Go ahead.

23               MR. YANCHUNIS:  Thank you, your Honor.  My name is

24     John Yanchunis.  I'm with the law firm of Morgan & Morgan, in

25     Florida.  I was last before you eight or nine years ago in

1    *Thrivent Financial*.   I am a representative of 46 law firms in

2    42 cases; a number of them were pending in the Northern

3    District of Illinois before Judge Gettleman.   In the hearings

4    that we had before Judge Gettleman, motions were either

5    denied, were rendered moot, based upon representation of

6    Target, but there is a motion for class certification pending

7    in connection with those cases that were filed in Illinois

8    and consolidated.

9             THE COURT:   Okay.

10            MR. YANCHUNIS:   That is the only motion I believe

11   that's pending.

12            THE COURT:   Okay.  Well, thank you for bringing

13   that to my attention.   I guess I'd put it this way:   If there

14   isn't a class motion pending, there sure is going to be one.

15            MR. YANCHUNIS:   Yes, your Honor, that's true.

16            THE COURT:   That's fine.  Okay.  Thank you very

17   much.   Now, I want to talk just a little bit about grouping

18   of these cases.   And you probably, as I was just discussing

19   it, have picked up what's very much in my mind.   And

20   Judge Keyes and I have discussed this, as well.   It's our

21   feeling -- and even the way we had you sign in this morning

22   you can see this -- it's our feeling that these cases are

23   appropriately divided into three major areas:   There are the

24   consumer cases, there are the bank cases, and there are the

25   shareholder cases that are derivative cases.   And while I

1       think the case needs to be handled and managed from one

2       overriding and overbridging source, nevertheless, the actual

3       breakdown of the work that needs to be done in putting the

4       litigation to resolution is going to need to be divided off

5       into these three different branches.  I anticipate that you

6       can expect that we will be progressing in that way.  Now,

7       there are two cases filed -- I don't know the names of them

8       -- but there are two cases filed where the litigation was

9       brought as both a combined consumer and bank in that

10      individual litigation.  I've heard a rumor that the parties

11      filing that are amenable to the idea of amending the

12      Complaints and breaking it into two.  I don't know if that's

13      true or not, but I would kind of encourage it and hope that

14      that can happen.

15             Sir.

16             MR. HAAG:  Thank you, your Honor.  Eric Haag.  I

17      have one case that your Honor referred to in the footnote,

18      *Schafer*, which was a case with both subclasses.  And I have

19      filed a notice of voluntary dismissal of the consumer side of

20      that.

21             THE COURT:  Okay.  Very well.  That takes care of

22      that subject, then.  Thank you.

23             The next thing that's on the agenda is the

24      continuation of the stay or the duration of the stay.  I

25      think maybe we should defer that for a little bit here --

1        well, there's got to be a little bit of a stay in all of

2        this.  I think once we kind of get a little organized, it's

3        going to be a lot easier to figure out just how long that

4        stay should be.  Let me tell you that I don't think it's

5        going to be very long because I think within the next month

6        or so we really will want to be up and running.

7                I hate to give the defendants bad news right out of

8        the gun, but I'm going to do it, because why not give

9        advisory opinions in these.  I know Target would like to have

10       big, long indefinite stays, because that's just the nature of

11       the business.  You're not going to get it unless you really

12       persuade me in a motion.  I don't see it's appropriate to put

13       any kind of indefinite stays on this case at all.

14               That will lead down to the next thing that's on the

15       agenda and that's the consolidated or the amended --

16               MAGISTRATE JUDGE KEYES:  Ms. Wildung wants to say

17       something.

18               THE COURT:  I'm sorry, Ms. Wildung.

19               MS. WILDUNG:  Your Honor, if I may for a moment

20       address the question of a stay.

21               THE COURT:  Sure.

22               MS. WILDUNG:  There is some additional updated

23       information that I'd like to provide the Court relative to

24       the shareholder derivative cases, things that have occurred

25       since we submitted our initial case management conference.

1       As the Court knows, those claims that are being asserted in

2       the shareholder derivative cases belong to Target, and there

3       are always threshold questions about whether an individual

4       shareholder can bring those claims.  The new development is

5       this:  Another shareholder has now made a written demand on

6       Target's board.  At the board meeting -- which is coming up

7       in June -- the board will consider that demand.  I anticipate

8       that it's highly likely the board will appoint a Special

9       Litigation Committee and, at that point in time, it is

10      customary for the company to request a stay of derivative

11      cases to allow the Special Litigation Committee to commit its

12      work.  So I just want to highlight to the Court that that may

13      be coming, and I do think that is a new development that the

14      Court will want to consider.

15              THE COURT:  Do you know the date of that board

16      meeting?

17              MS. WILDUNG:  June 11th, your Honor.

18              THE COURT:  Okay.  I really ask that question as

19      much as anything because -- I'll just say it now, tentatively

20      we are thinking that we'd have another status conference on

21      Wednesday, the 25th of June.  Potentially by that time you

22      would be in a better position to communicate, as well as the

23      Court, knowing how to deal with whatever that situation might

24      be.

25              MS. WILDUNG:  And we would want the shareholder

1    derivative plaintiffs to have an opportunity to know what the

2    situation is, and be heard on the issue, as well.  But I did

3    want to advise the Court of that.

4         THE COURT:  Thank you very much.  Incidentally, I

5    gave that one date.  So I don't forget it, I'm going to keep

6    on this.  We're thinking, for status conferences, that we'd

7    have one on the 25th of June, another one on Thursday, July

8    24, and another one on Thursday, August 14.  No definitive

9    agendas or anything else yet formed.  But for practical

10   purposes, trying to get some scheduling outlined the best we

11   can, we just set those dates aside.

12        The next thing that will come into play is

13   something that's going to have to be determined by people

14   after today or later in the day and that is whether or not

15   there will be consolidated Complaints in this proceeding.  It

16   kind of gets down to a series of factors.  A consolidated

17   Complaint or a series of consolidated Complaints can be

18   pretty efficient in the litigation, obviously, and you're

19   going to find courts encouraging it and you're going to find

20   us encouraging it.  Sometimes it's not possible.  And we know

21   that.  One of the fortunate factors in this case versus so

22   many MDL cases is that this case does not have a lexicon

23   problem.  We've had more litigation in Minnesota than you can

24   shake a stick at.  If we need bellwether cases, fine.

25   They're here.  If we have a consolidated Complaint and we

1    proceed in Minnesota, fine.  We're here.  We'll be here

2    either way.  You folks are stuck with us on that.  But, of

3    course, obviously, at the end of the day, if it's appropriate

4    that there be remand, there will be, but that will be a ways

5    down the road.  As I said, there probably isn't much more

6    that we can really say about that.

7            The same thing kind of comes down on this initial

8    disclosure factor.  I want to encourage that there will be an

9    initial disclosure -- oh.  I got a note that those of you in

10   the back can't hear me.  I apologize for that.  Number one, I

11   probably was not speaking into the microphone and I should

12   have been.  Number two, I'm not used to this courtroom.  In

13   your own courtroom you kind of learn how loud you need to

14   talk.  I haven't figured that out on this one yet.  And

15   incidentally, this may be the last time any of you will ever

16   be in this courtroom.  But, nevertheless, if you're not

17   hearing, why, please, cup your hand and we'll speak up.

