# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Target Corporation Customer Data Security Breach Litigation<br><br>This Document Relates to:<br><br> All Consumer Cases | MDL No. 14-2522 (PAM/JJK) |

## CONSUMER PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CERTIFICATION OF A SETTLEMENT CLASS AND PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

106922

# TABLE OF CONTENTS

**PAGE**

I.   BACKGROUND ....................................................................................................1

  A. The Settlement Agreement. ........................................................................1

  B. Mediated Settlement Negotiations. ...........................................................6

  C. The Litigation. ............................................................................................8

II.  THE SETTLEMENT CLASS SATISFIES THE REQUIREMENTS FOR
CLASS CERTIFICATION ..................................................................................13

  A. The Class Satisfies the Requirements of Rule 23(a). ...............................13

    1. Numerosity ....................................................................................13

    2. Commonality ..................................................................................15

    3. Typicality ......................................................................................16

    4. Adequacy of Representation. .........................................................17

  B. The Class Satisfies Rule 23(b)(3). ...........................................................19

    1. Common questions of law and fact predominate over
individual questions. ......................................................................19

    2. Superiority .....................................................................................22

III. THE PROPOSED SETTLEMENT MEETS THE STANDARDS FOR
PRELIMINARY APPROVAL .............................................................................24

  A. Standards and Procedure: Class Action Settlements Are
Favored. ...................................................................................................24

  B. The Proposed Settlement Was a Result of Arm's-Length
Negotiations Among Experienced Counsel. ..............................................26

  C. The Proposed Settlement Satisfies the Standard for Preliminary
Approval. .................................................................................................29

    1. The Settlement is Fair and Reasonable When Weighed
Against the Strengths and Weaknesses of the Claims. ..................29

2. The Defendant's Financial Condition...........................................34

3. The Complexity and Expense of Further Litigation. ....................34

D. The Proposed Form and Manner of Notice are Appropriate. ....................35

E. The Court Should Appoint Rust Consulting, Inc. as the Settlement Administrator...........................................................................40

F. The Request for Service Awards for the Proposed Class Representatives is Fair and Reasonable......................................................41

G. The Request for a Stay of Proceedings and Temporary Injunction Pending the Final Approval Hearing is Appropriate...............43

IV. CONCLUSION..............................................................................................44

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Pages**

*Alexander v. Nat'l Football League*, No. 4-76-Civil-123, 1977 WL 1497 (D. Minn.
    Aug. 1, 1997) ................................................................................................. 30

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................... 13, 19, 20, 22

*Barker v. Skype, Inc.*, No. 2:09-cv-01364-RSM (W.D. Wash. Nov. 17, 2009) ........................... 39

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) ................................................ 20

*Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50 (8th Cir. 1977) ........................................ 14

*Bradburn Parent/Teacher Store, Inc. v. 3M*, No. Civ.A.02-7626, 2004 WL 1842987
    (E.D. Pa. Aug. 18, 2004) ................................................................................. 23

*Brancheau v. Residential Mortg. Grp., Inc.*, 177 F.R.D. 655 (D. Minn. 1997) ........................... 17

*Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2006 WL 3826714 (N.D. Cal. Dec.
    27, 2006) ..................................................................................................... 38

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) .................................... 23

*Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43, 75 Cal. Rptr. 3d 413 (Cal. App. 2008) ................ 39

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) .......................................... 15, 28, 35

*Deposit Guarantee Nat'l Bank v. Roper*, 445 U.S. 326 (1980) ........................................ 24

*Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir. 1977) ........................................... 17

*Dryer v. Nat'l Football League*, Civ. No. 09-2182 (PAM/AJB), 2013 WL 5888231
    (D. Minn. 2013) ........................................................................... 29, 33, 34, 35, 44

*Figas v. Wells Fargo & Co.*, No. 08-4546 (PAM/FLN), 2010 WL 2943155 (D. Minn.
    Apr. 6, 2010) ............................................................................................... 15

*Gen. Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ..................................................... 13

*Grier v. Chase Manhattan Auto Fin. Co.*, No. Civ. A.99-180, 2000 WL 175126 (E.D.
    Pa. Feb. 16, 2000) .......................................................................................... 26

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975) .................................. 25, 26, 29, 30, 34, 35

*In re Certainteed Fiber Cement Siding Litig.*, MDL No. 2270, 2014 WL 1096030
    (E.D. Pa. Mar. 20, 2014) ................................................................................... 42

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277 (3d Cir. 2005) ....................................................................... 20

*In re Electronic Books Antitrust Litig.,* No. 11-md-02293-(DCL) (S.D.N.Y. Aug. 5, 2013) .............................................................................................................................. 39

*In re Employee Benefit Plans Sec. Litig.*, Civ. No. 3-92-708, 1993 WL 330595 (D. Minn. June 2, 1993) ............................................................................................ 26, 27, 30

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ..................................................................................................................... 26

*In re HP Laser Printer Litig.*, No. SACV 07-0667 AG(RNBx), 2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ............................................................................................... 39

*In re Korean Air Lines Co., Ltd. Antitrust Litig.*, MDL No. 1891, CV 07-05107 (C.D. Cal. Feb. 18, 2011) .......................................................................................................... 40

*In re Lutheran Brotherhood Variable Ins. Prods. Co. Sales Practices Litig.*, No. 99-MDL-1309 PAM/JCL, 2004 WL 2931352 (D. Minn. Dec. 16, 2004) ...................... 14, 15, 19

*In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229 (D. Minn. 2001) .................. 13, 14

*In re Online DVD Rental Antitrust Litig.*, No. 4:09-md-02029 (N.D. Cal. Aug. 29, 2011) .............................................................................................................................. 40

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995) .................................................. 20

*In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007) .................................................................................. 20

*In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 WL 1956267 (S.D.N.Y. May 1, 2008) ......................................................... 39

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liability Litig.*, 716 F.3d 1057 (8th Cir. 2013) ................................................................................................................. 33, 35

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922 (8th Cir. 2005) ...................... 29

*In re Xcel Energy, Inc. Sec., Derivatives & "ERISA" Litig.*, 364 F. Supp. 2d 980 (D. Minn. 2005) .................................................................................................................... 42

*In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08-MDL-1958 ADM/AJB, 2013 WL 716088 (D. Minn. Feb. 27, 2013) ........................................................................ passim

*In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08-MDL-1958 ADM/AJB, 2013 WL 716460 (D. Minn. Feb. 27, 2013) ................................................................................ 43

*In re Zurn Pex Plumbing Prods. Liab. Litig.,* No. 08-MDL-1958 ADM/AJB,
  2012 WL 5055810 (D. Minn. Oct. 18, 2012) ............................................................30, 44

*Jancik v. Calvary Portfolio Servs.*, Civ. No. 06-3104 (MJD/AJB), 2007 WL 1994026
  (D. Minn. July 3, 2007) ..................................................................... 16, 22, 24

*Kristian v. Comcast Corp.*, 446 F.3d 25 (1st Cir. 2006) ................................. 23

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371 (8th
  Cir. 1990) ............................................................................................ 26

*Martin v. Cargill, Inc.*, 295 F.R.D. 380 (D. Minn. 2013) ............................... 29

*Minnesota v. United States Steel Corp.*, 44 F.R.D. 559 (D. Minn. 1968) ............ 16, 21

*Mirakay v. Dakota Growers Pasta Co.*, Civil Action No. 13-cv-4429 (JAP), 2014 WL
  5358987 (D.N.J. Oct. 20, 2014) .......................................................... 40

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ................ 35

*Paxton v. Union Nat'l Bank*, 688 F.2d 552 (8th Cir. 1982) ......................... 14, 16, 17

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ............... 25, 28, 29, 34, 35

*Phelps v. MC Commc'ns, Inc.*, No. 2:11-CV-00423-PMP-LRL, 2011 WL 3298414
  (D. Nev. Aug. 1, 2011) ........................................................................ 39

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ............................... 23

*Pokorny v. Quixtar Inc.*, No. 3:07-cv-00201 (N.D. Cal. Feb. 21, 2012) ............ 40

*Robin Drug Co. v. PharmaCare Mgmt. Servs., Inc.*, No. Civ. 033397 (PAM/RLE),
  2004 WL 1088330 (D. Minn. May 13, 2004) ......................................... 21

*Schmidt v. Fuller Brush Co.*, 527 F.2d 532 (8th Cir. 1975) .......................... 35

*Sullivan v. DB Inv., Inc.*, 667 F.3d 273 (3d Cir. 2011) ............................... 25

*Todd v. Retail Concepts, Inc.*, No. 3:07-0788, 2008 WL 3981593 (M.D. Tenn. Aug.
  22, 2008) ............................................................................................. 39

*Van Horn v. Trickey*, 840 F.2d 604 (8th Cir. 1988) ................................ 25, 29

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ........................... 13, 16

*Welsch v. Gardenbring*, 667 F. Supp. 1284 (D. Minn. 1987) ........................ 26

*White v. Nat'l Football League*, 822 F. Supp. 1389 (D. Minn. 1993) ............... 25, 41

*White v. Nat'l Football League*, 836 F. Supp. 1458 (D. Minn. 1993) ........................................... 26

*Yarrington v. Solvay Pharm., Inc.*, 697 F. Supp. 2d 1057 (D. Minn. 2010) ................................. 41

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................... passim

Fed. R. Civ. P. 23(a) ................................................................................................1, 13, 19, 22

Fed. R. Civ. P. 23(a)(1) ....................................................................................................... 13

Fed. R. Civ. P. 23(a)(2) ....................................................................................................... 15

Fed. R. Civ. P. 23(a)(3) .................................................................................................... 16, 17

Fed. R. Civ. P. 23(a)(4) ....................................................................................................... 17

