# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Target Corporation Customer Data Security Breach Litigation<br><br>This Document Relates to:<br><br>All Consumer Cases | MDL No. 14-2522 (PAM/JJK) |

## DECLARATION OF CONSUMER PLAINTIFFS' LEAD COUNSEL VINCENT J. ESADES

I, Vincent J. Esades, declare:

1.       I am an attorney licensed to practice before the courts of the states of Minnesota and North Dakota. I am privileged to serve as the Court appointed Lead Counsel on behalf of Plaintiffs in the Consumer Cases in this litigation. I am a partner in the firm Heins Mills & Olson, P.L.C. I submit this Declaration in support of Consumer Plaintiffs' Motion for Certification of a Settlement Class and Preliminary Approval of Class Action Settlement.

2.       Both before and following my appointment as Consumer Plaintiffs' Lead Counsel pursuant to the Court's Order for Appointment of Lead and Liaison Counsel and Preliminary Scheduling Order entered May 15, 2014 (ECF No. 64), I have worked cooperatively with a team of experienced attorneys from law firms representing plaintiffs in the Consumer Cases, including: E. Michelle Drake, Nichols Kaster, PLLP, appointed by the Court to serve as Liaison Counsel in the Consumer Cases; John A. Yanchunis, Morgan & Morgan Complex Litigation Group, PA, who serves on the Executive Committee - Coordinating Lead and Liaison Counsel; and members of a Steering Committee I appointed, pursuant to the Court's Order (ECF No. 64) to assist in the prosecution and management of the Consumer Cases, including Ariana J. Tadler, Milberg LLP, Norman E. Siegel, Stueve Siegel Hanson LLP and Daniel C. Girard, Girard Gibbs LLP (collectively referred to as the "Steering Committee").

3.       This Declaration attempts to assist the Court by (a) describing the extensive factual investigation, legal research and work in identifying claims and developing an efficient case prosecution strategy on behalf of Consumer Plaintiffs; (b) highlighting the

discovery and procedural history of the litigation to date of the Consumer Cases; (c) describing the good faith, arm's length and intensive settlement negotiations conducted by experienced counsel on both sides under the supervision of the Honorable Arthur J. Boylan; (d) discussing the substantive terms of the Settlement reached between Consumer Plaintiffs and Defendant Target Corporation on March 9, 2015; and (e) providing the basis for my opinion, for the Court's consideration in evaluating the Settlement, that it is not only within the range of possible approval, but is fair, reasonable and adequate and in the best interests of the proposed Settlement Class.

**Case Development and Litigation Strategy**

4.      Before filing Consumer Plaintiffs' Consolidated Class Action Complaint on August 25, 2014 (ECF No. 182), I and members of the Steering Committee developed and in cooperation with other consumer plaintiff firms implemented an efficient and effective litigation strategy involving four primary steps.

5.      First, Consumer Plaintiffs' Counsel conducted extensive factual research into the chronology and anatomy of the events leading to the Target data breach. This important factual investigation involved examining and evaluating information from public sources, including various announcements by Target Corporation concerning the data breach; reviewing statements made by Target on its website and in communications to its customers relating to the Target data breach; examining Target's privacy policy and amendments to it made in years preceding, leading up to and during the period of the breach; analyzing testimony presented to and reports issued by investigating Congressional committees including the report entitled A 'Kill Chain' Analysis of the

2013 Target Data Breach, issued by the United States Senate Committee on Commerce, Science and Transportation (March 26, 2014); reviewing news articles, including investigative reports examining the causes and impact of the data breach; evaluating various analysts' reports and commentary concerning the Target data breach; assessing Target's descriptions and statements relating to the data breach, including in Target's annual reports and submissions to federal agencies such as the Securities and Exchange Commission; conducting  factual research into Target's data security practices, including a review of publicly available information relating to past breaches of Target's and other retailers' computer systems and warnings and alerts issued by credit card issuers; studying industry standards governing data security; researching studies examining data security practices, breaches, risks and the impact of breaches on the subject company and its customers; and communicating with consultants and experts knowledgeable and experienced in the area of data security.