18           On the subject of disclosures, my anticipation will

19   be that after we get the organization put together, the

20   parties can then work out just when the appropriate time for

21   disclosures would be.  Obviously if the parties can't do it,

22   we will.  I don't think that probably is going to be a

23   particular major issue.  And one of the reasons I say that --

24   and I'm just going to break off onto it now, you were given

25   today this sheet of what people have talked about as

1    potential agendas in this case.  And I think it's rather

2    remarkable, because these comments have come from all over

3    the United States, and lawyers in all kinds of different

4    practices, they are amazingly comparable.  Sure, there are

5    the usual differences, that's natural.  But I think that they

6    overall are amazingly comparable.  I think, as a result of

7    that, I do not envision, in scheduling of this entire

8    litigation, great difficulties with respect to that.  I will

9    go right down to the bottom line of this sheet and that is a

10   great deal of respect on my part for the ready-for-trial

11   time, because it does seem to me that scheduling ourselves to

12   have the case prepared for trial on the consumer cases early

13   in 2016 -- nothing like trying a case in Minnesota in

14   January, I want you to know that -- and, then, the bank cases

15   in February, and followed in that spring with the derivative

16   cases, it's a doable schedule.  A number of people in the

17   room are going to have to exercise a craft between now and

18   then in order to accomplish that schedule.  But, again, I

19   respect, I appreciate the suggestions that have been made

20   here.  There are no decisions on this.  This is just what you

21   told us.  I think it looks like it can be worked out.

22           On the overall thing of discovery and case

23   management, let me make a couple of comments, one is

24   Judge Keyes and I will be available in this case when this

25   discovery thing gets going.  Yes, there are rules for both

1       motions on discovery and dispositive motions and, yes, I

2       follow some of them.   There's one you do need to make a

3       little note of and that's our local rule has a way of getting

4       dispositive motions before the Court.   We have three old

5       judges on our bench, and the three old judges didn't get the

6       memo on the rules and, as a result of that, we set this up so

7       that follow-up practice on dispositive motions that we have

8       in hand, the completed briefing, 14 days before the hearing.

9       On complex matters, we'll follow that because, quite

10      candidly, when you've got several feet of material to work

11      through, you need the 14 days preparatory to the hearing and,

12      so, we will follow that.   On the other hand, on both

13      dispositive and nondispositive motions, Judge Keyes and I are

14      very willing to accept stipulated briefing schedules on

15      matters that are much shorter.   If you've got a dispute as to

16      whether or not you're going take a deposition in Chicago or

17      if you're going to take it in Memphis, we don't need four

18      weeks to figure that out.   Get on the telephone and we'll

19      tell where you it's going to be.   On the other hand, common

20      sense fits into that as to what kind of subject matter you're

21      dealing with.   But we are very amenable to stipulating and

22      shortening those briefing schedules, because we're not

23      interested in delaying the litigation while files just sit

24      and smolder.   Aside from that, on the motion practice, I

25      don't believe there are any motions to remand.   Now, if I'm

1      wrong about that, I can be advised.   But I don't think that

2      there will be.   There will be, as we talked about earlier, I

3      think potential of a motion of consolidated pleadings.   I

4      would just be the most shocked guy in town if I ever got a

5      Rule 12 motion from Target, but it just could happen.   And

6      that, again, will also have to be scheduled out once we know

7      what you're looking at in the last best iteration that you

8      can find for the defense to look at.   And the defense, of

9      course, will need to put together that Rule 12 motion.   And,

10     again, we'll try to work our way through it as expeditiously

11     as possible.   Get that before the Court so that the

12     parameters of the lawsuit, et cetera, are set forth and are

13     out there.

14                Class-action allegations and motion practice

15     relating to that, as a preliminary matter, I do not envision

16     that there's going to be a division or bifurcation of

17     discovery as it relates to class and fact discovery.   At this

18     point in time, I just don't see that.   But I also recognize

19     there's a little distance between the cup and the lip.   We

20     have to be aware that there will be factors that we'll get

21     into before that class-action motion that you have pending,

22     and any others that are going to be filed, will actually be

23     teed up and ripe for a decision.   I just think that will come

24     in due time.

25                Now we get down to why a lot of people appeared in

1    the room, and that's to, on the plaintiffs' side, talk about

2    lead and liaison counsel.  I will start to hear from you kind

3    of in seriatim, however you come up.  In doing that, I want

4    you to know that I am thinking that there will be an overall

5    lead and an overall liaison counsel.  In the shareholder

6    cases there will also -- I said "shareholder."  I meant to

7    say "consumer cases."  In the consumer cases there will also

8    be a lead and liaison counsel of that portion.  In the bank

9    cases there will be a lead and liaison of that portion.  And

10   on the shareholder cases there would also be a lead and a

11   liaison.  And, then, behind that, once those persons are

12   selected, then I think there needs to be an organization of

13   which -- I'm thinking that in addition to the lead counsel on

14   the overall thing there would probably be an executive

15   committee of about five people, and about three people on the

16   consumer cases, and another three people on the bank cases.

17   I don't think you need an executive committee on the

18   derivative cases.  You've got one law firm.  Maybe there are

19   going to be two pretty soon.  We've got one law firm.  We

20   don't need a committee to work on that.

21            I will tell you that any lead and liaison counsel

22   that are appointed, I anticipate to appoint them for a year,

23   subject to reappointment by the Court.  I've found from

24   experience that that's appropriate.

25            I'm getting a little ahead of myself here, but I'm

1    going to do it just because it's on the notes.  I haven't

2    quite come to conclusion with the geek squad here in the

3    courthouse, but we'll get there.  I'm going to want

4    eventually, from all of you that are appearing in the case,

5    first of all, just a submission -- which I already really

6    have -- but I'm eventually going to want to get it

7    electronically so we don't have to retype it -- a listing of

8    hourly rates that are customary rates for the various levels

9    of people that work on the case.  And that will just kind of

10   go in there and be set aside.  At that point I'm not any

11   longer worried about hourly rate, but I'm worried about hours

12   worked.  And, so, we're going try to set up an electronic

13   method of a confidential submission to the Court for

14   in-camera review -- from both sides -- of time expended, at

15   the various levels of lawyers, monthly.  Once we get this

16   worked out internally, and the best way to do it, we'll get

17   back to you on it.  I don't have it yet.  But once we get

18   that internally, that will be done.  Now, in the same token

19   I'm going to tell you that I want lawyers that are working on

20   this case to know that I expect lead counsel to assign work.

21   I expect that lead counsel will receive from lawyers

22   quarterly the billing statements of the lawyers, so that lead

23   counsel is, through the case, on top of this, because --

24   well, they just simply have to be.  And, frankly, those

25   submissions are going to have to be made timely.  They're

1     going to have to come in within 30 days at the end of the

2     period that's appropriate to report that.

3          Okay.   Now let's start talking about lead and

4     liaison counsel.   I know that there are people that have

5     interest in these positions, and I think it would be

6     appropriate to hear from those that do have an interest in

7     filling these positions.

8          Counsel.

9          MR. GIRARD:   Good morning, your Honor.   My name is

10    Daniel Girard from Girard, Gibbs in San Francisco.   I have,

11    together with co-counsel from the Hagens, Berman firm, and

12    the Robbins, Geller firm, submitted my name to your Honor for

13    consideration.   I'm happy to speak to the details.   You have

14    the background.   We are seeking to play a role on the

15    consumer side.