Fed. R. Civ. P. 23(b)(3) ............................................................................................. 1, 13, 19, 22, 24

Fed. R. Civ. P. 23(b)(3)(A-D) ...............................................................................................22

Fed. R. Civ. P. 23(c)(2) .......................................................................................................38

Fed. R. Civ. P. 23(c)(3) ....................................................................................................... 39

Fed. R. Civ. P. 23(e) ....................................................................................................24, 25, 35

Fed. R. Civ. P. 23(g) .......................................................................................................... 18

Fed. R. Civ. P. 26(a)(1)(A) ..................................................................................................11

**Other Authorities**

Manual for Complex Litig. § 21.312 (4th Ed. 2011) ................................................................. 35

Manual for Complex Litig. § 21.631 (4th Ed. 2011) .................................................................35

Newburg on Class Actions  § 11.41 (4th Ed. 2002) .................................................................. 26

Consumer Plaintiffs' Lead Counsel, on behalf of the proposed Settlement Class Representatives and Settlement Class (defined below), asks the Court to certify a Settlement Class and preliminarily approve a Settlement reached after arm's length negotiations under the supervision of the Honorable Arthur J. Boylan, former Chief Magistrate Judge for the United States District Court for the District of Minnesota. The proposed Settlement Class satisfies all of the requirements for certification under Rule 23(a) and (b)(3).  The Settlement provides for significant monetary and equitable relief for the benefit of the Settlement Class, was reached after intensive mediated negotiations by experienced counsel fully informed of the merits of Consumer Plaintiffs' claims and Target's potential liability, and meets and exceeds the standards for preliminary approval.

## I.    BACKGROUND

### A.    The Settlement Agreement.

On March 9, 2015, Consumer Plaintiffs, by Consumer Plaintiffs' Lead Counsel on behalf of the Settlement Class, entered into a Settlement Agreement and Release ("Settlement") with Defendant Target Corporation ("Target" or "Defendant"). The Settlement is attached as Exhibit 1 to the Declaration of Consumer Plaintiffs' Lead Counsel Vincent J. Esades filed herewith ("Esades Decl."). Consumer Plaintiffs and Target have agreed to resolve all claims asserted in the Consumer Cases that were consolidated for pretrial purposes in this litigation. Target has agreed to provide a Settlement Fund of $10 million to be distributed to Settlement Class Members pursuant to the Distribution Plan (Settlement, Exhibit 1) submitted for consideration and approval

by the Court and the payment of any service awards to Settlement Class Representatives that may be approved by the Court. Settlement ¶¶ 1.20 and 5.

> As defined in the Settlement, the Settlement Class consists of:

> All persons in the United States whose credit or debit card information and/or whose personal information was compromised as a result of the data breach that was first disclosed by Target on December 19, 2013.

> Excluded from the class are the Court, the officers and directors of Target, and persons who timely and validly request exclusion from the Settlement Class.

Settlement ¶ 3.1.

Under the Settlement, Target will pay the $10 million Settlement Fund into an interest bearing escrow account within ten business days of the effective date of the Settlement. Settlement ¶ 5.1.1. Importantly, no part of the Settlement Fund will revert to Target. *Id.* ¶ 5.1.3. The Settlement Fund will be used to pay Class Member claims and any service awards approved by the Court in recognition of the services provided to the Settlement Class by Settlement Class Representatives. Any residual amount in the escrowed Settlement Fund remaining after payment of any approved service awards to Class Representatives, claims by Settlement Class Members, and any feasible supplemental distributions to Class Members shall be distributed as directed by the Court. *Id.* ¶¶ 5.1.2, 5.1.3 and 7.1.

The Settlement provides for a consumer-friendly process for Settlement Class Members to submit claims to the Settlement Administrator. Claims will be submitted and processed primarily online through a dedicated website to be established by the Settlement Administrator (with an option for submission of claims by U.S. mail). The

claim submission process is easy and efficient. After a request for proposals process in which several claims administrators submitted proposals, Target selected and the parties recommend to the Court for approval the highly experienced claims administrator Rust Consulting, Inc. to serve as the Settlement Administrator. Settlement ¶ 1.16.

The Distribution Plan provides guidelines for distributing the Settlement Fund that are straightforward, efficient, fair and beneficial to all Class Members. Settlement Class Members who submit a Documentary Support Claim and reasonable documentation showing their losses more likely than not arose from the Target data breach (for example, a credit card statement, invoice or receipt) are eligible for reimbursement up to a maximum of $10,000.  Settlement, Ex. 1, Distribution Plan ¶ 1.1. Class members submitting valid documentation for their losses may also include two hours of lost time (at $10 per hour) for each type of documented loss they incurred (for example, unauthorized charges or replacement of a driver's license, etc.). *Id*. ¶ 1.1.2.   Class Members who submit a valid Self-Certification Claim need not provide documents evidencing losses caused by the data breach and are eligible to receive equal shares of the Settlement Fund after payment from the Settlement Fund of any service payments and approved Documentary Support Claims. *Id.* ¶ 4.1. The benefit paid to such Class Members will be calculated by dividing the amount remaining in the Settlement Fund by the total number of valid Self-Certification Claims.  The Claim Form for Documentary Support and Self-Certification claims is attached as Exhibit 1 to the Distribution Plan (Settlement, Ex. 1).

The Distribution Plan further provides for a process of claim validation by the Settlement Administrator. *Id.* ¶ 2.  The Distribution Plan sets forth a process for resolving any disputes relating to Documentary Support Claims, which includes notice within 10 days by email or mail to a Class Member if the Settlement Administrator determines that the claimed losses are less than what the Class Member requested, an opportunity for the Class Member to respond within 10 days by accepting or rejecting the Settlement Administrator's determination, reconsideration by the Settlement Administrator within 10 days of any rejection by the Class Member, and an additional 10 days for the Class Member to accept or reject the final determination of the Settlement Administrator.  If the Class Member approves the determination, the claim will be approved.  If the Class Member disagrees, the Settlement Administrator will provide Consumer Plaintiffs' Counsel and Target's Counsel with the claim file materials.  The claim will be approved upon agreement of the parties' counsel or, if no agreement is reached, the claim will be referred to a third party Claim Referee agreed to by the parties.  The Claim Referee will then make a decision based on the claim file whether the claimed amount or a portion of it is reasonably supported. *Id.* ¶ 3.

Additionally, the Settlement provides for significant non-monetary relief designed to better safeguard customer data in the possession of Target. Specifically, for five years following the effective date of the Settlement, Target will adopt and implement the following data security measures:

> a.  **Chief information security officer**. Target will designate a high level executive to coordinate and take responsibility for its information

4

security program entrusted with the protection of consumers' personally

identifiable information;

b. **Maintain a written information security program**. Target will

identify internal and external risks to the security of consumers'

personally identifiable information that could result in unauthorized

access to Target's system and periodically review the sufficiency of

safeguards to control such risks. Target will develop security metrics

measuring its security program and will ensure that those metrics are

periodically reviewed and approved by senior Target leadership;

c. **Maintain a process to monitor for information security events and

respond to such events determined to present a threat**. Target will

design and implement reasonable safeguards to control information

security risks, including through reasonable and appropriate software

security testing; and

d. **Provide security training to Target employees**. Target will implement

a program to educate and train relevant employees of the importance of

the security of consumers' personally identifying information.

Settlement ¶ 5.2.

The Settlement further provides that Target will pay all costs associated with

providing notice to the Settlement Class and all costs of administering the Distribution

Plan, including the Settlement Administrator's fees. *Id.* ¶¶ 4.3 and 5.1.4. Target's

obligation to pay the costs of class notice and administration is an additional significant

benefit to the Settlement Class, as it is independent of (and in addition to) the $10 million Settlement Fund. As a result, class notice and administrative costs will not reduce the amount of the Settlement Fund and therefore will not decrease the amount of benefits distributed to Class Members.

The Settlement also requires Target to pay any attorneys' fees and expenses awarded by the Court to Settlement Class Counsel. *Id.* ¶ 7.2. As with administrative costs and the costs of class notice, Target's agreement to pay an award of attorneys' fees and expenses approved by the Court is in addition to the Settlement Fund, so any fee award will not decrease Class Members' benefits. The Settlement's finality is not dependent on the Court awarding attorneys' fees and expenses to Settlement Class Counsel. Target reserves its rights to object to Settlement Class Counsel's request for attorneys' fees but waives its right to appeal any award of attorneys' fees that does not exceed $6.75 million. *Id.*

In summary, the Settlement provides for significant monetary and non-monetary benefits to Settlement Class Members. The substantial benefits for the Class compare strongly and favorably to those provided in settlements involving other data breach lawsuits. Esades Decl. ¶ 46 and Ex. 2. The Settlement falls well within the range of possible approval and warrants providing notice to the Settlement Class.

### B. Mediated Settlement Negotiations.

At the initial case management conference on May 14, 2014, the Court encouraged the parties, while pursuing the litigation, to also seek to develop "a road map to resolution." While aggressively prosecuting the case, Consumer Plaintiffs' Lead Counsel

6

also pursued good faith, arm's length and strongly contested negotiations with Target's Counsel to attempt to create and navigate such a road map. In August 2014, the parties retained the Honorable Arthur J. Boylan, a highly experienced mediator and retired federal magistrate judge, to assist the parties' negotiations. Judge Boylan first met individually with Consumer Plaintiffs' Counsel on August 4, 2014, and with Target's Counsel on August 5, 2014. Declaration of the Honorable Arthur J. Boylan (Ret.) ¶ 4.