6.      Second, I and members of a complaint drafting and research committee within the Steering Committee and other plaintiff firms, undertook comprehensive legal research into potential claims that could be brought on behalf of Consumer Plaintiffs. This exhaustive research effort included examining claims brought in previous data breach and consumer privacy litigation and consideration of potential claims based on the statutory and common law of all fifty states with particular emphasis on identification of claim elements, governing case law, the viability of claims with respect to the likelihood of class certification and the common evidence that would be available to support each claim through the class certification and trial stages. This intensive research effort

included a careful look at and analyses of the defenses and positions likely to be raised or asserted by Target based in part on defense theories advanced in previous litigation involving retailer data breaches.

7.      Third, Consumer Plaintiffs' Lead and other Class Counsel were cognizant of the many consumer actions challenging retailer data breaches that have resulted in successful defense motions to dismiss, including on grounds of lack of standing. Accordingly, Consumer Plaintiffs' Counsel devoted substantial resources and efforts in identifying and vetting potential plaintiffs, examining their transactional documents to confirm their purchases from Target during the period of the data breach and examining their documents evidencing harm resulting from the breach. This important plaintiff vetting process resulted in presenting to the Court a narrowed group of Consumer Plaintiffs from across the United States who suffered both actual and imminent, certainly impending harm directly resulting from the Target breach and therefore had standing to assert viable claims on behalf of the Class, thereby benefiting the Class, easing burdens on the Court and enhancing the efficiency and effectiveness of prosecution of the Consumer Cases.

8.      Fourth, I and Consumer Plaintiffs' Counsel developed and implemented an efficient case prosecution strategy. Rather than advancing numerous claims with varying strengths and weaknesses, Consumer Plaintiffs' Counsel focused the litigation, both to protect and advance the interests of the Class and for efficiency purposes and to avoid overburdening the Court, and advanced a streamlined set of core legal theories and claims. The initial success of that strategy is reflected in the Court's ruling denying in

large part Target's motion to dismiss and allowing the substantial majority of Consumer Plaintiffs' statutory and common law claims to proceed.

9.     These four pre-complaint steps taken to carefully investigate, research, identify and plead claims and legal theories for prosecuting the consumer litigation provided me as Lead Counsel and Consumer Plaintiffs' Counsel with a base of information and experience to consider all contested legal and factual issues required to make informed judgments on the strengths and weaknesses of the claims and defenses asserted by all parties in this litigation, to evaluate Target's positions, to make accurate and appropriate negotiating demands and to pursue the litigation effectively and in a cost efficient manner. The significant litigation developments to date further provided an informed basis for advocating for the best interests of the Class through case prosecution and in the negotiation process.

**Litigation History Highlights**

10.     Because the Court is intimately familiar with the litigation history, I mention only significant highlights here. By conducting numerous case management and status conferences and issuing multiple scheduling and other orders, the Court has set and advanced an aggressive discovery, motion practice and pre-trial schedule that is well designed to promote the efficient, expedited prosecution of the claims of Consumer Plaintiffs, as well as those of the Financial Institution Plaintiffs and other plaintiffs in this MDL litigation. (*See*, *e.g.*, Pretrial Scheduling Order governing the Consumer Cases filed June 25, 2014, ECF No. 94; Pretrial Scheduling Order relating to Bank Actions filed June 25, 2014, ECF No. 93).

11.     On July 3, 2014, Target moved to stay all discovery pending the Court's rulings on Target's then forthcoming motions to dismiss. I and members of my firm worked closely with Lead Counsel for the Financial Institution Plaintiffs cases in researching, drafting and, for the Court's convenience, submitting a joint memorandum in opposition to Target's motion to stay discovery. On July 24, 2014, the Court denied Target's motion, determining that staying discovery would only serve to delay the expeditious prosecution of this action. ECF No. 138.

12.     The parties then negotiated a stipulation dated May 15, 2014, governing disclosure and discovery of electronically stored information (ESI), and a subsequent supplemental stipulation governing joint e-discovery in this litigation (ECF No. 147). Target moved to dismiss the consolidated class action complaint filed by the Financial Institution Plaintiffs (ECF No. 183) and moved to dismiss Consumer Plaintiffs' Consolidated Class Action Complaint (ECF No. 202).