16         MR. CAMBRONNE:   Speak into the microphone, please.

17         MR. GIRARD:   Sure.   I can repeat any portion of

18    that.   But the bottom line is we're seeking to be appointed

19    in the consumer litigation.   My individual client is the

20    Dorobiala matter, which was filed in the Central District of

21    California.   If you want further discussion on the merits,

22    I'm happy to talk about my qualifications.   You have those on

23    paper.

24         THE COURT:   I really do have those, counsel.   So I

25    think --

1          MR. GIRARD:  I'll leave it at that.

2          THE COURT:  -- to tell you that I can remember them

3     all, or anything else -- but I have perused over....

4          MR. GIRARD:   Thank you.

5          THE COURT:  So thank you very much.

6          MR. CLIFFORD:   Your Honor, good morning.  I'm

7     Robert Clifford of the Clifford Law Offices in Chicago.

8     Please don't hold that against me today.

9          THE COURT:  I'll tell you, now let's talk about

10    lucky shots off the glass.  The only difference is that

11    because of that you and I got to sleep at a reasonable hour

12    last night.

13         MR. CLIFFORD:  Yes, we did.  Well, thank you.  I

14    speak today on behalf of myself and my firm and, also, the 46

15    law firms that we brought together in Chicago before Judge

16    Gettleman, where Mr. Tom Zimmerman and I and John Yanchunis

17    were appointed as interim lead counsel there.  We seek

18    position, respectively, John and I, for lead and liaison in

19    the consumer cases.  We've done a lot of work on the cases to

20    date before Judge Gettleman.  We both have a breadth of

21    experience that we think is valuable to the class.  On the

22    liaison side, for me in particular, I was liaison before

23    Judge Hellerstein.

24         THE COURT:  I'm sorry, I didn't hear that.  Would

25    you repeat that.

1    MR. CLIFFORD:  For me, in particular, I was liaison

2    before Judge Hellerstein in the Southern District of New York

3    on all the 911 property damage claims, and headed up the

4    discovery team there when we did the liability discovery.  So

5    bringing those experiences to this case would be one that we

6    think would benefit the class.  And we'd be proud and

7    privileged to practice before you.

8    THE COURT:  Thank you.

9    MR. YANCHUNIS:  I think Mr. Clifford carried those

10   buckets for me, your Honor.

11   THE COURT:  Okay.  Thank you very much.

12   MR. ESADES:  Good morning, your Honor.  Vincent

13   Esades from Heins, Mills & Olson.  I guess I'll just round

14   out what I believe to be the consumer side, attorneys seeking

15   lead counsel.  I'm seeking a lead counsel position in the

16   case.  I submitted that recommendation, which includes the

17   qualifications under 23(g) and my personal qualifications.

18   And even what's been outlined by the Court and in terms of

19   assigning work, it's a position I've been in before, it's a

20   position I'm comfortable with.  I'm proud to say I have the

21   support of many good firms in the case.  I don't have exact

22   numbers, but they're outlined in our papers.  And with

23   specific experience in this area and, more importantly, with

24   managing these types of large class actions.  Unless you have

25   any comments for me, I'll just rest on the papers.

1          THE COURT:   Okay.   Thank you very much.

2          MR. ESADES:   Thank you.

3          MR. DAVIDSON:   Good morning, Judge.   My name is

4     Stuart Davidson from the Robbins, Geller law firm.   Myself

5     and my managing partner, Paul Geller, along with the Hagens,

6     Berman firm and the Girard, Gibbs firm, have asked the Court

7     to appoint us as lead counsel in the consumer cases.   First,

8     I wanted to thank your Honor for allowing Mr. Geller to be

9     excused from today, he's undergoing a medical procedure, but

10    would otherwise be here.   The only thing I would like to

11    point out to your Honor, as far as appointment goes, is that

12    I believe among all the lead counsel applicants who I believe

13    have submitted in-camera submissions to your Honor, I believe

14    we are the only ones that have served as lead counsel in the

15    *Sony* data-breach case, which is pending before Judge

16    Battaglia in the Southern District of California.   We got

17    past the Motion to Dismiss in that case.   That case remains

18    pending.   And I believe our experience would bring

19    substantial effect on behalf of the consumer cases.   And I

20    know Mr. Loeser from the Hagens, Berman firm was an Assistant

21    U.S. Attorney handling data-breach cases and prosecuting

22    them.   And I think that the qualifications of our three firms

23    stands apart from others.

24          THE COURT:   What is the status of the *Sony* data

25    breach?   I was curious about it.

1              MR. DAVIDSON:   Sure.   We've briefed two sets of

2      Motions to Dismiss in that case.   The Court stayed discovery

3      in those cases.   So we had a consolidated Master Complaint

4      that we filed.   The Judge granted the Motion to Dismiss,

5      primarily without prejudice.   We amended that Complaint.   We

6      asserted claims on behalf of consumers from multiple

7      different states.   In that case, we had another full round of

8      briefing on the Motion to Dismiss, and Judge Battaglia

9      granted in part and denied in part that Motion to Dismiss.

10     And that's the current status of the case.

11              THE COURT:   Okay.

12              MR. DAVIDSON:   Thanks, Judge.

13              THE COURT:   It's getting there but not there yet.

14              MR. DAVIDSON:   Right.

15              THE COURT:   Okay.   Yes, sir.

16              MR. BECNEL:   Your Honor, I think you have -- I'm

17     Daniel Becnel from Louisiana.   You had an executive committee

18     or a steering committee and that's what I applied for.   I

19     don't know if you want to hear about that at this point or

20     not.

21              THE COURT:   No.   To be honest with you, Mr. Becnel,

22     my feeling is that I want to get lead and liaison counsel

23     appointed, and then I want lead and liaison counsel to go to

24     work at developing the executive committees from throughout

25     the country that are appropriate with this.   They can bring

1    that back before the Court and the Court will either approve

2    or disapprove those committees.  But I think I'd just as soon

3    take that in that step as opposed to my deciding who's best

4    to be on the executive committee.  There's a lot of people in

5    this room I don't know.

6              MR. BECNEL:  Okay.  Thank you, your Honor.

7              THE COURT:  Okay.  Anybody else want to address the

8    consumer -- yes, sir.  Sir.

9              MR. ARROYO:  Shareholder derivative, your Honor.

10             THE COURT:  Okay.  Let's pick up the shareholder

11   after we -- in other words, let's go through the bank cases,

12   then we'll go to the shareholder.

13             MR. ARROYO:  Thank you, your Honor.

14             THE COURT:  Okay.  Anybody else on the consumer?

15   If not, let's go to the bank cases.

16             MR. ZIMMERMAN:  Your Honor, I'm Bucky Zimmerman.

17   I'm applying as the overall.  I don't know if you want me to

18   speak now or after the --

19             THE COURT:  Sure, go ahead.

20             MR. ZIMMERMAN:  Your Honor, I ask to be appointed

21   as the overall lead counsel in all three cases.  I pledge to

22   serve the Court with honor and with integrity.  I believe the

23   history of my work before this court speaks for itself and I

24   hope it is positive.  I think I bring the right combination

25   of experience and sensitivity and communication skills and

1     advocacy to this case.   I think I said in my papers, and I

2     will repeat today, Target is an important and valued citizen

3     of our community.   That does not mean I would not have

4     vigorous advocacy, but I want to give them the respect that

5     they deserve, having been grown in this community and having

6     done so well by the citizens of this community.   And I just

7     want the Court to know I feel that sensitivity and I will

8     remain sensitive to that.   Your Honor, we've always been

9     involved in our firm with cutting-edge issues, and we've

10    traveled roads to get us to reasonable and just resolutions

11    of cutting-edge issues.   I think we have one here.   And I

12    pledge to you to use the same experience and the same type of

13    creativity to bring about the right advocacy and the right

14    resolution.   I will conclude by saying I will abide by the

15    manual for complex litigation, which asks us to work

16    cooperatively, to achieve efficiency and economy without

17    jeopardizing fairness to the parties.   I believe I'm the only

18    one who has applied for the overall lead, but I believe that

19    I would be particularly well suited for that role, knowing

20    all of the other people, having worked with all the other

21    people except, perhaps, some of the shareholder people.   But

22    certainly in both the banking side and on a consumer side.