Judge Boylan then conducted a series of mediation sessions with counsel for the parties (on August 11, October 27, December 11, 18, 19, 22, 23 and 29, 2014 and January 8, 2015). *Id.* ¶ 6. The parties provided the mediator with extensive written materials setting out their respective positions on the facts, claims, defenses and assessments of risks in the litigation, which Judge Boylan carefully considered along with the pleadings and the parties' briefing papers in connection with Target's motion to dismiss. *Id.* ¶ 5. Judge Boylan conducted numerous separate teleconferences with the parties' counsel between the in-person mediation sessions. *Id.* ¶ 6. Judge Boylan expressed his view, based on the mediation briefing and supporting documentation provided by the parties and the numerous mediation sessions, that continued litigation posed significant risks for both sides. *Id.* ¶ 7. The mediation was highly contested, with counsel for each side advancing their respective arguments zealously on behalf of the best interests of their clients while demonstrating their willingness to continue to litigate rather than accept a settlement not in the best interests of their clients. *Id.*¶ 8. The negotiations were hard-fought throughout and the settlement process was conducted at arm's length "and, while conducted in a highly professional manner, was quite adversarial." *Id.* The provisions of

7

the Settlement relating to Target's commitment to pay any attorneys' fees and costs approved by the Court were negotiated only after substantive terms of the Settlement were discussed and agreed upon in writing by the parties. *Id.* ¶ 9.

While deferring to the Court for the ultimate determination of the fairness, reasonableness and adequacy of the Settlement, Judge Boylan offers his view that the proposed Settlement "is a reasonable result, obtained at arm's length after a professionally conducted, adversarial negotiating process." *Id.* ¶ 10. Based on his extensive experience as a mediator and former magistrate judge and the facts and circumstances of the case, as well as settlements reached in similar data breach cases, Judge Boylan opines that the Settlement "provides for substantial benefits and relief to the Class and is a fair, adequate and reasonable settlement reached through arm's length negotiations by skilled, well informed counsel." *Id*. He adds, "It is my opinion that the Settlement is not only within the range of reasonableness and subject to preliminary approval but is fair, adequate, and reasonable and in the best interests of the Consumer Plaintiffs and the proposed Class." *Id.*

## C.      The Litigation.

Because the Court is intimately familiar with this litigation, only highlights are mentioned here. Before filing the Consumer Plaintiffs' Consolidated Class Action Complaint on August 25, 2014 (ECF No. 182), Consumer Plaintiffs' Lead Counsel, working cooperatively with members of the Steering Committee and other consumer plaintiff firms, conducted an extensive factual investigation and legal research to identify claims and develop a carefully planned prosecution strategy on behalf of Consumer

Plaintiffs. Esades Decl. ¶ 4. Consumer Plaintiffs' Counsel implemented an efficient and effective litigation strategy consisting of four broad steps. *Id*. First, Consumer Plaintiffs' Counsel conducted in-depth factual research into the events leading to the Target data breach. *Id*. ¶ 5. This factual investigation drew from public sources and included reviewing announcements by Target concerning the data breach such as statements Target made on its website and in communications to its customers; examining iterations of Target's privacy policy over a number of years preceding and during the period of the breach; analyzing testimony before and reports issued by Congressional committees; reviewing news articles, including investigative reports, examining the causes of the data breach; evaluating analysts' reports; reviewing Target's annual reports and submissions to federal agencies; conducting factual research into Target's data security practices, including public information about past breaches of Target's and other retailers' systems; researching warnings and alerts issued by credit card issuers; studying industry standards governing data security; evaluating studies examining data security practices, breaches, risks and the impact of breaches; and communicating with knowledgeable consultants and experts on data security. *Id.*

Second, Consumer Plaintiffs' Counsel engaged in comprehensive legal research into potential claims that could be brought on behalf of Consumer Plaintiffs. *Id*. ¶ 6. This in-depth research included reviewing claims asserted in previous other data breach and consumer privacy litigation and considering potential claims based on the statutory and common law of all 50 states. *Id*. Consumer Plaintiffs' Counsel identified the elements of the claims and governing case law, assessed the viability of claims through class

certification and trial, identified the common evidence available to support each claim, and analyzed Target's likely defenses and positions based on defense theories advanced in other data breach litigations. *Id.*

Third, cognizant of the numerous consumer actions challenging retailer data breaches that have resulted in successful motions to dismiss, Consumer Plaintiffs' Counsel devoted significant resources to identifying and vetting potential class representatives, including gathering and examining the documents that confirmed their purchases during the Target data breach and evidenced harm they suffered as a result of the breach. *Id.* ¶ 7. This process narrowed the number of plaintiffs while ensuring that the plaintiffs were geographically dispersed across the United States and had suffered both actual and imminent harm resulting from the Target breach and therefore had standing to assert viable claims on behalf of the Class. *Id.* This important step narrowed the group of potential plaintiffs, benefited the Class, eased burdens on the Court and enhanced the efficiency and effectiveness of case prosecution. *Id.*

Finally, Consumer Plaintiffs' Counsel developed and implemented an efficient case prosecution strategy. *Id.* ¶ 8. Rather than asserting numerous claims with varying strengths and weaknesses, Consumer Plaintiffs' Counsel focused the litigation for efficiency purposes and to avoid overburdening the Court, and advanced a streamlined set of core legal theories and claims on behalf of the Class. *Id.* The initial success of that strategy is reflected in the Court's motion to dismiss ruling, which allowed the majority of Consumer Plaintiffs' statutory and common law claims to proceed. *Id.*

Consumer Plaintiffs have pursued the litigation within the aggressive discovery, motion practice and pretrial schedule designed by the Court to promote the efficient, expedited prosecution of the claims of Consumer Plaintiffs and those of the Financial Institution Plaintiffs and other plaintiffs in this MDL litigation.

On July 3, 2014, Target moved to stay discovery pending the Court's rulings on Target's then forthcoming motions to dismiss. Consumer Plaintiffs and Financial Institution Plaintiffs filed a joint opposition. On July 24, 2014, the Court denied Target's motion. ECF No. 138.

Under the Court's supervision, discovery proceeded. The parties negotiated a May 15, 2014, stipulation governing disclosure and discovery of ESI and a subsequent supplemental stipulation governing joint e-discovery (ECF No. 147). On October 28, 2014 Magistrate Judge Keyes entered an Order Regarding Discovery Plan and Deposition Protocol (ECF No. 227) and on December 2, 2014, an Order Regarding Expert Discovery (ECF No. 262). The details of each of these orders were the subject of extensive negotiation among the parties. Consumer Plaintiffs made their initial disclosures under Fed. R. Civ. P. 26(a)(1)(A) ahead of schedule on September 12, 2014 and Target made its initial disclosures on September 15, 2014. Consumer Plaintiffs and Target each issued and responded to requests for production of documents.

Consumer Plaintiffs produced and received and reviewed a substantial volume of documents in discovery. Responding to Target's document requests, Consumer Plaintiffs produced 1,407 documents totaling 5,048 pages, consisting of transactional and other documents from the files and records of the majority of the named Consumer Plaintiffs

and were continuing to produce documents on a rolling basis at the time of settlement.

Esades Decl. ¶ 18. In turn, Target initially produced to Consumer Plaintiffs and the

Financial Institution Plaintiffs approximately 39,000 pages of documents, including ESI

and materials previously produced by Target to investigating governmental agencies. *Id.*

¶ 19. Discovery also included depositions taken by Consumer Plaintiffs and Financial

Institution Plaintiffs of three current and former Target employees  (on November 3 and

4, 2014 and February 3, 2015) and of a third party (on February 11, 2015).  *Id.* ¶ 21.

Target also deposed three Consumer Plaintiffs (on November 21 and December 3 and 4,

2014). *Id.*

Consumer Plaintiffs and Financial Institution Plaintiffs jointly issued eight third

party subpoenas resulting in the production of additional documents. *Id.* ¶ 22.

Additionally, working jointly with counsel for the Financial Institution Plaintiffs,

Consumer Plaintiffs' Counsel successfully opposed a non-party's motion to quash

subpoena and for a protective order and kept the Court informed of this development,

including the denial of the non-party's motion by the United States District Court for the

Northern District of California on December 19, 2014. *Id.* ¶ 23.

Target moved to dismiss the Consolidated Class Action Complaint filed by the

Financial Institution Plaintiffs (ECF No. 183) and moved to dismiss Consumer Plaintiffs'

Consolidated Class Action Complaint (ECF No. 202). On October 31, 2014, Consumer

Plaintiffs submitted an extensive memorandum in opposition to Target's motion to

dismiss, accompanied by five charts collecting case law from all applicable jurisdictions

concerning Consumer Plaintiffs' state consumer protection and data breach claims, as

well as their negligence, implied contract and unjust enrichment claims. On December 1,

2014, Consumer Plaintiffs filed Consumer Plaintiffs' First Amended Consolidated Class

Action Complaint ("Am. Compl.") (ECF No. 258).  Following a hearing on December

11, the Court on December 18, 2014, issued its Memorandum and Order (ECF No. 281),

granting in part and denying in part Target's motion to dismiss and allowing the majority

of Consumer Plaintiffs' claims to proceed.

## II.     THE SETTLEMENT CLASS SATISFIES THE REQUIREMENTS FOR CLASS CERTIFICATION

Consumer Plaintiffs have the burden of demonstrating satisfaction with all of the

applicable requirements of Rule 23. *In re Monosodium Glutamate Antitrust Litig.*, 205

F.R.D. 229, 231 (D. Minn. 2001) (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161

(1982)); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011). When

"[c]onfronted with a request for settlement-only class certification, a district court need

not inquire whether the case, if tried, would present intractable management problems …

for the proposal is there be no trial," but must still ensure satisfaction with other Rule 23

requirements. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The Settlement

Class satisfies each of the requirements of Rule 23(a) (numerosity, commonality,

typicality and adequacy of representation) and of Rule 23(b)(3) (predominance and

superiority).