13.     Under the Court's direction, discovery proceeded.

14.      The parties negotiated various issues involving discovery, including a deposition protocol and an expert discovery stipulation.  On October 28, 2014, Magistrate Judge Keyes entered an Order Regarding Discovery Plan and Deposition Protocol (ECF No. 227). The parties negotiated and on November 24, 2014, filed a Stipulation Regarding Expert Discovery (ECF No. 253).  On December 2, 2014, Magistrate Judge Keyes entered an Order regarding Expert Discovery (ECF No. 262).

15. Consumer Plaintiffs made their initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A) on September 12, 2014. Target made its initial disclosures on September 15, 2014.

16. Consumer Plaintiffs issued their first set of document requests to Target on September 18, 2014, to which Target provided responses and objections on October 20, 2014. Consumer Plaintiffs also submitted responses and objections on October 20, 2014, to Target's first request for production of documents.

17. Consumer Plaintiffs filed their operative complaint, Consumer Plaintiffs' First Amended Consolidated Class Action Complaint, on December 1, 2014 (ECF No. 258).

18. Consumer Plaintiffs produced and received and reviewed a substantial volume of documents produced in discovery in this litigation. In response to Target's document requests, Consumer Plaintiffs produced 1,407 documents totaling 5,048 pages, consisting of transactional and other documents from the files and records of the majority of Consumer Plaintiffs. At the time of settlement, Consumer Plaintiffs had established and met their obligations by continuing to produce documents for all Consumer Plaintiffs on a rolling basis pursuant to agreement with Target's counsel.

19. Target has initially produced to Consumer Plaintiffs and the Financial Institutions Plaintiffs approximately 39,037 documents, totaling about 149,742 pages. Target began producing documents on September 3, 2014, with the production of 22 documents, and Target produced an additional 37,605 documents on October 20 and 1,410 documents on November 4, 2014. Target's production consisted of documents

previously produced to governmental agencies, such as the Securities and Exchange Commission, the Federal Trade Commission and various state Attorneys General. Target provided a privilege log relating to its document productions on November 19, 2014, consisting of over 2,000 entries for more than 800 documents. The parties' dispute relating to Target's request for return of certain documents allegedly inadvertently produced and Plaintiffs' motion for modification of the Protective Order and to compel production of documents was briefed and argued before Magistrate Judge Keyes, who issued an Order on February 25, 2015 (ECF No. 344).

20.     Target's document productions followed extensive negotiations between Consumer Plaintiffs' Counsel, working jointly with the Financial Institution Plaintiffs' Counsel and Target's Counsel, through a series of meet and confer communications, emails and teleconferences, some of which are detailed in the parties' correspondence to Magistrate Judge Keyes in the course of seeking the Court's effective and prompt assistance in resolving the few discovery issues on which the parties were unable to reach agreement.

21.     Discovery in this matter also included depositions taken by Consumer Plaintiffs and Financial Institution Plaintiffs of three current or former employees of Target (on November 3 and 4, 2014 and February 3, 2015), as well as Target's conducting and Consumer Plaintiffs' defense of the depositions of three Consumer Plaintiffs (on November 21 and December 3 and 4, 2014).

22.     Additionally, Consumer Plaintiffs and Financial Institution Plaintiffs jointly issued subpoenas to eight third party entities, mainly consisting of Target's business

partners that provided technical capabilities and consulting services in information technology and data security both before and after the breach, and Consumer Plaintiffs have initially reviewed and analyzed resulting document productions from third parties.

23.     As part of the discovery process, Consumer Plaintiffs' Counsel, working jointly with counsel for Financial Institution Plaintiffs, engaged in a meet and confer process and successfully opposed a non-party's motion to quash subpoena and motion for a protective order. Consumer Plaintiffs and Financial Institution Plaintiffs kept Magistrate Judge Keyes informed of this development, including the denial of the non-party's motions by the United States District Court for the Northern District of California on December 19, 2014.