23    Not only have I worked with them, but I would call them my

24    friends.   And I will pledge to do dignity to this court.

25                Thank you.

1              THE COURT:   Okay.   Thank you.

2              MR. CAMBRONNE:   Good morning, your Honor.   My name

3     is Karl Cambronne.   I have submitted papers in-camera, also,

4     as you know, and offer myself for a leadership position in

5     these cases.   I have filed a bank case; there's where I'm

6     anxious to participate and play a meaningful role.   But let

7     me say one thing that I think needs to be said out loud and

8     that is the number of lawyers sitting behind me, your Honor,

9     and those on the phone and those who are not here really

10    compels leadership in this case to have a sine qua non of

11    efficiency and professionalism.   We have lots and lots of

12    good lawyers here that are going to help bring this matter to

13    a proper resolution at some point in the future.   It's going

14    to be incumbent upon anybody who is appointed leader of this

15    case, whether it's the overall or overarching leader, or one

16    of the categories of cases, your Honor, to really emulate

17    those sorts of criteria when they appear, not only before

18    this court but their interactions with defense counsel and

19    their interactions with their colleagues on the same side of

20    the fence.   I want to also state that I echo entirely Bucky

21    Zimmerman's notion that we're not dealing here with a

22    villain.   Target has got a problem, Target needs to have a

23    problem solved.   But Target is a good member of this

24    community, they do a lot for this community, they do a lot

25    around the country.   And we approach this case, we should

1     approach this case, and I intend to approach this case, with

2     that in mind.  Thank you, your Honor.

3                  THE COURT:  Okay.  Thank you, Mr. Cambronne.

4                  MS. RIEBEL:  Good morning, your Honor.

5                  THE COURT:  Good morning.

6                  MS. RIEBEL:  I'm Karen Hanson Riebel with the law

7     firm Lockridge, Grindal, Nauen, in Minneapolis.  I submitted

8     leadership papers on behalf of 20 of the banks on file in the

9     bank cases, seeking to be lead of the bank portion of this

10    litigation.  Those banks, I think it bears noting, and it is

11    put forth in our papers, are the largest banks that have

12    filed suit in this case.  We also represent many small banks,

13    we represent banks across the country.  I believe that there

14    are -- well, there are many law firms that requested that I

15    step forward and serve as lead in this litigation.  And I did

16    so.  I absolutely echo the sentiments that Mr. Zimmerman and

17    Mr. Cambronne have put forth about the integrity of this

18    court and of this state.  I would like to serve in the

19    leadership capacity.  And I think the number of banks that I

20    was able to work with and coordinate and consolidate to move

21    forward together, and the leadership papers that I submitted,

22    shows that I will be able to do that and do it well.

23                  THE COURT:  Okay.  Thank you very much.

24                  MR. BLANCHFIELD:  Good morning, your Honors.  My

25    name is Garrett Blanchfield.  I am from the firm Reinhardt,

1      Wendorf & Blanchfield, which is located across the street

2      from this courthouse.  You'll have to excuse my voice.  I'm

3      fighting off some kind of superbug that has lept from family

4      member to family member for two months now.

5              THE COURT:  It's located in this block.

6              MR. BLANCHFIELD:  Is it?

7              THE COURT:  I'm struggling with the same thing.

8              MR. BLANCHFIELD:  I'm sorry to hear that.  I hope

9      yours resolves more quickly than my family's.

10              I'm also seeking a lead counsel position; I have

11      put in my papers for that.  I'm happy to serve in whatever

12      capacity this court deems appropriate for my firm.  My

13      qualifications are in my papers and, based on those

14      qualifications, I think I am qualified to lead or co-lead

15      this litigation.  Unless the Court has any questions, I'm

16      just going to rest on my papers and rest my voice.

17              THE COURT:  Thank you very much, Mr. Blanchfield.

18              MR. BLANCHFIELD:  Thank you.

19              THE COURT:  Maybe the rest of the people wish I

20      would, too.

21              Yes, sir.

22              MR. BARNOW:  Good morning, your Honor.  My name is

23      Ben Barnow from Barnow & Associates, in Chicago.  My stepping

24      up is a variation on a theme.  As the Court may be aware, I

25      filed papers supporting other Minnesota people.  And I stand

1       by those papers.   And as I said in my papers, because of

2       leadership roles, those individuals have not only sought, but

3       the leadership activity that they've affected to date.

4       Having said that, I also believe that the cases that I have

5       settled in the data-breach area, probably more than anybody

6       in the country, although the hands may go up here.   I don't

7       think there's any other bigger ones.   I was the lead counsel

8       in *TJX*, which was 50 million people.   I was the lead counsel

9       in *Certegy*, *Countrywide* and, then, Heartland, which was, I

10      guess, the mother lode of it all.   I wasn't going to get up

11      other than to restate my support for the people I did put in

12      my papers.   But, additionally, my colleague, Mr. Davidson,

13      got up and mentioned *Sony PlayStation*.   I just wanted to

14      point out to the Court that, while I didn't mention that in

15      my papers, I'm also a member of the plaintiffs' steering

16      committee there.   And even though seven people were

17      appointed, it was a very harmonious relationship, it

18      continues to be.   And is yet another large data-breach case.

19      What I think is important in these cases is the ability of

20      counsel to seriously consider resolution.   I heard one of the

21      candidates for the big positions here mention that.   And I

22      endorse that.   I also noted in the papers from Target that

23      they may have that interest.   Well, sometimes there's a

24      settlement over here and a settlement over there.   And

25      whether or not they ever come together, I don't know.

1       But I stand ready to work with the people that I mentioned in

2       my papers, or any other appointees, to bring to the table

3       whatever value that experience might have.   Thank you.

4               THE COURT:   Okay.   Thank you very much.   I may need

5       a transcript about that business about resolution.   That's

6       music to the ears of a Judge, you know that.

7               MR. BARNOW:   Let me throw in a sentence.   The first

8       class action I ever did when I switched from defense work, I

9       called up a large firm and it was -- I felt was scorched and

10      burned.   Of course, all defense firms can be viewed that way,

11      I guess.   And I said, "Your client and my client have

12      something in common."   The guy said, "No way."   I said, "I'll

13      tell you what, if I tell you what it is, and you agree, we'll

14      have a settlement meeting."   He said, "Okay."   And I said,

15      "What they have in common is resolution."   We had a meeting

16      and we settled it.   Thank you, Judge.