### A.     The Class Satisfies the Requirements of Rule 23(a).

#### 1.     Numerosity

Rule 23(a)(1) provides for class certification where, as here, the class is so

numerous that joinder of all class members is impracticable. In determining whether the numerosity requirement is satisfied, courts consider a number of factors, "most obvious of which is, of course, the number of persons in the proposed class." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982). "No arbitrary rules on the size of classes have been established by the courts and the question of what constitutes impracticability depends upon the facts of each case." *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54 (8th Cir. 1977) (citation omitted).

Target has publicly stated that up to 110 million people were affected by the data breach. Esades Decl., Exs. 3 and 4; and Am. Compl. ¶ 180. Consumer Plaintiffs are geographically disbursed across the country. Am. Compl. ¶¶ 1-113. Consumer Plaintiffs' damages claims are of modest amounts, necessitating class treatment. The Class easily satisfies the numerosity requirement. *See, e.g., Paxton*, 688 F.2d at 560-61 (class of 74 employees satisfied numerosity); *In re Lutheran Brotherhood Variable Ins. Prods. Co. Sales Practices Litig.*, No. 99-MDL-1309 PAM/JCL, 2004 WL 2931352, at *7 (D. Minn. Dec. 16, 2004) (numerosity satisfied by class including "hundreds of thousands" of persons); *In re Zurn Pex Plumbing Prods. Liability Litig.*, No. 08-MDL-1958 ADM/AJB, 2013 WL 716088, at *3 (D. Minn. Feb. 27, 2013) (finding that "[n]umerosity is present because there are thousands of class members" and citing cases certifying classes with 40, 20 and 48 members); *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. at 232 (numerosity met where class of more than 750 members "are located throughout the United States, making joinder impracticable").

14

2.   <u>Commonality</u>

Rule 23(a)(2)'s requirement of common questions is satisfied. "The rule does not require that every question of law or fact be common to every member of the class." *Paxton*, 688 F.2d at 561 (citations omitted). Rather, as this Court has recognized, "[t]he commonality requirement . . . generally is satisfied when members of the proposed Class share at least one common factual or legal issue." *Lutheran Brotherhood*, 2004 WL 2931352, at *7; *see also Zurn Pex,* 2013 WL 716088, at *3 (noting that "[t]he threshold for commonality is low, requiring only that the legal question 'linking the class members is substantially related to the resolution of the litigation'" (citation omitted)); *Figas v. Wells Fargo & Co.*, No. 08-4546 (PAM/FLN), 2010 WL 2943155, at *5 (D. Minn. Apr. 6, 2010) (stating that "Rule 23 does not require that all questions of law and fact are common to every member of the proposed class" but "requires only that common questions exist"); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (commonality satisfied where plaintiff challenged defendant's conduct in allegedly over-escrowing mortgage escrow funds, reasoning that "all members of the class are interested in a satisfactory common course of conduct in the future servicing of their loans").

Numerous common questions exist.  Indeed, common questions pervade this litigation, including whether Target owed a duty to Consumer Plaintiffs and the Class to adequately protect their personal and financial information and to provide timely and accurate notice of the Target data breach; whether Target breached its duties; and whether Target failed to inform Consumer Plaintiffs and members of the Class that its security practices were not adequate to reasonably safeguard customers' sensitive data.

Am. Compl. ¶ 248. Commonality is satisfied so long as the plaintiff's claims depend upon a "common contention…[that] must be of such a nature that is capable of classwide resolution—which means that determination of its truth or falsity would resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. at 2551. Because common issues, including the adequacy of Target's systems in reasonably safeguarding customers' data, underlie all class members' claims and Consumer Plaintiffs allege that Target's course of conduct caused all class members to be harmed, the commonality requirement is satisfied. *See*, *e.g.*, *Paxton*, 688 F.2d at 561 (commonality satisfied because the common issue of whether defendant discriminated against black employees pervaded all class members' claims); *Jancik v. Calvary Portfolio Servs.*, Civ. No. 06-3104 (MJD/AJB), 2007 WL 1994026, at *6 (D. Minn. July 3, 2007) (defendant's issuance of a collection letter was a course of conduct giving rise to a cause of action affecting all class members) (citation omitted); *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 566 (D. Minn. 1968) (the existence of an alleged conspiracy and the impact on prices are common to all class members).

3.     Typicality

Rule 23(a)(3) requires that the claims of the representative parties be typical of the claims of the class. "This requirement is generally considered to be satisfied 'if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory.'" *Paxton*, 688 F.2d at 561-62 (citation omitted). Here, Consumer Plaintiffs' claims and those of the Class arise from the same course of conduct by Target leading to the data breach. Consumer Plaintiffs will rely

16

upon the same evidence in proving their individual claims as will be used to prove class members' claims. *See Paxton*, 688 F.2d at 562. Additionally, absent class members have the same or similar grievances as Consumer Plaintiffs. Consumer Plaintiffs and the Class allege that they suffered damages resulting from the same event, the Target data breach. *See Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977) (stating that Rule 23(a)(3) "requires a demonstration that there are other members of the class who have the same or similar grievance as the plaintiff") (citation omitted); *Brancheau v. Residential Mortg. Grp., Inc.*, 177 F.R.D. 655, 659 (D. Minn. 1997) (noting that "the burden of establishing typicality is 'fairly easily met so long as other class members have claims similar to the named plaintiff'") (citations omitted). The typicality requirement is met.

4.     Adequacy of Representation.

The fourth requirement for certification of a proposed class is that "the representative parties will fairly and adequately protect the interests of the class." Rule 23(a)(4). The adequacy requirement focuses on whether "(1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562-63 (citation omitted); *Zurn Pex*, 2013 WL 716088, at *4.

No conflict exists between Consumer Plaintiffs and other members of the Class. All seek damages and appropriate injunctive relief. Consumer Plaintiffs and all Class members have similar interests in establishing Target's liability for the same conduct and recovering damages resulting from that conduct. *See Zurn Pex,* 2013 WL 716088, at *4

17

(noting that "common issues of law and fact exist, and the defenses and claims are typical throughout the class" since each class member claims defendant's product contains defective fittings, each seeks damages and "[a]ll class members have the same interests and remedial theories").

The Court appointed Vincent J. Esades, Heins Mills & Olson, P.L.C. as Consumer Plaintiffs' Lead Counsel after considering the factors set forth in Fed. R. Civ. P. 23(g). Consumer Plaintiffs move pursuant to Rule 23(g) to appoint as Settlement Class Counsel Mr. Esades and Consumer Plaintiffs' Liaison Counsel, E. Michelle Drake, Nichols Kaster PLLP; members of the Steering Committee for the Consumer Cases, Ariana J. Tadler, Milberg LLP, Norman E. Siegel, Stueve Siegel Hanson LLP and Daniel C. Girard, Girard Gibbs LLP; and the Consumer Representative on the Executive Committee, John Yanchunis, Morgan & Morgan Complex Litigation Group, PA (collectively, "Settlement Class Counsel"). Consumer Plaintiffs' Lead Counsel and these firms have devoted substantial time and resources to the case, including investigating and evaluating the factual bases of the claims, working with experts, drafting and filing pleadings, engaging in discovery and motion practice, and litigating all contested issues in this case. Settlement Class Counsel have extensive experience and expertise in class action and complex civil litigation and have successfully prosecuted class actions and other similar cases in courts throughout the United States. Settlement Class Counsel respectfully urge the Court, based upon its knowledge of the case and its observations of Settlement Class Counsel's work in prosecuting this case, to conclude that both prongs of the adequacy of representation requirement are satisfied.  Consumer Plaintiffs' interests are precisely

18

aligned with and not antagonistic to the interests of Class Members, and Settlement Class

Counsel are competent and capable of pursuing the action, as evidenced by their skilled,

effective advocacy in prosecuting the case and the significant benefits they achieved for

the Class under the Settlement.

### B.     The Class Satisfies Rule 23(b)(3).

The Settlement Class satisfies both requirements of Rule 23(b)(3), which provides

that a class should be certified if the requirements of Rule 23(a) are met and "the court

finds that the questions of law or fact common to class members predominate over any

questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3).

### 1.     Common questions of law and fact predominate over individual questions.

The predominance inquiry tests whether the proposed class is sufficiently cohesive

to warrant adjudication by the representative plaintiff. *Amchem Prods.,* 521 U.S. at 623.

The predominance requirement is "readily met" in cases alleging violations of consumer

laws. *Id.* at 625. The Supreme Court also recognized in *Amchem* that the fact of a

"[s]ettlement is relevant to a class certification," *id.* at 619, and instructed that the portion

of the predominance analysis that ordinarily focuses on the management of the trial

becomes unnecessary and irrelevant when a class is being certified for settlement

purposes. *Id.* at 620. This Court has taken the same approach. *See*, *e.g.*, *Lutheran*

*Brotherhood*, 2004 WL 2931352, at *8 ("The Court also notes that, because the Action is

being settled, rather than litigated, the Court need not consider manageability issues that might be presented by the trial of a nationwide class action involving issues in this case.") (citing *Amchem Prods., Inc.*, 521 U.S. at 620).

The predominance analysis focuses on whether evidence is available to prove plaintiffs' claims on a common basis. *See Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005) (stating that "[t]he nature of the evidence that will suffice to resolve a question determines whether the question is common or individual" and that "[i]f the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question"); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995) (noting that "a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position" (citation omitted)).