24.     On October 31, 2014, Consumer Plaintiffs submitted an in-depth memorandum in opposition to Target's motion to dismiss, summarizing the relevant facts surrounding the Target data breach, marshalling the facts and case law demonstrating Consumer Plaintiffs' satisfaction of established standing requirements, responding to Target's multiple challenges to Consumer Plaintiffs' standing and supporting each of Consumer Plaintiffs' statutory and common law claims. Consumer Plaintiffs' opposition was accompanied by five charts submitted for the Court's convenience, collecting cases and summarizing the law of all applicable jurisdictions concerning Consumer Plaintiffs' consumer law and state data breach statutory claims, and their negligence, implied contract and unjust enrichment claims.

25.     Following a hearing and presentation of the parties' oral arguments, the Court on December 18, 2014 issued its Memorandum and Order (ECF No. 281), granting

in part and denying in part Target's motion to dismiss and allowing the majority of Consumer Plaintiffs' claims to proceed.

**Mediated Settlement Negotiations**

26. At the outset of this litigation, at the May 14, 2014 initial case management and status conference, the Court encouraged the parties, to the extent possible, to discuss and develop "a roadmap to resolution" of the litigation.

27. Pursuant to the Court's suggestion, while aggressively prosecuting the case, Consumer Plaintiffs' Lead Counsel and Target's Counsel pursued good faith, arm's length and rigorously contested negotiations. On August 11, 2014, the parties retained the highly experienced Honorable Arthur J. Boylan to serve as mediator in this matter.

28. Judge Boylan met individually with Consumer Plaintiffs' counsel on August 4 and with Target's counsel on August 5, 2014.

29. Judge Boylan conducted a series of mediation sessions between the parties, including in-person negotiating sessions on August 11, October 27, December 11, 18, 19, 22, 23 and 29 and January 8, 2015.

30. On July 31, 2014, Consumer Plaintiffs submitted a confidential detailed position statement requested by Judge Boylan outlining the facts (necessarily drawn from public sources in the absence of discovery at that time) surrounding the Target data breach and providing an overview of Consumer Plaintiffs' anticipated claims in the litigation to assist the mediator. Target also made a confidential written submission to the mediator providing Target's position. During the mediation process, Consumer Plaintiffs' counsel and Target's counsel continued to submit written materials to Judge Boylan

outlining their respective positions concerning the facts, claims, defenses and risk assessments. Consumer Plaintiffs provided Judge Boylan with copies of pleadings, including their initial consolidated complaint and first amended consolidated complaint, as well as the parties' briefing papers and respective state law overview charts in connection with Target's motion to dismiss, and the Court's December 18, 2014 decision on Target's motion to dismiss. Consumer Plaintiffs' Counsel, as well as Target's Counsel, also provided at Judge Boylan's request materials relating to settlement agreements from other retail data breach lawsuits and correspondence concerning both parties views on the meaning and significance of such settlements.

31.     I served as the principal negotiator on behalf of Consumer Plaintiffs throughout the negotiation process. In addition to the formal mediation sessions before Judge Boylan, I had numerous separate telephone conversations with Judge Boylan, who also communicated by telephone with Target's counsel. Throughout the mediation process, the parties exchanged numerous confidential settlement offers and counter-proposals.

32.     The settlement negotiations were conducted in good faith and at arms' length between experienced counsel on both sides. Unsurprisingly, the parties brought diametrically opposed positions to the bargaining table. The negotiations were adversarial yet civil, with both parties firmly advancing their clients' positions and consistently expressing their willingness to continue through the litigation process to advance their respective clients' interests.

33. The accompanying Declaration of the Honorable Arthur J. Boylan (Ret.) provides additional information concerning the parties' arm's length efforts to resolve this matter through a negotiated settlement.

34. I and members of the Consumer Plaintiffs' Steering Committee actively involved in the negotiations took steps necessary to ensure that we had all the necessary information to advocate for a fair settlement that serves the best interests of the Settlement Class.