17              THE COURT:   Thank you.

18              Yes, ma'am.

19              MS. DRAKE:   Good morning, your Honor.   I'm Michelle

20      Drake from the firm of Nichols, Kaster.   I have submitted an

21      application to be appointed as the overall liaison in this

22      litigation.   And in submitting that application, I thought

23      about what might be important to the Court in appointing

24      someone as the bridge between different groups of plaintiffs'

25      lawyers who may, at times, have competing interests, and also

1      this court.  And there are two things that I think I bring to

2      this possible position that are important and that is the

3      foundation in the two communities that I see as having

4      interest in the liaison position; one is in the community of

5      the plaintiffs' bar.  And I submitted my application in

6      connection with a consumer group with Mr. Antonus and

7      Mr. Clifford.  And I filed a consumer case.  But I can say to

8      this court that I built my firm's consumer practice largely

9      through building relationships with plaintiffs' lawyers

10     around the country.  And when I came into this room today, in

11     both the bank cases and the consumer cases, I can tell the

12     Court I have strong relationships with many members of both

13     groups, and that I believe I can faithfully serve the bank

14     lawyers, the consumer lawyers, the shareholder lawyers.  And

15     that I also have a strong foundation in the Minnesota legal

16     community and with this bench and this court.  I've served on

17     this court's Federal Practice Committee, and I believe that I

18     have the respect of this court.  That I understand what it

19     means to be Minnesota nice, while also being a zealous

20     advocate.  I'm committed to that.  I share the sentiments of

21     Mr. Zimmerman and Mr. Cambronne about Target's role in our

22     community.  And I believe that I can serve faithfully as

23     liaison between this court and the various groups of

24     plaintiffs' lawyers who are appointed.  And that's why I seek

25     this position.

1          THE COURT:  Okay.  Thank you very much.

2          Yes, sir.

3          MR. PIZZIRUSSO:  Good morning, your Honor.  James

4     Pizzirusso, Hausfeld, LLP, from Washington, D.C.  I submitted

5     papers in support of Mr. Cambronne and Mr. Zimmerman, your

6     Honor.  And also was willing to serve in whatever position

7     the Court would deem appropriate for my firm.  I was last in

8     front of this court, your Honor, in the NFL litigation, where

9     we were --

10          THE COURT:  I recognized you when you stood up and

11    I was trying to remember where it was.  Okay.

12          MR. PIZZIRUSSO:  Well, I argued summary judgment in

13    front of your Honor about choice-of-law issues, successfully.

14    My firm is also appointed in the Onity Lock litigation as

15    co-lead with Zimmerman, and Scott + Scott, who are also here,

16    in front of Judge Nelson.  So I have had experience with

17    Minnesota nice, even though I'm from Washington, D.C.  And

18    have spent several winters here and happy to do it again, if

19    need be.  Thank you, your Honor

20          THE COURT:  Thank you very much, Mr. Pizzirusso.

21          Yes, sir.

22          MR. McEWEN:  Good morning, your Honor.

23          THE COURT:  Good morning.

24          MR. McEWEN:  Greg McEwen from Inver Grove Heights,

25    Minnesota.  McEwen Law Firm.  I've been in front of your

1     Honor a number of times in various matters.

2              THE COURT:   Well, I wouldn't want to say your home

3     town, or anything, but I used to be city attorney down there,

4     you know.

5              MR. McEWEN:   I know that, your Honor.   I am one of

6     the 23 law firms that have affirmed Mr. Esades in the

7     consumer class.   I want to tell your Honor that the *Horton*

8     case, the first consumer case filed in Minnesota, is my case,

9     your Honor.   I know Mr. Esades and his good work.   Albeit I'm

10    a little out of order, I just want to affirm that I'm one of

11    those 23 cases endorsing him for lead of the consumers.

12              Thank you, your Honor.

13              THE COURT:   Thank you very much.   And you're young

14    enough that you weren't even practicing law when I was down

15    there.

16              MR. COFFMAN:   Good morning, your Honor.

17              THE COURT:   Good morning.

18              MR. COFFMAN:   Richard Coffman from Beaumont, Texas.

19    I've also filed papers to be appointed lead counsel in the

20    bank cases, but with a twist.   Your Honor, I have filed a

21    motion with the court to create a fourth track in this

22    litigation on behalf of large individual banks who wish to

23    pursue their claims outside the class that have large

24    damages.   Your Honor, I'll also add that I have filed on

25    behalf of my clients the only data-breach case in this

1      litigation, and I believe ever, a case asserting RICO claims.

2      And if the Court may recall from my papers, we put together

3      quite a leadership team for this particular case, including

4      Professor G. Robert Blakey, who is the noted author of the

5      RICO statute.  We believe that these RICO claims are cutting

6      edge in this area, in data-breach litigation.  So we're

7      asking the Court to create this fourth litigation track and

8      to appoint myself and my co-counsel, Mitch Toups who,

9      unfortunately, couldn't be here today because he's in

10     court-ordered depositions down in Texas as co-lead counsel

11     for this fourth track.  I'll add, just by way of experience,

12     your Honor, I'm currently co-lead for the financial

13     institution track in the Heartland data-breach litigation,

14     which is pending down in federal court, in Houston, before

15     Judge Rosenthal.  That is the largest payment card --

16             THE COURT:  Help me, counsel -- somebody else is on

17     the Heartland too.  What is the Heartland?  When I'm in New

18     York or Washington, I say, "I come from the heartland."  I

19     don't know....

20             MR. COFFMAN:  The Heartland data-breach litigation

21     is the result of the largest payment card data breach in the

22     history of the universe.  In this particular case, it's

23     alleged there are 40 million payment cards that were breached

24     -- in this Target litigation.  In Heartland, I think the

25     count now is over a hundred and thirty million.  Heartland

1      Payment Systems is a payment processing company for

2      electronic transactions in the Visa and MasterCard network.

3                  THE COURT:   Okay.

4                  MR. COFFMAN:   It's just one of the contracting

5      parties along the line of the electronic transactions that

6      actually processes the particular transaction and then sends

7      it on up the line to the issuing banks for approval.   Again,

8      in that particular litigation, it's very similar to this

9      case.   We had three tracks.   We had the securities cases, we

10     had the consumer cases.   And you heard from Mr. Barnow a

11     couple of minutes ago.   He's one of the co-leads for the

12     consumer track in that case and, then, I'm one of the

13     co-leads for the financial institution track in that case.

14     And I'm proud to say that case continues to chug forward.

15     The wheels of justice are grinding, albeit slowly, but they

16     are.   We are making progress in that case.   I'll also say I'm

17     co-lead currently in two other consumer medical data-breach

18     cases at this particular point in time.   So in terms of the

19     credentials, I think that I've got the experience and the

20     credentials, not only in the data-breach area but in leading

21     MDL class actions.   So we would just request a creation of

22     this fourth track for larger individual financial

23     institutions.   And, by the way, banks aren't the only issuers

24     here, credit unions are too.

25                  THE COURT:   I recognize that.   As you were talking,

1    you used the term "financial institutions," and I've been

2    using the term "bank."  I think your term is probably better

3    than mine because it's more inclusive.  And it is a more

4    inclusive subject, there's no question about that.

5        Secondly, I'm kind of coming to learn very quickly

6    that this data-breach business is quite a cottage industry.

7        MR. COFFMAN:  It's a cottage industry.  I'm not

8    sure I would go so far as to say it's necessarily profitable

9    to date, but we're working at it.