Here, the focus is on Defendant's conduct and not on matters pertaining to individual Settlement Class members. *See, e.g.*, *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666, at *12 (M.D. Pa. Nov. 19, 2007) (stating that "'[c]ommon issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members'") (citation omitted). Additionally, "'[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individual damage issues.'" *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 306 (3d Cir. 2005) (citation omitted).

Consumer Plaintiffs will rely upon common, class-wide evidence to establish each element of their claims against Target for violations of state consumer laws, state data breach statutes, negligence, breach of implied contract and unjust enrichment. Precisely the same proof is available to and would be relied upon by each Class Member in proving her or his individual claims. Common, predominating issues include whether Target failed to take adequate and reasonable measures to ensure its data systems were protected against theft, whether Target failed to disclose to Consumer Plaintiffs and members of the Class that its computer systems and security practices were inadequate to reasonably safeguard customers' personal and financial information, and whether Target failed to immediately and accurately notify its customers of the data breach. The predominance requirement is satisfied for settlement purposes because common questions present a significant aspect of the case and may be resolved for all Class Members in a single common judgment. *See*, *e.g.*, *Zurn Pex*, 2013 WL 716088, at *5 (finding predominance where class representatives and absent class members sought to remedy a shared legal grievance concerning defective product and shared common remedial theories); *Robin Drug Co. v. PharmaCare Mgmt. Servs., Inc.*, No. Civ. 033397 (PAM/RLE), 2004 WL 1088330, at *4 (D. Minn. May 13, 2004) (finding predominance satisfied where defendant used the same master contract with plaintiff pharmacies, raising common question involving interpretation of its terms, which "is the predominant issue and is common to all class members"); *Minnesota v. United States Steel Corp.*, 44 F.R.D. at 571 (noting that "where a conspiracy to fix prices is at issue, but damages differ widely among the several plaintiffs, the predominant questions are common to the class").

21

2.      Superiority.

Rule 23(b)(3) allows certification of a class if the court, upon determining

satisfaction of each of Rule 23(a)'s requirements, also finds that "a class action is

superior to other available methods for fairly and efficiently adjudicating the

controversy." Rule 23(b)(3) identifies various factors as pertinent to a superiority finding,

including class members' interests in pursuing separate actions, the extent of any

independent litigation already begun by class members, the desirability of concentrating

the litigation in this forum, and the difficulties likely to be encountered in the

management of a class action. Fed. R. Civ. P. 23(b)(3)(A-D). *See also Amchem*, 521 U.S.

at 615 (noting that the superiority requirement ensures that resolution by a class action

will "'achieve economies of time, effort, and expense, and promote . . . uniformity of

decision as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results'") (citation omitted).

The Settlement unquestionably will "achieve economies of time, effort and

expense, and promote . . . uniformity of decision as to persons similarly situated." *Id.* at

615. Such economies will be achieved for both litigants and the Court, avoiding millions

of individual adjudications that would otherwise place an enormous strain on judicial and

litigant resources. Given the typically small claims of Consumer Plaintiffs and Class

Members, the class action mechanism provides the only available means of pursuing their

claims. *See Jancik*, 2007 WL 1994026, at *9 (noting that "[a] class action is a superior

form of litigation to address 'the rights of groups of people who individually would be

without effective strength to bring their opponents into court at all'") (quoting *Amchem*,

22

521 U.S. at 617); *Bradburn Parent/Teacher Store, Inc. v. 3M*, No. Civ.A.02-7626, 2004

WL 1842987, at *18 (E.D. Pa. Aug. 18, 2004) (reasoning that "bringing this suit as a

class action 'provides an efficient alternative to individual claims, . . . because individual

Class members are unlikely to bring individual actions given the likelihood that their

litigation expenses would exceed any potential recovery'") (citation omitted); *Kristian v.*

*Comcast Corp.*, 446 F.3d 25, 54-55 (1st Cir. 2006) (stating that "[t]o say that each

potential class member is unlikely to have or make available the up-front costs needed to

prosecute this costly antitrust suit is a large understatement"). As the Seventh Circuit has

observed, the only realistic option is either proceeding on a class basis or not proceeding

at all:

> It would hardly be an improvement to have in lieu of this single class action
> 17 million suits seeking damages of $15.00 to $30.00 . . . . The *realistic*
> alternative to a class action is not 17 million individual suits, but zero
> individual suits, as only a lunatic or a fanatic sues for $30.00. But a class
> action has to be unwieldy indeed before it can be pronounced an inferior
> alternative – no matter how massive the fraud or other wrongdoing that will
> go unpunished if class treatment is denied – to no litigation at all.

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). Certification of the

Settlement Class will promote an essential purpose of the class action mechanism. *See*

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (explaining that "[c]lass

actions also may permit the plaintiffs to pool claims which would be uneconomical to

litigate individually" and that "most of the plaintiffs would have no realistic day in court

if a class action were not available").

    Besides constituting the only practical means for Consumer Plaintiffs and Class

Members to proceed with their claims, a class action is clearly superior in light of the size

of the Settlement Class. Additionally, the nonexclusive factors identified in Rule 23(b)(3) weigh heavily in favor of a superiority determination in this case. As discussed, "[t]he first factor focuses on whether individual claims are so small that 'aggrieved persons may be without any effective redress unless they may employ the class-action device.'" *Jancik*, 2007 WL 1994026, at *9 (citing *Deposit Guarantee Nat'l Bank v. Roper*, 445 U.S. 326, 336, 339 (1980)). While many class actions were filed by consumers challenging Target's conduct relating to the data breach, the Consumer Cases have been consolidated in this MDL proceeding in recognition of the desirability of concentrating the litigation in this Court.

The Settlement avoids duplicative litigation, saving all parties and the Court significant time and resources. The Settlement provides substantial benefits to all members of a large Class. *See Zurn Pex*, 2013 WL 716088, at *5 (noting that for similar reasons, "a class settlement is the most effective way of resolving thousands of potential individual controversies arising from members of this class"). Under the compelling circumstances of this case, a class action is superior to other available methods for fairly and efficiently adjudicating the litigation.

## III. THE PROPOSED SETTLEMENT MEETS THE STANDARDS FOR PRELIMINARY APPROVAL

### A. Standards and Procedure: Class Action Settlements Are Favored.

Parties settling a class action must seek approval of the settlement from the court. Fed. R. Civ. P. 23(e). Rule 23(e) contemplates a sequential process for courts evaluating class action settlements. First, the Court must determine whether a class should be

certified for settlement purposes. *See*, *e.g.*, *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 296

(3d Cir. 2011) (en banc). Second, the Court must consider whether to approve a

settlement preliminarily and order that notice be provided to the class. At this preliminary

approval stage, the court determines whether the settlement is within the range of

possible approval and whether class members should be notified of the terms of the

proposed settlement. *White v. Nat'l Football League*, 822 F. Supp. 1389, 1399 (D. Minn.

1993). Third, after the class has been notified and has had the opportunity to consider the

settlement, the Court must decide whether to grant final approval of the settlement as

"fair, reasonable and adequate." Fed. R. Civ. P. 23(e); *see also*, *e.g.*, *Grunin v. Int'l*

*House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975). This Court has broad discretion in

evaluating a class action settlement:

> Such a determination is committed to the sound discretion of the trial
> judge. Great weight is accorded his views because he is exposed to the
> litigants, and their strategies, positions and proofs. He is aware of the
> expense and possible legal bars to success. Simply stated, he is on the
> firing line and can evaluate the action accordingly.

*Van Horn v. Trickey*, 840 F.2d 604, 606-607 (8th Cir. 1988) (citing *Grunin*, 513 F.2d at

123).

The law strongly favors resolving litigation through settlement, particularly in the

class action context. *White*, 822 F. Supp. at 1416 ("The policy in federal court favoring

the voluntary resolution of litigation through settlement is particularly strong in the class

action context.") (citation omitted); *Zurn Pex*, 2013 WL 716088, at *6. The Eighth

Circuit has recognized that "strong public policy favors [settlement] agreements, and

courts should approach them with a presumption in their favor." *Petrovic v. Amoco Oil*

*Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) (citing *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1388 (8th Cir. 1990)). By supporting the settlement of complex class action litigation, the judiciary can minimize litigation expenses on both sides, reduce the strain on scarce judicial resources and avoid the risk of trial to both parties. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (citing cases: NEWBURG ON CLASS ACTIONS § 11.41 (4th Ed. 2002)).

**B.    The Proposed Settlement Was a Result of Arm's-Length Negotiations Among Experienced Counsel.**

Courts attach "[a]n initial presumption of fairness . . . to a class settlement reached in arm's-length negotiations between experienced and capable counsel after meaningful discovery." *Grier v. Chase Manhattan Auto Fin. Co.*, No. Civ. A.99-180, 2000 WL 175126, at *5 (E.D. Pa. Feb. 16, 2000); *see also Grunin,* 513 F.2d at 123; *White v. Nat'l Football League*, 836 F. Supp. 1458, 1476-77 (D. Minn. 1993). "The court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." *In re Employee Benefit Plans Sec. Litig.*, Civ. No. 3-92-708, 1993 WL 330595, *5 (D. Minn. June 2, 1993) (citation omitted); *see also Welsch v. Gardenbring*, 667 F. Supp. 1284, 1295 (D. Minn. 1987) (affording "great weight" to opinions of experienced counsel).

Indeed, courts consistently find that the terms of a settlement are appropriate where the parties, represented by experienced counsel, have engaged in extensive negotiation at an appropriate stage in the litigation and can properly evaluate the

26

strengths and weaknesses of the case and the propriety of the settlement. *See, e.g., In re Employee Benefit Plans Sec. Litig.*, 1993 WL 330595, at *5 (noting that "intensive and contentious negotiations likely result in meritorious settlements . . . ."); *Zurn Pex*, 2013 WL 716088, at *6 (observing that "[s]ettlement agreements are presumptively valid, particularly where a 'settlement has been negotiated at arm's length, discovery is sufficient, [and] the settlement proponents are experienced in similar matters . . . .'") (citation omitted).