**The Settlement**

35. The good faith, adversarial and arm's length negotiations and mediation sessions under the supervision of Judge Boylan, together with the supplemental communications between counsel for the parties, resulted in a settlement agreement expressed in a January 8, 2015 term sheet for settlement and subsequently embodied in the Class Action Settlement Agreement ("Settlement") (attached as Exhibit 1) pending before the Court for consideration of preliminary approval and certification of the Settlement Class.

36. The Settlement Class, as defined in the Settlement, is defined as:

> All persons in the United States whose credit or debit card information and/or whose personal information was compromised as a result of the data breach that was first disclosed by Target on December 19, 2013.

> Excluded from the class are the Court, the officers and directors of Target, and persons who timely and validly request exclusion from the Settlement Class.

Settlement, ¶ 3.1.

37.     The Settlement provides substantial benefits to all members of the Settlement Class. The Settlement provides for establishment of a Settlement Fund in the amount of $10 million to be distributed pursuant to the Distribution Plan submitted by Consumer Plaintiffs' Counsel for Court approval and the payment of any service awards to Settlement Class Representatives that may be approved by the Court. Settlement ¶¶ 1.21 and 5.

38.     The Settlement provides for a consumer-friendly process for Settlement Class Members to submit claims to the Settlement Administrator approved by the Court. The claim form is attached to the Distribution Plan (Exhibit 1 to the Settlement).

39.     A straightforward, fair and efficient proposed Distribution Plan is submitted for the Court's consideration and is attached to the Settlement as Exhibit 1. Settlement Class Members who submit a Documentary Support Claim and reasonable documentation showing their losses more likely than not arising from the Target data breach (for example, a credit card statement, invoice or receipt) are eligible for reimbursement up to a maximum of $10,000.  Distribution Plan ¶ 1.1. Class Members who submit a valid Self-Certification Claim need not provide documents evidencing losses caused by the data breach and are eligible to receive equal shares of the Settlement Fund after payment from the Settlement Fund of approved Documentary Support Claims and any service payments approved and ordered by the Court. *Id.* ¶¶ 1.2 and 4.1.

40.     As explained in greater detail in Consumer Plaintiffs memorandum, the Distribution Plan further provides for a process of claim validation by the Settlement

Administrator, which includes validation criteria for both types of claims and a process for resolving any disputes relating to Documentary Support Claims. *Id*. ¶¶ 2 and 3.

41. Within ten business days of the effective date of the Settlement, Target will pay the $10 million settlement fund into an interest bearing escrow account. Settlement ¶ 5.1.1. Importantly, no part of the Settlement Fund will revert to Target. Settlement ¶ 5.1.3. In other words, the entire Settlement Fund will be used to pay class member claims and any service awards approved by the Court in recognition of the services provided to the Settlement Class by Settlement Class Representatives. Any amount remaining in the escrow account following payment of claims by Settlement Class members and any approved service awards shall be distributed as directed by the Court. Settlement ¶¶ 5.1.2, 5.1.3 and 7.1.

42. Under the Settlement, Target will pay all costs of administration and all costs associated with providing notice to the Settlement Class. Settlement ¶¶ 4.3 and 5.1.4. This is an additional important benefit to the Settlement Class, in that Target's payment of all class notice and settlement administrative costs will be independent of and in addition to the $10 million Settlement Fund. As a result, unlike the provisions under many class action settlements, class notice and administrative costs will not reduce the amount of the Settlement Fund and consequently will not reduce the amount of benefits distributed to Class Members from the Settlement Fund. Notice and administration costs are expected to be around or exceed $7 million.

43. In addition to the significant monetary relief benefits provided under the Settlement, the Settlement provides for significant non-monetary relief designed to better

safeguard customer data in the possession of Target. For a period of five years following the effective date of the Settlement, Target will adopt and implement these data security measures:

a. **Chief information security officer**. Target will designate a high level executive to coordinate and take responsibility for its information security program entrusted with the protection of consumers' personally identifiable information;

b. **Maintain a written information security program**. The Settlement mandates that Target will identify internal and external risks to the security of consumers' personal identifiable information that could result in unauthorized access to Target's system and periodically review the sufficiency of safeguards to control such risks. Target will develop security metrics measuring its security program and will ensure that those metrics are periodically reviewed and approved by senior Target leadership;

c. **Maintain a process to monitor for information security events and respond to such events determined to present a threat**. Under the Settlement, Target will design and implement reasonable safeguards to control information security risks, including through reasonable and appropriate software security testing; and

d. **Provide security training to Target employees**. The Settlement further requires Target to implement a program to educate and train relevant

employees of the importance of the security of consumers' personal identifying information.