10        THE COURT:  I've been doing a whole bunch of stuff,

11    getting myself in trouble with a whole bunch of advisory

12    opinions as we've gone through the day.  I'll probably

13    continue to do it and continue to get myself in more trouble

14    for it.  My reaction -- and I just want to hear from you.  My

15    reaction, when I saw your papers with respect to this, is,

16    "Okay, there are going to be class motions, and all that kind

17    of stuff, and at some point opt out."

18        MR. COFFMAN:  Certainly.  And that's certainly

19    going to be available at a later point in time.  But as I

20    pointed out in my papers, not only is it unprecedented to do

21    this, because this kind of arrangement occurs in MDL classes

22    actions all across the country, but we believe it's more

23    efficient at this point in time, right up front, to create

24    this fourth track.  Certainly we can opt out at a later point

25    in time.  But why litigate the case a second time down the

1   road as opposed to being right in there and litigating from

2   the get-go.  And I also believe, just by virtue of our

3   attorney team's experience, we might be able to bring a

4   little bit to the table and help some other folks out.

5           THE COURT:  Very good.

6           MR. COFFMAN:  Thank you, Judge.

7           THE COURT:  Okay.  Thank you very much.

8           Anybody else with respect to financial

9   institutions?

10          MR. YANCHUNIS:  Your Honor, can I --

11          THE COURT:  Sure.  Welcome back.

12          MR. YANCHUNIS:  There are a number of lawyers who

13  support Mr. Clifford and I and Michelle Drake and they wanted

14  to come and take the podium.  I assume that you do not want

15  to hear from them.  I asked that they not come up, and I said

16  I would come up and tell you that.

17          THE COURT:  That's understood.  There are plenty of

18  meters running.  Plenty of lawyers behind each of these

19  people have spoken.  And I understand that.

20          MR. YANCHUNIS:  Thank you, Judge.

21          THE COURT:  Yes, sir.

22          MR. ALSALEH:  Good morning, Judge.  My name is

23  Haidar Alsaleh, I represent the consumer side, from Detroit,

24  Michigan.  Your Honor, before we move to the next point, I

25  notice that you're only talking about executive committees

1     and steering committees.  I think it would help the Court to

2     have another third committee.  You mentioned earlier geek

3     squad.  We're probably going to need something similar to a

4     technical committee.  And that's the pattern they use in

5     pharmaceuticals, where they have a science committee to

6     identify the issues, which is common to all the groups we

7     have -- the consumer, the financial, the shareholders.  If we

8     could get one person from each group, and then we'll have a

9     three-people committee called the "technology committee" that

10    could identify the key issues relevant to this lawsuit and

11    run forward with it.

12            THE COURT:  Very good.  I thank you for the

13    suggestion.  I'm just simply saying I don't think at this

14    point in time I want to make that decision.  I think I need

15    to let some lawyers do lawyer work first and then we can come

16    to --

17            MR. ALSALEH:  I hear you.

18            THE COURT:  -- how we organize all of that.

19            MR. ALSALEH:  I'm with you, Judge.  But the reason

20    I'm making that --

21            THE COURT:  It certainly makes sense to talk about

22    it, because there's going to come a day where we're going to

23    have a lot of experts involved in discussions here and that

24    will have to be organized in a very direct way, number one.

25    I will tell you this -- I want to tell everybody this and

1          that is a long ways down the line, when we start hearing
2          expert depositions being taken, I want the expert on each
3          side in the same room at the same time when those depositions
4          are taken.   It's an amazing effect it has on those people.
5                    MR. ALSALEH:   Your Honor, you're probably going to
6          hear from me.   I have a PhD in computer engineering.
7                    THE COURT:   Good for you.   Congratulations.
8                    MR. ALSALEH:   Thank you.   I appreciate it, Judge.
9                    THE COURT:   And I want to know where the
10         Control-Alt-Delete button is.
11                   Yes, sir.
12                   MR. LOESER:   Your Honor, Tom Loeser, Hagens,
13         Berman.   As was discussed earlier, I was a former cyber
14         prosecutor with the United States Department of Justice.   I
15         wanted to just make sure the Court was aware that we have --
16         and I think many of the plaintiffs' side have talked together
17         in the past -- all considered the fact that this is a
18         technology intensive subject matter.   And there are going to
19         be experience of certain attorneys and certain groups of
20         attorneys that are going to be highly relevant to expediting
21         the discovery process, and understanding both what Target has
22         done, and did, and what its resources were.   But also those
23         of the Government, which has been heavily involved in this
24         case from the outset, including, actually, having first
25         informed Target that they had an issue.   At this stage I

1        would agree with the Court that there doesn't need to be a

2        separation of a technology group, but I do think that the

3        group selected for the various lead and liaisonships in this

4        process, it would be very wise to make sure that there is a

5        substantial nexus of experience, both in running data-breach

6        cases but, also, in the underlying technology, because the

7        lawyer team that can sit in on a deposition that can talk to

8        an expert and it can understand the fundamentals of what is

9        going on, what the RAM scraper is, how the exfiltration

10       software work, those kinds of technology issues are going to

11       be relevant even at the very initial stages of this

12       litigation, even as early as drafting possible Amended

13       Complaints, talking with Target about discovery, talking with

14       the Government, as it may be appropriate.   All those steps

15       are going to be critical.   And it is going to be important to

16       have experience in data-breach cases but, more specifically,

17       experience in investigations of data-breach cases and the

18       technology involved.   I just wanted to mention that to the

19       Court.

20                 THE COURT:   Excuse me, who are you with now?

21                 MR. LOESER:   Hagens, Berman, your Honor.

22                 THE COURT:   Okay.

23                 MR. LOESER:   Thank you.

24                 THE COURT:   I didn't want to misunderstand that.

25                 MR. LOESER:   Yes.   And we've put in --

1          THE COURT:   You're not with the Government now.

2          MR. LOESER:   -- we've put in a proposal for a

3    co-lead.   Thank you, your Honor.

4          THE COURT:   Got it.   Okay.   Somebody stood up to

5    talk about the derivative cases.

6          MR. ARROYO:   Thank you, your Honor.   Felipe Arroyo

7    of the Robbins, Arroyo firm.   I am here in connection with

8    the shareholder cases.   And given the number of folks in the

9    room, I'm going to spare everybody a full recitation of the

10   qualifications and credentials I put in my papers.   There's

11   no one else really opposing or competing, I suppose.   I guess

12   I'll just assure the Court that if there are new entrants to

13   the case that our firm prides itself in working cooperatively

14   with our friends, both in our space and the derivative space,

15   as well as with the defense counsel.   And I'm happy to report

16   that I believe our firm has a very good relationship with the

17   defense counsel, indeed with many of the folks here in the

18   room, and I look forward to working with them.

19         THE COURT:   Okay.

20         MR. ARROYO:   Thank you.

21         THE COURT:   I'll make this really easy.   You are

22   appointed.

23         Ms. Wildung, would you like to address the Court

24   with respect to the defense perspective?

25         MS. WILDUNG:   I would, your Honor.   Just on an

1    overall organizational issue, it's triggered by the fact

2    that, as I said before, the derivative cases, we believe, not

3    only will have a different trajectory than the other cases

4    but involve a different alignment of interests.   When you

5    think about it, the shareholder plaintiffs, if the case

6    proceeds, are representing Target's interests.   And, of

7    course, Target's interests and the shareholders' interests

8    are to successfully defend the financial institution cases

9    and the consumer cases.   So we have a concern that it would

10   be inappropriate, and possibly unfair, to have the

11   shareholder derivative structure within the overall umbrella

12   of the MDL.   And the devil of this may be in the details.