Here, Consumer Plaintiffs and Defendant have had ample opportunity to test and refine their legal theories through investigation, research, discovery and contested motion practice, to assess the merits of Consumer Plaintiffs' claims and Target's defenses, and to balance the potential value of Consumer Plaintiffs' claims against the substantial risks and expense of trial.

The settlement negotiations were conducted under the supervision of Judge Boylan, who facilitated rigorous negotiations over the course of nine in-person mediation sessions. Judge Boylan confirmed that the mediation negotiations were strongly contested, hard-fought and conducted at arm's length, and concluded that continued litigation posed significant risks for both sides. Judge Boylan Decl. ¶¶ 7 and 8. Judge Boylan describes the Settlement as providing "substantial benefits and relief to the Class" and representing a "fair, adequate and reasonable settlement reached at arm's length negotiations by skilled, well-informed counsel." *Id.* ¶ 10.

Consumer Plaintiffs' Lead Counsel and Class Counsel were confident that the evidence would establish Defendant's liability and prove damages on a class-wide basis.

27

Esades Decl. ¶ 48. Yet Consumer Plaintiffs still faced significant risks and challenges in continued litigation. *Id*. ¶ 49. These risks included obtaining and maintaining class certification through trial, particularly since Consumer Plaintiffs' claims are anchored in state statutory and common law claims, establishing causation, and proving Class Members' damages. *Id.* Consumer Plaintiffs' Lead Counsel was well versed in the merits of Consumer Plaintiffs' claims and Target's liability and defenses following exhaustive factual investigation, in depth research, motion practice to date, discovery practice, and the rigorous negotiations conducted under Judge Boylan's supervision. *Id*. ¶ 51. Consumer Plaintiffs' Lead Counsel recommends, for the Court's consideration, preliminary approval of the Settlement because it is within the range of possible approval and is fair, reasonable and adequate and in the best interests of the Settlement Class. *Id.*

When, as here, the parties are represented by experienced counsel and rigorous negotiations were conducted at arm's length, the judgment of the litigants and their counsel concerning the adequacy of the Settlement may and should be considered. *See Petrovic*, 200 F.3d at 1149; *DeBoer*, 64 F.3d at 1178. The extent of the negotiations conducted by Consumer Plaintiffs' Counsel and Target's Counsel, Consumer Plaintiffs Counsel's experience litigating complex class actions, the arm's length nature of the settlement negotiations, and the fact that the negotiations were overseen by Judge Boylan, all weigh in favor of preliminary approval of the Settlement.

**C.    The Proposed Settlement Satisfies the Standard for Preliminary Approval.**

At the preliminary approval stage, "the fair, reasonable and adequate standard is lowered, with emphasis only on whether the settlement is within the *range* of possible approval due to an absence of any glaring substantive or procedural deficiencies." *Martin v. Cargill, Inc.* 295 F.R.D. 380, 383 (D. Minn. 2013) (citation omitted). Courts consider four factors in determining whether a proposed settlement is fair, reasonable and adequate: (1) the merits of plaintiffs' case weighed against the settlement terms; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932-33 (8th Cir. 2005) (citing *Grunin*, 513 F.2d at 124); *Van Horn v. Trickey*, 840 F.2d at 607; *Dryer v. Nat'l Football League*, Civ. No. 09-2182 (PAM/AJB), 2013 WL 5888231, at *2 (D. Minn. 2013). At the preliminary approval stage, the fourth factor is not yet relevant. At this stage, the relevant factors weigh in favor of granting preliminary approval of the Settlement.

1.    <u>The Settlement is Fair and Reasonable When Weighed Against the Strengths and Weaknesses of the Claims.</u>

"The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Van Horn*, 840 F.2d at 607; *Dryer*, 2013 WL 5888231, at *4. The Court must balance the risks and benefits of litigation against immediate recovery for class members. *Grunin*, 513 F.2d at 124; *Petrovic*, 200 F.3d at 1150. In considering this factor, courts are "not to reach any conclusions as to the merits . . . nor . . . substitute

29

[their] opinion" for that of counsel or the class members. *In re Employee Benefit Plans Sec. Litig.*, 1993 WL 330595, at *4 (citation omitted); *see also Alexander v. Nat'l Football League*, No. 4-76-Civil-123, 1977 WL 1497, at *12-13 (D. Minn. Aug. 1, 1997) (stating that "the court does not have the responsibility of trying the case or ruling on the merits of the matters resolved by agreement . . . . Rather, 'the very purpose of compromise is to avoid the delay and expense of such a trial'") (quoting *Grunin*, 513 F.2d at 124).

The Settlement will result in significant benefits to the Class. The $10 million Settlement Fund will be distributed pursuant to a fair proposed Distribution Plan attached to the Settlement agreement and discussed above. The distribution process will be consumer friendly, using a simple claim form and a claims submission process that is primarily administered online by a very experienced Settlement Administrator, Rust Consulting, Inc. No portion of the $10 million Settlement Fund will revert to Target. Target will pay all administrative costs and class notice expenses in addition to the Settlement Fund. As a result, no Class Member's benefits will be reduced by administrative or notice costs. The same is true with any attorneys' fees or expenses awarded by the Court. *See In re Zurn Pex Plumbing Prods. Liability Litig.,* No. 08-MDL-1958 ADM/AJB, No. 08-MDL-1958, 2012 WL 5055810,  at *5  (D. Minn. Oct. 18, 2012) (Judge Montgomery's preliminarily approval of a settlement in which the defendants agreed to pay for costs of claims administrator, an engineering consultant, the costs of class notice and up to $8.5 million in attorneys' fees, in addition to paying up to

$20 million for class members' claims, "making the total value of this settlement approximately $30 million").

In addition to significant monetary relief, the Settlement provides substantial benefits to all Class Members in the form of non-monetary relief designed to safeguard customers' sensitive information held by Target. These measures include Target's designation of a high level executive as its Chief Information Security Officer who will have responsibility for Target's information security program; Target's maintenance of a written information security program that will identify risks to the security of its customers' personally identifiable information that could result in unauthorized access to the company's system, and periodic review of the sufficiency of its safeguards and development, review and approval by senior leadership security metrics that measure its security program; Target's commitment to maintain a process to monitor for information security events and respond to those events determined to present a threat; and Target's implementation of a program to educate and train relevant employees on the importance of the security of consumers' personally identifying information. Settlement ¶ 5.2.

Dr. Larry Ponemon, an expert on data security,[1] submits for the Court's consideration his opinion concerning the value and importance of these non-monetary

_____

[1] Larry Ponemon, Ph.D., founded and chairs the Ponemon Institute, a research firm dedicated to advancing privacy and data protection practices. Ponemon Decl. ¶ 1. Over the past ten years, the Ponemon Institute has conducted widely cited cost of data breach studies and has conducted independent research relating to organizations' data breach readiness, incident response and risk management. *Id.* ¶¶ 10 and 11. The Ponemon Institute has also conducted studies on data breach management effectiveness for

relief measures. Declaration of Larry Ponemon, Ph.D. Dr. Ponemon opines that the non-monetary relief provided in the Settlement is of substantial value to all consumers impacted by the Target breach as well as to consumers whose card data and personal information is held by Target now and in the future:

> In my opinion, the equitable relief provided by this Settlement is of substantial value to the millions of consumers who are victims of the Target data breach incident and to consumers whose credit or debit card data and/or personal information is maintained or in the future will be maintained by Target, in the following ways:
>
> - Increases accountability and centralizes responsibility for data breach incident management;
>
> - Improves the company's ability to quickly detect and contain security threats through aggressive monitoring and agile response;
>
> - Raises the level of awareness and understanding about data security and privacy issues among the company's employees (who serve as the first line of defense); and
>
> - Reduces the risk of future data breaches for customers, consumers, employees and other stakeholders.

Ponemon Decl. ¶ 17. Dr. Ponemon further opines that "[w]hile a corporate information security or privacy program can never guarantee the mitigation of all privacy and data protection risks, I believe that implementation of the requirements included in the Settlement will lead to important improvements in Target's protection of customer data to the benefit of all members of the proposed Settlement Class." *Id.* ¶ 18.

---

companies and governmental entities that have experienced data breaches. *Id.* ¶13. Dr. Ponemon as an expert on data breach related issues for the Federal Trade Commission. *Id.* ¶ 12. Dr. Ponemon's experience and credentials are detailed in his declaration.

The Settlement also compares favorably with settlements reached in numerous other retailer data security breach cases. Esades Decl. ¶ 46 and Ex. 2. This comparison supports a determination that the Settlement is fair, reasonable and adequate.

Absent the Settlement, Class Members may not have been able to recover their losses. As the Court is aware, Target asserted numerous arguments and defenses that would have raised complicated and challenging factual and legal questions at trial. Class Counsel considered these significant risks, as well as the delay in Class Members' recovery due to continued litigation. Class Counsel agreed to the Settlement based on a careful consideration of various factors, including the significant monetary and equitable relief benefits of the Settlement, and the uncertainty of trial, recognizing that both sides faced the risks that a jury could react unfavorably to the evidence presented, as well as the uncertainties, risks, substantial expenses and significant delays associated with appeals that would inevitably be pursued following trial. Esades Decl. ¶¶ 48-49.