Settlement ¶ 5.2.

44.     The Settlement requires Target to pay any attorneys' fees and expenses awarded by the Court. Settlement ¶ 7.2.  Target's agreement to pay an award of attorneys' fees and expenses awarded by the Court is in addition to and independent of the Settlement Fund.  The Settlement further provides that Target, while reserving its rights to object to Consumer Plaintiffs' request for attorneys' fees, waives its right to appeal any award of attorneys' fees that does not exceed $6.75 million. *Id.* The Settlement is not dependent upon the Court awarding attorneys' fees and expenses to Settlement Class Counsel.  *Id.*

45.     The provisions of the Settlement relating to attorneys fees and costs were discussed and negotiated only after the parties reached agreement on the substantive merits of the Settlement.

46.     I and Consumer Plaintiffs' Counsel have studied settlements reached in other retailer data breach cases. A summary of the terms and benefits provided to the settlement classes in other data breach cases is contained in the attached Exhibit 2 submitted for the Court's consideration and convenience. The significant monetary and non-monetary benefits secured by the Settlement in this case compare strongly and favorably to those provided in the settlements involving other data breach lawsuits and provide compelling additional support for a determination as to the fairness, reasonableness, and adequacy of the Settlement.

**Litigation Risks and Uncertainties**

47.     Consumer Plaintiffs' Lead and other Class Counsel undertook this litigation on a wholly contingent basis. From the outset, we understood that we were embarking on extensive and costly litigation through an evolving data breach jurisprudence landscape, all the while confronting highly skilled lawyers who would vigorously advocate Defendant's cause and uncertain as to whether our firms would ever receive any compensation for the significant investment of time and money in advancing the interests of the Class. The commitment of time, staff and financial resources made by Plaintiffs' Lead Counsel and Class Counsel in this matter was substantial. Consumer Plaintiffs' Lead and Class Counsel assumed these resource and financial burdens regardless of whether a recovery would ever reimburse their firms for out-of-pocket expenses or compensate them for any of the time and effort they dedicated to this case on behalf of the Class. This complex and strongly contested case presented a host of risks and uncertainties that could have precluded any recovery for the Class.

48.     Consumer Plaintiffs' Lead Class Counsel and Class Counsel never waivered in their belief that the record evidence Consumer Plaintiffs have already identified and would continue to marshal for trial would establish Defendant's liability and prove damages on a class-wide basis. The decision to agree to the Settlement on behalf of the Class was based on a careful and deliberate consideration of a variety of factors, prominent among them being the significant monetary and non-monetary benefits of the Settlement to the Class.

49.     A variety of factors made the outcome at trial uncertain. They include the significant risks and challenges of obtaining class certification and maintaining class certification through trial based on the claims surviving Target's motion to dismiss, which are anchored in numerous states' statutory and common law cutting across multiple jurisdictions; establishing causation, an issue that has proved challenging to and, indeed, a barrier to consumer plaintiffs' success in other retailer data breach lawsuits; risks in proving damages for class members, many of whom incurred actual damages (for example, as the Court recognized in its motion to dismiss opinion, damages including unauthorized charges, loss of access to their accounts, and the payment of sums such as late fees, card replacement fees and credit monitoring services as a result of the Target data breach), and, as to all class members who suffered imminent, certainly impending harm from potential fraud and identity theft based on their credit card and personal information being misused via the sale of Consumer Plaintiffs' and Class members' information on the Internet card black market; the fact that neither side could be sure of a favorable jury verdict; the risk that further developments in the law or the factual evolution of the case could undermine Consumer Plaintiffs' claims; the risk that if class certification were achieved and maintained and the Class was successful in establishing liability at trial, the jury could have awarded damages less than those sought by the Class or the amount provided in the Settlement; the risk both sides faced that a jury could react unfavorably to the evidence presented; and the uncertainties, risks, expense and significant delays associated with appeals that would inevitably be pursued following trial.