13   And certainly I would anticipate that, if all the cases went

14   ahead, there would need to be coordination, because it's in

15   no one's interest, whoever you represent, to have duplicative

16   efforts.   But we see the interests of Target in the MDL cases

17   and the interests of the shareholder plaintiffs in the

18   derivative cases to be aligned, not inconsistent with one

19   other.

20             THE COURT:   Okay.   Thank you.

21             MAGISTRATE JUDGE KEYES:   Can I ask you a question,

22   Mr. Wildung.   What's the status of the Hennepin County

23   shareholder derivative action?   Have there been any new

24   developments in that?

25             MS. WILDUNG:   There has, your Honor.   Earlier this

1     week the parties filed a stipulation seeking an Order staying

2     that action.   That's been submitted to Judge Miller.   To my

3     knowledge, she hasn't ruled on the stipulation; but if she

4     does, then that case would be stayed.

5          THE COURT:   I think, Ms. Wildung, in response to

6     the comments that you've just made that they are well taken.

7     There is a difference, but there's also an overlap.   Like you

8     say, the devil may be in the details.   And oftentimes they

9     are.   My own feeling is, for whatever it's worth, right,

10    wrong or indifferent, that, yes, they should coterminously

11    move forward, something along the lines of what's been

12    outlined on that piece of paper.   But there will have to be

13    certain severability, separation, whatever the word might be,

14    because of what can in fact end up being conflicting

15    interests.   I think we have to be aware of it, we have to

16    figure out a way to work with it.   And that's not unusual in

17    complex litigation.   We've all seen those tensions.   I think

18    we deal with them when we see them.

19         MS. WILDUNG:   Thank you, your Honor.

20         THE COURT:   Okay.   Anybody else want to make any

21    further address with respect to the subject of lead counsel,

22    et cetera?   I'd like to take five minutes and take a little

23    break, and let Judge Keyes and I confer for a minute, and let

24    you have a little time to stretch your legs, and then we'll

25    come.   I think we'll get you to lunch before too long.

1    (Court stood in recess at approximately 12:15 p.m.,

2    and reconvened at approximately 12:30 p.m.).

3    THE COURT:   Welcome back, everybody.   Counsel, I've

4    had an opportunity to review the submissions that you've made

5    with respect to the leadership of this matter.   I came into

6    the hearing today with a general idea of what I thought we

7    should do.   And I appreciate the submissions that have been

8    made.   I recognize that what I'm going to say momentarily I'm

9    going to be criticized for, maybe legitimately, because it's

10   going to be very heavily oriented to Minnesota people.   I'm

11   saying this because I feel rather strongly that this is, in

12   fact, some Minnesota litigation and, as a result of that,

13   will treat it accordingly.   By the same token, to those from

14   Minnesota that I'm about to make a lot of appointments, I

15   want you to know that I highly respect some outstanding

16   litigators from all over the United States, and that I fully

17   expect that they will be well represented as committee

18   members on various executive committees and performing other

19   committee structures as things are created.

20   Having said all of this, I'm going to make the

21   following appointments:

22   As the overall lead counsel, Karl Cambronne.

23   As the overall liaison counsel, Garrett

24   Blanchfield.

25   As the consumer lead counsel, Vincent Esades.

1              As the consumer liaison counsel, Michelle Drake.

2              As the bank lead counsel, Bucky Zimmerman.

3              As the bank liaison counsel, Karen Riebel.

4              As the shareholder lead counsel -- I've already

5    done that job.  The Arroyo firm can do that.  I think that

6    Chris Walsh of the Walsh Law Firm was interested in being

7    liaison counsel and, so, I'll make that appointment, as well.

8              I'm going to ask that all of these lead counsel and

9    liaison counsel move forthwith to have a five-member

10   executive committee, that the consumer and bank cases appoint

11   three-member steering committees on each of them.  As I say,

12   I expect that to be done as expeditiously as possible.  That

13   the Court will make its appointments to those positions after

14   consideration by the suggestions made by counsel.

15             Having said that, and while people are still in the

16   building, as I indicated earlier, the Court will ask for a

17   status conference on Wednesday, June 25.  I would hope and

18   anticipate at that time that we will either be down to a Rule

19   26 post-Scheduling Order or at least have the outline in

20   place for that.  There's some mechanics that get involved in

21   that, I recognize, but I really think that we need to pursue

22   having the outline in place for that.  That will, in turn,

23   lead to the other things that come into play later on, the

24   electronic discovery plan, the Protective Orders, all those

25   things that get involved.  This case will, by it very nature,

1          have a great deal of electronic discovery involved.  I expect

2          the parties to go to work on that electronic discovery plan.

3                  I divert at this moment -- when you get old, you

4          can go to Judges' meetings if you feel like it, or you don't

5          go if you don't feel like it.  Well, the Judges met last

6          week, and I didn't feel like going, so I didn't.  Well, they

7          did all kinds of damage and I don't know what it is.  Number

8          one, they amended the local rules and I haven't read a word

9          of it.  I haven't got the slightest idea what's in there.

10         But just in case it affects you in some way, well, I'll let

11         you find out.  But number two -- this, I think, is a positive

12         thing -- they adopted an e-Discovery process that is an

13         outline of approach to e-Discovery in this district.  I'm not

14         by any way, shape or form going to tell you that that has to

15         be followed.  It's a guideline, a guideline as you work

16         through that process.  But I want you to be aware of it.  And

17         notwithstanding the fact, like I say, I don't have any idea

18         what's in there but, nevertheless, there's something there

19         and know about it.  In addition to that, there will have to

20         be developed and worked out the documentary repositories,

21         along with the search capable document production formats.

22         The document repository, of course, isn't anything near what

23         it used to be way back when because of the requirements of

24         the search approach to it.  So that will work out.  I think

25         we've covered the state court litigation.

1        Obviously the different types of cases that are
2   involved here need to go simultaneously, and will go
3   simultaneously, but the consolidated discovery needs to be
4   worked out on a very practical method and process of getting
5   that done.   As I indicated before, I think discovery needs to
6   work in an orderly manner.   I don't intend to bifurcate it.
7   But there will certainly be discussion that will need to go
8   on and be worked out with respect to it.
9        Going forward from here, I think you're aware of
10   the Web site.   It will be www.mnd.uscourts.gov/MDL/T.
11        Your communications, first of all, my courtroom
12   deputy, Suzanne Ruiz, at 651-848-1156, is your primary
13   contact.   She'll send stuff from there.   E-mail, send it to
14   Magnuson_chambers@mnd.uscourts.gov.   For Judge Keyes, his
15   courtroom deputy is Jackie Phipps at 651-848-1180.   With the
16   e-mail of Keyes_chambers@mnd.uscourts.gov.
17        Along those lines, I do not encourage you to call
18   to get advice from law clerks.   It just creates real
19   difficulties for them and it can create difficulties across
20   the board.   If I want to backdoor somebody, call me.   I can
21   quickly decide whether it's appropriate or not.   And don't
22   necessarily be afraid of that.
23        I will tell you, and please know, in this kind of
24   litigation, it's absolutely essential that there be ex parte
25   communications by the Court with parties involved in the

1    litigation.  You can't have a complex MDL case without that

2    occurring.  I know the people that we've just appointed on

3    one side.  I know many of the people on the Target side.