Thus, the first factor weighs in favor of approval of the Settlement. *See Dryer*, 2013 WL 5888231, at *4-7 (finding that the merits of plaintiff's case balanced against the terms of the settlement weighed heavily in favor of the settlement, considering the fact that "it is likely that the law of many different jurisdictions will apply to Plaintiffs' claims," class members' varying damages, and the numerous benefits of the settlement for class members); *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liability Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013) (upholding Judge Montgomery's determination that the merits of plaintiffs' case and the favorable settlement terms warranted settlement approval).

33

2.     The Defendant's Financial Condition.

Courts also consider the compensation provided in the settlement and the defendant's ability to pay when determining whether a settlement is fair, reasonable and adequate. *See Petrovic*, 200 F.3d at 1152 (citing *Grunin*, 513 F.2d at 124). In this case, Target has agreed to both a cash settlement and non-monetary relief. There is no reason for concern that Target will be unable to pay the full amount of the Settlement Fund, together with notice and administrative costs and any attorneys' fees and expenses awarded by the Court. *See Dryer*, 2013 WL 5888231, at *4 (reasoning that "there is no issue with the NFL's financial condition," that defendant is "fully able to pay what it has committed to pay" and "is also fully able to continue to litigate this matter vigorously and defend itself against the class's claims should it be necessary," and concluding that "[t]his factor is neutral in the Court's analysis").

3.     The Complexity and Expense of Further Litigation.

Additionally, the Court must evaluate whether the expense and complexity of further litigation weighs in favor of approving the Settlement. Continued litigation would necessarily involve the risk and expense of significant additional discovery, class certification, and likely appeals of any verdict. This factor therefore supports settlement approval. In applying this factor, this Court has approved a settlement where "[t]here is no doubt that further litigation in this matter would be both complex and extraordinarily expensive"; "[t]he class certification process would undoubtedly be hard-fought and would also require a detailed analysis of the claims of the class members"; "Plaintiffs' claims themselves are complex"; and damages determinations would be "exceedingly

34

time-consuming and complex." *Dryer*, 2013 WL 5888231, at *3. *See also Uponor*, 716 F.3d at 1163 (noting that "[t]he third factor – complexity and expense – also weighed in favor of approval because 'class actions place an enormous burden of costs and expense upon the parties'") (citing *Schmidt v. Fuller Brush Co.*, 527 F.2d 532, 535 (8th Cir. 1975) (per curiam)).

For these reasons, Consumer Plaintiffs urge the Court to find that the proposed Settlement is within the range of reasonableness warranting notice to Class Members and should be preliminarily approved.

### D.    The Proposed Form and Manner of Notice are Appropriate.

Under Rule 23(e), Class Members are entitled to reasonable notice of the proposed Settlement. *See* MANUAL FOR COMPLEX LITIG. §§ 21.312, 21.631 (4th Ed. 2011). Settlement notice must be "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Petrovic*, 200 F.3d at 1153 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Notice need only satisfy the "'broad "reasonableness" standards imposed by due process.'" *Id.* (quoting *Grunin*, 513 F.2d at 121). Notice need not provide "a complete source of information" or an exact amount of recovery for each class member. *Id.* (citing *DeBoer*, 64 F.3d at 1176).

Consumer Plaintiffs have submitted for the Court's consideration and approval a Notice Plan developed by a highly experienced and well regarded notice expert firm, Kinsella Media, LLC ("Kinsella Media"). *See* Declaration of Shannon R. Wheatman, Ph.D. on Adequacy of Notices and Notice Plan ("Wheatman Decl."). Dr. Wheatman

began her class action experience in 2000 at the Federal Judicial Center where she was

instrumental in working on model plain language notices to satisfy the plain language

requirements of Rule 23. Wheatman Decl. ¶ 8.  Dr. Wheatman, now president of Kinsella

Media, specializes in designing and implementing large scale notification plans. *Id*. ¶¶ 4-

7.  Dr. Wheatman has designed a multifaceted Notice Plan (Settlement, Exhibit 6)

consisting of the following components.

**Direct Notice**. The Notice Plan provides for Direct Notice through email and mail

notices. Wheatman Decl. ¶ 21. Rust Consulting, Inc. ("Rust"), the proposed Settlement

Administrator, will send a Notice via email ("Email Notice") to all Class Members for

whom Target has an email address.  *Id*. ¶ 22. Rust will send a mailed Notice ("Postcard

Notice") to all Class Members for whom Target has a mailing address but does not have

an email address. *Id*. ¶ 24.  Postcards returned as non-deliverable will be re-mailed to any

address indicated by the USPS or, if no new address is indicated by the USPS, such

notices will be further searched through a third party vendor and, if a current address is

found, will be re-mailed. *Id.*¶ 26.

**Paid and Earned Media Notice**. In addition to Direct Notice, the Notice Plan

provides for paid and earned media-based notice to the Settlement Class. *Id*. ¶ 27.

Kinsella Media will place a Publication Notice in major print media, specifically in

popular consumer magazines *Better Homes & Gardens* (estimated circulation of

7,600,000) and *People* (estimated circulation of 3,425,000).  *Id.* ¶ 33. The Notice Plan

includes Internet advertising. *Id*. ¶ 34. Kinsella Media will  place banner advertisements

on *Facebook.com* and on websites that are part of the *Specific Media* network (a network

36

consisting of premium websites covering topics such as news, entertainment and sports). *Id.* ¶ 35. When individuals click on the banner advertisements, they will be connected to the Settlement website containing information about the Settlement and their rights. *Id.* ¶ 33. Kinsella Media will distribute a national press release highlighting the toll-free number and website via PR Newswire, which Dr. Wheatman describes as reaching approximately 5,000 media outlets and 5,400 websites. *Id.* ¶ 37. Additionally, Kinsella Media will sponsor links that will appear when individuals enter certain terms on major search engines such as Google AdWords, Yahoo! Search Marketing, and Bing Microsoft Advertising. *Id.* As Dr. Wheatman explains, "[w]hen a user searches for one of the specified search terms or phrases (*e.g.* "Target data breach"), sponsored links will appear on the results page." *Id.*

**Dedicated Website**. The settlement provides that Rust will establish and maintain a dedicated website at which Settlement Class Members will be able to obtain information about the Settlement, including the Long Form Notice and the Settlement Agreement. *Id.* ¶ 40.

**Toll-free telephone number**. Rust will establish and maintain a toll-free phone number to allow Settlement Class Members to call and request a Notice by mail or listen to answers to frequently asked questions. *Id.* ¶ 41.

**Post office box**. Finally, the Settlement Administrator will establish a post office box to allow Class Members to contact Class Counsel by mail with any specific requests or questions. *Id.* ¶ 42.

37

Dr. Wheatman opines that the proposed Notice Plan and notices fully comply with the requirements of Fed. R. Civ. P. 23(c)(2) and satisfy due process requirements. *Id.* ¶¶ 2 and 49.  Dr. Wheatman opines that the Notice Plan will reach an estimated 83% of the intended audience with an average frequency of 1.5 times. *Id.* ¶ 36.

All Notices have been developed to satisfy the plain language requirements of Fed. R. Civ. P. 23(c)(2). *Id.* ¶¶ 44 and 45. The Long Form Notice, which will be available at the settlement website, via the toll-free number, or by mailing or emailing a request to the settlement administrator, provides substantial information, including instructions Class Members are to follow in exercising their rights. *Id.* ¶ 47. Dr. Wheatman notes that "[i]t is designed to encourage readership and understanding in a well-organized and reader-friendly format." *Id.* The Summary Notices (Postcard, Email and Publication Notices) "are designed to capture Class Members' attention with clear, concise, plain language." *Id.* ¶ 45.  Dr. Wheatman opines that the Notice Plan provides the best notice practicable under the circumstances. *Id.* ¶ 16.

Courts have fleshed out the requirements for providing "the best practicable notice under the circumstances" by repeatedly approving multifaceted notice programs consisting of the components similar to those in the carefully designed Notice Plan here. *See*, *e.g.*, *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2006 WL 3826714, at *8-9 (N.D. Cal. Dec. 27, 2006) (approving "extensive, multifaceted, and innovative" notice program consisting of notice delivered through email and posted on the Internet, standard mail for email bounced back as undeliverable, a web site, and publication notice as constituting the best practicable notice under the circumstances "and notice in a

38

reasonable manner"); *In re Electronic Books Antitrust Litig.,* No. 11-md-02293-(DCL), slip op. at 3 (S.D.N.Y. Aug. 5, 2013) (approving notice to class of e-book purchasers in Minnesota via email and Internet notice); *In re HP Laser Printer Litig.*, No. SACV 07-0667 AG(RNBx), 2011 WL 3861703, at *3 (C.D. Cal. Aug. 31, 2011) (approving email and publication notice plan); *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *4 (S.D.N.Y. May 1, 2008) (approving notice plan consisting of settlement website, a link to the website maintained on defendant's home page, email notice and direct mail when emails bounced back and for whom defendant had postal addresses, and newspaper publication); *Phelps v. MC Commc'ns, Inc.*, No. 2:11-CV-00423-PMP-LRL, 2011 WL 3298414, at *6 (D. Nev. Aug. 1, 2011) (approving email or mail notice and noting that "[e]mail is an efficient, reasonable, and low-cost supplemental form of notice, particularly where Defendants may lack current physical mailing address information for its former employees"); *Todd v. Retail Concepts, Inc.*, No. 3:07-0788, 2008 WL 3981593, at *2-3 (M.D. Tenn. Aug. 22, 2008) (approving class notice consisting of email notice to all customers as to whom defendant had email addresses, together with notice via defendant's internet home page and in-store posting); *Barker v. Skype, Inc.*, No. 2:09-cv-01364-RSM, slip op. at 4 (W.D. Wash. Nov. 17, 2009) (permitting notice exclusively through email and noting that "[d]ue to the unique nature of the . . . internet based accounts that typically are not tied to a postal address, mailed notice would not be effective and would unnecessarily deplete potentially available funds, to the detriment of the Settlement Class"); *Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43, 58 75 Cal. Rptr. 3d 413, 427 (Cal. App. 2008) (stating that

"[u]sing a summary notice that directed the class member wanting more information to a Web site containing a more detailed notice, and provided hyperlinks to that Web site, was a perfectly acceptable manner of giving notice in this case"); *Mirakay v. Dakota Growers Pasta Co.*, Civil Action No. 13-cv-4429 (JAP), 2014 WL 5358987, at *2 (D.N.J. Oct. 20, 2014) (approving notice by email and reminder email notices, publication notices in selected periodicals and Internet banner ads where calculations showed the notice reached 80% of class members approximately three times).[2]

Consumer Plaintiffs respectfully submit that the multifaceted, comprehensive notice plan developed by the notice expert provides the best notice practicable under the facts and circumstances of this case and fully satisfies due process requirements. Class Counsel request that the Court approve the proposed form and manner of notice to the Settlement Class as set forth in the Notice Plan.