50.     Judge Arthur J. Boylan, the highly experienced mediator who assisted the parties in their negotiations, discussed the substantial risks both sides faced in this litigation. Declaration of the Honorable Arthur J. Boylan (Ret.) ¶ 7.

51.     From the exhaustive factual investigation, in depth research, litigation involving significant motion practice, discovery and the arm's length, rigorous mediated negotiations, I have developed an understanding of and have assessed the merits of Consumer Plaintiffs' claims and Target's liability and defenses in this litigation. It is my opinion as Lead Counsel appointed by the Court in the Consumer Cases, provided merely for the Court's consideration in evaluating the Settlement, that the Settlement is both within the range of possible approval meeting the standards for preliminary approval, and is fair, reasonable and adequate and in the best interests of the Settlement Class.

**Services of Settlement Class Representatives Benefiting Class**

52.     Each of the Consumer Plaintiffs named in Consumer Plaintiffs' First Amended Consolidated Class Action Complaint (ECF No. 258), whom Class Counsel recommend for the Court's approval as Settlement Class Representatives and the payment of service awards, has provided valuable services  for the benefit of the Settlement Class. Each of the proposed Settlement Class Representatives furnished to Class Counsel documents and information about their purchases at Target during the Target data breach. Each responded to numerous inquiries from Class Counsel concerning their individual facts and circumstances and provided documents to Class Counsel relating to the time and efforts they expended in dealing with the Target data breach and the harm they suffered as a result of it. Settlement Class Representatives have

monitored the litigation through continued contact with counsel. Additionally, Settlement

Class Representatives Thomas Dorobilia, Brystal Keller and Deborah Guercio, beyond

the foregoing activities, further benefited the Settlement Class by providing deposition

testimony at which they provided facts concerning their own transactions and harm

resulting from the Target data breach. Settlement Class Representatives have been

informed that whether and in what amount any service awards may be awarded is within

the sole discretion of the Court. Based on their valuable service rendered for the benefit

of the proposed Settlement Class and in recognition of their having provided the

important public service of assisting in the prosecution of a case involving important

public protection laws and claims, Class Counsel respectfully requests that the Court

consider approving service awards in the amounts of $1,000 for Settlement Class

Representatives Thomas Dorobilia, Brystal Keller and Deborah Guercio and $500 to each

of the remaining proposed Settlement Class Representatives to be paid, pursuant to the

Settlement Agreement, out of the $10 million Settlement Fund.

**Additional Exhibits**

53.     I attach true and correct copies of the following documents:

   a. Exhibit 3: "Target Confirms Unauthorized Access to Payment Card

      Data in U.S. Stores," dated December 19, 2013, available at

      http://pressroom.target.com (last accessed March 5, 2015).

   b. Exhibit 4: "Target Provided Update on Data Breach and Financial

      Performance," dated January 10, 2014, available at

      http://pressroom.target.com (last accessed March 5, 2015).

c. Exhibit 5: *In re Electronic Books Antitrust Litig.*, No. 11-md-02293 (DCL), slip op. (S.D.N.Y. Aug. 5, 2013).

d. Exhibit 6: *Barker v. Skype, Inc.*, No. 2:09-cv-01364-RSM, slip op. (W.D. Wash. Nov. 17, 2009).

e. Exhibit 7: *In re Korean Air Lines Co., Ltd. Antitrust Litig.*, MDL No. 1891, CV 07-05107, slip op. (C.D. Cal. Feb. 18, 2011).

f. Exhibit 8: *In re Online DVD Rental Antitrust Litig.*, No. 4:09-md-02029, slip op. (N.D. Cal. Aug. 29, 2011).

g. Exhibit 9: *Pokorny v. Quixtar Inc.*, No. 3:07-cv-00201, slip op. (N.D. Cal. Feb. 21, 2012).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of March, 2015, in Minneapolis, Minnesota

s/ *Vincent J. Esades*
Vincent J. Esades