4    That's not going to be unethical communication but it's going

5    to be necessary communication. And we can handle it.  But

6    just know it's going to happen.  It will happen with Judge

7    Keyes, it will happen with me.  Be prepared for it.

8           In terms of forthcoming meetings, I want to see

9    lead and liaison counsel at meetings, certainly.  But beyond

10   that, use your judgment.  I love to have you here.  The mayor

11   is very happy that you're here spending your money.  But

12   aside from that, I don't know that it's necessary to be here

13   unless you're specifically requested for particular areas

14   that you're working on, it's going to be dealt with at a

15   particular time or hearing.

16          Comment was made about resolution; Judges love it.

17   I think when you meet between now and the 28th (sic) of June

18   that not only do you start working on your 26(f) stuff, but

19   you start working towards a road map for resolution.  I don't

20   know and you don't know.  If we have to try a case, fine,

21   we'll do it.  If we have to try bellwether cases, fine, we'll

22   do it.  Know that that's the business that trial courts are

23   in, and we'll try cases if we have to.  Neither you nor I

24   have seen very many cases tried in multidistrict litigation.

25   And there's a good reason for that.  There's complex reasons

1     for it.  But there's a good reason for it.  Therefore, the

2     resolution side should not be ignored.  Exactly how we'll get

3     from here to there -- there are bumps in the road, and it may

4     take this kind of a turn, it may take that kind of a turn.

5     Know that Judge Keyes and I are very flexible on that

6     subject, depending on the circumstances that are arising

7     under whatever it is.  But we're not going take our eye off

8     that resolution ball.  And don't expect to be together

9     without that question being asked.  All the local lawyers

10    that have ever been in a Rule 16 conference with me, I always

11    finish it with one question, "When are you going to settle?"

12    That word continues to come into play.  And it will.

13             With that, I think I'll be quiet.

14             Judge Keyes, any additional subjects that you have?

15             MAGISTRATE JUDGE KEYES:    I think one thing is

16    important and that is when we have our next status conference

17    that you be prepared, as a result of your discussions over

18    the next month, to submit to us a case management schedule so

19    that we can go to work on that at that conference.  Also, we

20    do expect that you'll make significant progress between now

21    and then with respect to your Protective Order, that's going

22    to be critical in this case and, then, also, for your

23    e-Discovery plan.  So we'll be expecting that we will see

24    that.  And, obviously, submit ahead of time, time for us to

25    do a good review of that before we have that next status

1    conference of those materials.

2              THE COURT:   Okay.  Mr. Cambronne.

3              MR. CAMBRONNE:   Thank you, your Honor.  I just do

4    have a question about the -- I'm very honored by the role

5    that you've given me.  I have filed a bank case.  Is it

6    appropriate, as far as you're concerned, that I also play an

7    active role in that bank case?

8              THE COURT:   Yes.

9              MR. CAMBRONNE:   Thank you.

10             THE COURT:   As a matter of fact, I meant to say,

11   Mr. Cambronne, that I recognize that you have worked

12   primarily into the subject of the bank matters.  For distinct

13   reasons, I felt it was appropriate that you be in the overall

14   lead position.  But I fully expect, fully anticipate, and

15   sort of know that I will see you a number of times when it

16   comes time to make presentations and be involved in the

17   submission of the bank litigation.

18             MR. CAMBRONNE:   Thank you for the clarification,

19   your Honor.

20             THE COURT:   Okay.  And that might carry over to

21   some other people, too.  We can work through that.  Okay.

22             Do other people have suggestions or thoughts or

23   ideas before we leave?

24             Yes, sir.

25             MR. GIRARD:   Your Honor, may I ask a question?

 1              THE COURT:   You certainly can.

 2              MR. GIRARD:   Again, I'm Dan Girard from Girard,

 3      Gibbs.   As I understand it, you are leaving to the discretion

 4      of the lead counsel in the specific case the selection of the

 5      executive committee?

 6              THE COURT:   I'm saying I leave to them to give the

 7      names that they suggest to the Court.   The Court will make

 8      the appointment --

 9              MR. GIRARD:   Understood.

10              THE COURT:   -- but not until after they have made

11      their suggestions.

12              MR. GIRARD:   And here's the second question.   The

13      number being three, is that number subjection to variation at

14      all if cause is shown to the Court's satisfaction?

15              THE COURT:   Yes.

16              MR. GIRARD:   Thank you, your Honor.

17              THE COURT:   It comes down to this:   There are real

18      interests here.   I have arbitrarily picked a number, which is

19      much smaller than the number that had been submitted by other

20      various people that had made suggestions in the past.   And I

21      recognize that.   If there's good reason that you got to have

22      another person in there, I'm not going to hold them to it.

23      That's fine.   The whole point, I don't want it to become

24      unwieldy because, you know, I'll be darned if lawyers don't

25      have opinions.   You end up with a debating society if you get

1      a great big group.  If you get a small group, you can move it
2      more efficiently.  So that's what I'm looking for.  But there
3      have been some strong suggestions made today, very
4      appropriately, about technical expertise.  It's got to be
5      represented.  I've been parochial in this appointment, I
6      fully admit that.  There are excellent lawyers from all over
7      the United States in this room.  They need to be represented,
8      those clients need to be represented.  So this is not
9      necessarily an easy target.  And however it can work out to
10     the satisfaction -- well, it will never work to everybody's
11     satisfaction -- but as close as possible, that would be good.
12                  MR. GIRARD:    Thank you very much, your Honor.
13                  THE COURT:   Okay.   I'm going to suggest -- first of
14     all, people are completely free to have lunch and whatnot.
15     But I will tell you that -- I don't know about Judge Keyes,
16     but I will be available through the day.  If you have some
17     caucus meetings in any of these other rooms that are set
18     aside, and something comes up that you need to communicate
19     with us about it, we'll be here and available to do so.  If
20     not, I thank you very much for coming.  And I congratulate
21     you from Chicago on a lucky shot last night.  And Delta
22     Airlines thanks you for coming.
23                  (Court stood in recess at approximately 12:45 p.m.,
24     on May 14th, 2014).
25

1          <u>CERTIFICATE PAGE</u>

2          I, Ronald J. Moen, an Official Court Reporter for the
District of Minnesota, CSR, RMR, and a Notary Public in and
3    for the County of Hennepin, in the State of Minnesota, do
hereby certify:

4          That the said STATUS CONFERENCE was taken before me as
an Official Court Reporter for the District of Minnesota,
5    CSR, RMR, and a Notary Public at the said time and place and
was taken down in shorthand writing by me;

6
          That said STATUS CONFERENCE was thereafter under my
7    direction transcribed into computer-assisted transcription,
and that the foregoing transcript constitutes a full, true
8    and correct report of the STATUS CONFERENCE which then and
there took place;

9          That I am a disinterested third person to the said

10   action;

11         That the cost of the original has been charged to the
Plaintiffs and Defendants equally.

12
          That I reported pages 1 through 54.

13
          IN WITNESS THEREOF, I have hereto subscribed my hand
14   this 19th day of May, 2014.

15

16                          <u>s/Ronald J. Moen</u>
                            Ronald J. Moen,
17                          Official Court Reporter,
                            CSR, RMR, NP

18

19

20

21

22

23

24

25