### E.     The Court Should Appoint Rust Consulting, Inc. as the Settlement Administrator.

The parties request that Rust Consulting, Inc. be appointed as the Settlement Administrator to oversee the administration of the Settlement. As detailed in its firm

---

[2] *See also In re Korean Air Lines Co., Ltd. Antitrust Litig.*, MDL No. 1891, CV 07-05107, slip op. at 6 (C.D. Cal. Feb. 18, 2011) (approving class notice in the form of email or mail notice using addresses in defendant's records and long form notice posted on settlement web site); *In re Online DVD Rental Antitrust Litig.*, No. 4:09-md-02029, slip op. at 1-2 (N.D. Cal. Aug. 29, 2011) (approving notice by email to all settlement class members, followed by notice by mail to members whose emails bounce back upon up to three attempts); *Pokorny v. Quixtar Inc.*, No. 3:07-cv-00201, slip op. at 3 (N.D. Cal. Feb. 21, 2012) (preliminarily approving class action settlement and approving notice via email, postcards and publication).

resume (Wheaton Decl., Exhibit 2), Rust is highly experienced in carrying out large

public notice of payment projects. Rust has provided such services for over 35 years and

has been appointed a settlement administrator in many complex class actions, including

in this District. Wheaton Decl., Exs. 2 and 3.

### F. The Request for Service Awards for the Proposed Class Representatives is Fair and Reasonable.

Consumer Plaintiffs' Counsel respectfully request that the Court approve

including in the Long Form Notice to the Settlement Class a statement that Class Counsel

will request the payment of service awards to the Settlement Class Representatives in

recognition of their services as Class Representatives in this litigation. Consumer

Plaintiffs' Counsel will request up to a $500 service award to each Settlement Class

Representative and up to a $1,000 service award each to Plaintiffs Thomas Dorobilia,

Brystal Keller and Deborah Guercio, whose service to the Class included providing

deposition testimony.

Courts recognize the purpose and appropriateness of service awards to class

representatives. *See*, *e.g.*, *White*, 822 F.2d at 1406 (noting that "[c]ourts . . . routinely

approve such awards for class representatives who expend special efforts that redound to

the benefit of absent class members," and citing cases); *Yarrington v. Solvay Pharm.,*

*Inc.*, 697 F. Supp. 2d 1057, 1068 (D. Minn. 2010) (approving $5,000 service awards to

each class representative and noting that "[s]mall incentive awards…promote the public

policy of encouraging individuals to undertake the responsibility of representative

lawsuits" and "may be 'merited for time spent meeting with class members, monitoring

41

cases, or responding to discovery'") (citation omitted); *In re Xcel Energy, Inc. Sec., Derivatives & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1003 (D. Minn. 2005) (awarding $2,000 to each of three class representatives and noting that "the three plaintiffs reviewed pleadings, conferred with counsel, provided information about the plan, responded to discovery, and reviewed and consented to the settlement"); *In re Certainteed Fiber Cement Siding Litig.*, MDL No. 2270, 2014 WL 1096030, at *27 (E.D. Pa. Mar. 20, 2014) (noting that "[t]he purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws" (citation omitted)).

Each of the proposed Settlement Class Representatives could have simply awaited the outcome of this litigation and received the same benefits as any other Settlement Class Member. Instead, they stepped up to lead this litigation and represent the interests of all Class members. They remained committed to and actively participated in this hard fought litigation against a formidable defendant on behalf of a very large group of class members. They provided Class Counsel with documents and information concerning their purchases at Target, patiently responded to numerous inquiries from Class Counsel about their experiences, and provided information and documents to Class Counsel relating to their efforts to minimize the effects of the Target data breach and the harm they suffered as a result of the breach. Esades Decl. ¶ 52. Settlement Class Representatives have monitored the litigation through continued contact with counsel. *Id.*

Their dedicated services, including their willingness to take the time from their daily lives to serve as plaintiffs and assist in the prosecution of a case involving the enforcement of important consumer protection laws, have benefited the Settlement Class. *Id*. Class Representatives Thomas Dorobilia, Brystal Keller and Deborah Guercio further benefited the Class by sitting for depositions taken by Target, and are deserving of a slightly increased award. *Id. See In re Zurn Pex Plumbing Prods. Liab. Litig*., No. 08-MDL-1958 ADM/AJB, 2013 WL 716460, at *2 (D. Minn. Feb. 27, 2013) (approving $5,000 service award to each of nine class representatives and $7,500 to seven class representatives who were deposed, noting that the service payments "reflect the efforts by the class representatives to gather and communicate information to counsel and act as the public face of the litigation" and explaining that each class representative "assisted with the investigation and preparation of these suits, gathered documents for production and helped class counsel" and "[s]ome of the class representatives gave depositions").

Service payments for the proposed Settlement Class Representatives are appropriate.

### G. The Request for a Stay of Proceedings and Temporary Injunction Pending the Final Approval Hearing is Appropriate.

The Proposed Order includes a stay of proceedings (except for matters necessary to implement or further approval of the Settlement) and a temporary injunction prohibiting Settlement Class Members from prosecuting or participating in any other proceedings in any jurisdiction relating to claims related to the Target data breach or the claims asserted in the Consumer Actions in this MDL proceeding, pending the final

43

approval hearing.  Such stay and temporary injunction provisions are typically included in preliminary approval orders and are appropriate here.  *See, e.g., Zurn Pex*, 2012 WL 5055810, at *11-12, *14 (noting that "[t]his type of injunctive relief is commonly granted in preliminary approvals of class-action settlements pursuant to the All Writs Act and the Anti-Injunction Act," discussing case law and  affirming federal courts' authority "to enjoin current or future federal proceedings … and future state court proceedings"); *Dryer v. National Football League*, Civil No. 09-2182, 2013 WL 1408351, at *9 (D. Minn. Apr. 8, 2013) (entering a preliminary injunction against class members prosecuting claims pending final approval hearing on settlement). Such relief in aid of this Court's jurisdiction is appropriate here.  The temporary injunction will not prejudice any plaintiffs in the Consumer Actions, since if the Settlement is finally approved, the cases subject to the injunction will become moot unless plaintiffs in any such other proceedings exclude themselves from the Settlement.  *See Zurn Pex,* 2012 WL 5055810, at *14.

## IV.    CONCLUSION

For these reasons, Consumer Plaintiffs' Counsel respectfully ask the Court to enter an Order: (1) certifying the Settlement Class for purposes of settlement; (2) appointing Consumer Plaintiffs as representatives of the Settlement Class; (3) appointing Consumer Plaintiffs' Lead Counsel and the undersigned counsel as Settlement Class Counsel; (4) granting preliminary approval of the proposed Settlement; (5) approving the proposed form and manner of notice to the Settlement Class; (6) directing that the notice to the Settlement Class be disseminated in the manner described in the Settlement, the Notice Plan and the Declaration of Shannon R. Wheatman, Ph.D.; (7) establishing a deadline for

Settlement Class members to request exclusion from the Settlement Class or file objections to the Settlement; (8) appointing Rust Consulting, Inc. as Settlement Administrator; and (9) setting the proposed schedule for completion of further settlement proceedings, including scheduling the final fairness hearing.

Date:  March 18, 2015

Respectfully submitted,

s/ *Vincent J. Esades*
Vincent J. Esades (249361)
David Woodward (018844X)
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Tel.:  (612) 338-4605
Fax:  (612) 338-4692
vesades@heinsmills.com
dwoodward@heinsmills.com

**Lead Counsel Consumer Cases**

E. Michelle Drake (0387366)
NICHOLS KASTER, PLLP
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 256-3200
Fax: (612) 338-4878
drake@nka.com

**Liaison Counsel Consumer Cases**

John A. Yanchunis
MORGAN & MORGAN COMPLEX
LITIGATION GROUP, PA
201 North Franklin Street, 7th Floor
Tampa, FL 33602
Tel.:  (813) 223-5505
Fax:  (813) 223-5402
jyanchunis@forthepeople.com

**Executive Committee - Coordinating
Lead and Liaison Counsel**

Daniel C. Girard
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
Tel.:  (415) 981-4800
Fax:  (415) 981-4846
DCG@girardgibbs.com

Ariana J. Tadler
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Tel.:  (212) 594-5300
Fax:  (212) 868-1229
atadler@milberg.com

Norman E. Siegel
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel.:  (816) 714-7100
Fax:  (816) 714-7101
siegel@stuevesiegel.com

**Steering Committee Consumer Cases**