# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Target Corporation Customer Data Security Breach Litigation | MDL No. 14-2522 (PAM/JJK) |
| This Document Relates to: | |
| All Consumer Cases | |
| LEIF OLSON, | |
| Objector. | |

## OLSON'S OBJECTION TO SETTLEMENT AND TO MOTION FOR ATTORNEYS' FEES

# INTRODUCTION

This settlement should be rejected. It flunks basic Rule 23 class-certification requirements designed to protect class members, freezing out millions of class members without compensation or even separate representation. But worse, it contains multiple signs of red-flag self-dealing by class counsel, who have submitted papers exaggerating the benefits to the class from this settlement, structured the settlement to deter legitimate objections and to protect their excessive fee request from scrutiny, and improperly hidden from this Court the claims rate and actual benefit to the class. At a minimum, fees should be reduced to the *forty-five* firms that have engaged in duplicative efforts at the expense of the class. Furthermore, the current fee request improperly devolves Rule 23(h)'s supervision of fee distribution from the Court (and its responsibility to approve payments only if they are in the class's best interest) to class counsel (who have cartelized with an undisclosed fee-sharing agreement).

## I.     Olson is a class member and intends to appear through counsel at the fairness hearing.

As his accompanying declaration demonstrates, Objector Leif A. Olson is a member of the settlement class. Olson's mailing address is PMB 188, 4830 Wilson Road, Suite 300, Humble, Texas 77396. *See* Declaration of Leif A. Olson (attached at Exhibit 1) ¶ 2. Olson shopped at a Target store using his debit and credit cards on December 15, 17, and 18. Olson Decl. ¶¶ 3-4. Olson also received direct email notification from the settlement administrator regarding the Settlement. Olson Decl. ¶ 5. Olson is thus a class member.

Olson's counsel, Melissa A. Holyoak of the non-profit Center for Class Action Fairness will appear at the Fairness Hearing, currently scheduled for November 10, 2015, at 10:00 a.m. Olson reserves the right to cross-examine any witnesses put forward in support of the settlement. Olson objects to any provisions of the settlement purporting to limit appellate rights of class members or creating new burdens beyond those imposed upon appellants in Federal Rules of Appellate Procedure 7 or 8.

**A.     The Center for Class Action Fairness is a non-profit 501(c)(3) that fights against unfair class action procedures and is not a "professional objector."**

The Center, established in 2009, represents class members *pro bono* in class actions where class counsel employs unfair class-action procedures to benefit themselves at the expense of the class. *See e.g., Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (observing that the Center "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) ("*Pampers*") (describing the Center's client's objections as "numerous, detailed, and substantive.") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing the Center's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement.") (rejecting settlement approval and certification); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013, at A12 (calling the Center's founder Ted Frank "[t]he leading critic of abusive class-action settlements"). The Center has won millions of dollars for class members. *See, e.g., In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *29 (W.D. Wash. Jun. 15, 2012) (noting that the Center's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel … at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

The Preliminary Approval Order in this case requires Olson to include a detailed account of Olson's counsel's experience with class actions including "whether the attorney was paid for each case that was voluntary [sic] dismissed, at any time, including on appeal." *See* Preliminary Approval Order, Dkt. 364 ¶ 11. This requirement seeks to identify which objectors are "professional objectors." A "professional objector" is a specific legal term

referring to for-profit lawyers who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees. Some courts presume that such objectors' legal arguments are not made in good faith. Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 437 n.150 (2003).

This is not the Center's *modus operandi*. Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: CLASS ACTION LITIG. REPORT (Aug. 12, 2011) (distinguishing CCAF from professional objectors). As set forth in the accompanying Declaration of Melissa A. Holyoak (attached at Exhibit 2), neither the Center nor its attorneys have received pecuniary compensation for the voluntary dismissal of a Center objection to a class action. Holyoak Decl., ¶ 9. The Center's mission differs greatly from the agenda of those who are often styled "professional objectors." Instead, the Center is funded entirely through charitable donations and court-awarded attorneys' fees.

**B.    To effectively prevent bad faith objectors, this Court should enjoin the settling parties from paying objectors in exchange for settlement of their objections.**

The Center agrees with the goal of discouraging bad-faith objectors, and Olson brings this objection through the Center in good faith to protect the interests of the class. In an effort to discourage bad faith objectors, the settling parties included a provision in the proposed Preliminary Approval Order requiring counsel for any objector to include a detailed list of their class-action litigation, including any action in which they were paid to dismiss an objection. *See* Dkt. 358-1 at 82. But this isn't an effective deterrent. Instead, the Center requests that the Court enjoin the settling parties from paying objectors in exchange for settlement of their objections, both while the objection is pending in this Court and on appeal. *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem). To preempt any possibility of a false and unjustifiable accusation of objecting in bad faith and

seeking to extort class counsel, Olson himself is willing to stipulate to an injunction prohibiting him from accepting compensation in exchange for the settlement of this objection. *See* Olson Decl. ¶ 8.

In satisfaction of the listing requirement, attached are the declarations of undersigned counsel Melissa A. Holyoak, as well as the declaration of Theodore H. Frank, the Center's President. *See* Holyoak Decl., ¶¶ 7-9; Declaration of Theodore H. Frank (attached at Exhibit 3). Complying with the listing requirement required several hours and was unduly burdensome, particularly because the requested information is publicly available.

If this listing requirement deters bad-faith objections, so too would exposing whether class counsel has created incentives for bad-faith objections by paying off such objectors. Just as objectors are required to list actions in which they were paid to dismiss objections, the Court should require class counsel to disclose all actions in which they paid an objector to dismiss an objection—including the amount of money they paid. Further, as detailed in Section III.C, Olson objects to the settlement because class counsel has not revealed to the Court or the class what the class members will *actually* receive, i.e., the amount of claims that will be paid and the number of class members who will receive them. The Court should further require class counsel to disclose all class-action settlements where they received attorneys' fees, the amounts they received, and the amounts of money—actual monetary payments, not counsels' valuations of coupons or illusory "injunctive relief"—the class received.

## II.   The settlement class cannot be certified.

"Class-action settlements are different from other settlements." *Pampers*, 724 F.3d at 715. "[I]n class-action settlements the district court cannot rely on the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class. Instead, the law relies upon the fiduciary obligations of the class representatives and, especially, class counsel, to protect those interests. And that means the courts must carefully

scrutinize whether those fiduciary obligations have been met." *Id.* at 718. (internal quotation omitted). Thus, through its oversight responsibility, the court itself assumes a derivative fiduciary obligation to the class. *McNeil v. Guthrie*, 945 F.2d 1163, 1167 (10th Cir. 1991); *Gottlieb v. Barry*, 43 F.3d 474, 490 (10th Cir. 1994) ("[T]he importance of safeguarding the class' interests cannot be underestimated.").

This judicial duty to vouchsafe the rights of the absent plaintiffs extends to the decision to grant class certification, obliging district courts to conduct a "rigorous analysis" to ensure compliance with the Rule 23 certification prerequisites. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). A proponent of class certification "must affirmatively demonstrate his compliance with the Rule." *Id.* Aside from trial manageability concerns, that burden is no lighter when the Court is confronted with a settlement-only class certification. In fact, the specifications of rules Rule 23(a) and (b)(3) are "designed to protect absentees by blocking unwarranted or overbroad class definition" and "demand undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620 (1997); *see also Pampers*, 724 F.3d at 721 ("These requirements are scrutinized more closely, not less, in cases involving a settlement class"); *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 380 (3d Cir. 2013) ( "policy in favor of voluntary settlement does not alter the 'rigorous analysis' needed to ensure that the Rule 23 requirements are satisfied.").

Fed. R. Civ. P. 23(b)(3) allows a class action to be maintained if the requirements of Rule 23(a)(1)-(4) are satisfied, "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The burden of proving these prerequisites resides with the proponents of certification. *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013). The proposed settlement class falls short because (1) the settlement involves an intra-class conflict in contravention of Rule 23(a)(4); and (2) the claims process demonstrates that

the settling parties cannot satisfy the predominance and superiority requirements necessary for certification.

> **A.      Class certification is impermissible because of the intra-class conflict between class members who will receive compensation and class members who will receive nothing.**

The settlement here provides for a single settlement class. But a subclass within that class—uncertified and unrepresented—receives no recovery or benefit under the settlement. To receive compensation under the settlement, class members must submit a claim. The Claim Form here contains the following questions:

| |
|---|
| 1.  Did you use a credit or debit card at any United States Target store, excluding the Target.com website, between November 27, 2013 through and including December 18, 2013?  ☐  YES       ☐ NO<br>    Skip to Question 3  Continue to Question 2 |
| 2.  Did you receive notice (or otherwise believe) that your personal information was compromised as a result of the data breach that was first disclosed by Target on December 19, 2013? ☐  YES       ☐ NO |
| 3.  Did you experience one or more of the following caused by the theft of your Payment Card information and/or personal information as a result of the Target data breach? (Check Applicable Boxes)<br>        ☐  Unauthorized, unreimbursed charges on your credit or debit card.<br>        ☐  Time spent addressing unauthorized charges on your credit or debit card.<br>        ☐  Costs to hire someone to help correct your credit report.<br>        ☐  Higher interest rate on an account or higher interest fees that you paid.<br>        ☐  Loss of access or restricted access to funds.<br>        ☐  Fees paid on your accounts (i.e. late fees, declined payment fees, overdrafts, returned checks, customer service, card cancellation or replacement).<br>        ☐  Credit-related costs (i.e. buying credit reports, credit monitoring or identity theft protection, costs to place a freeze or alert on your credit report or a drop in your credit score).<br>     ☐  Costs to replace your driver's license, state identification card, social security number, or phone number.<br>     ☐  Other costs or unreimbursed expenses as a result of the Target data breach. (Explain below) |
| If you were unable to answer YES to question 1or 2, **or if you were unable to check any of the boxes under question 3, you are not eligible to submit a Claim under the Settlement**. |

*See* Claim Form, Dkt. 358-1 at 38 (emphasis added).

The settlement class is defined as "[a]ll persons in the United States whose credit or debit card information and/or whose personal information was compromised as a result of the data breach that was first disclosed by Target on December 19, 2013." Preliminary Approval Order, Dkt. 364 at 2. Thus, while a class member may be part of the class (responding YES to Questions 1 or 2 of the Claim Form), if that class member cannot check one of the boxes in Question 3, she is ineligible to submit a claim or obtain any recovery under the settlement.

The class members that are ineligible for relief are part of a zero-recovery *de facto* uncertified subclass. Although these class members will receive nothing from the settlement, they are still providing a broad release to defendant Target of all potential claims, including unknown and future claims:

**6.1 Release of Settlement Class Claims.** Releasing Party will be deemed to have completely released and forever discharged the Released Parties, and each of them, from and for any and all liabilities, claims, crossclaims, causes of action, rights, actions, suits, debts, liens, contracts, agreements, damages, costs, attorneys' fees (except as otherwise provided herein), losses, expenses, obligations, or demands, of any kind whatsoever, **whether known or unknown, existing or potential, or suspected or unsuspected,** whether raised by claim, counterclaim, setoff, or otherwise, **including any known or unknown claims, which they have or may claim now or in the future to have,** that were alleged or asserted against any of the Released Parties in the Consumer Actions or that could have been alleged or asserted against any of the Released Parties arising out of the same nucleus of operative facts as any of the claims alleged or asserted in the Consumer Actions ("Released Claims"), including but not limited to the facts, transactions, occurrences, events, acts, omissions, or failures to act that were alleged in the Consumer Actions or in any pleading or other paper filed with any court in the underlying Consumer Actions, and the disclosures and/or notices that Target made or failed to make to the Settlement Class Representatives or the other Settlement Class Members about the Intrusion.

…

**6.3 Unknown Claims**. … Each of the Releasing Parties shall be deemed to have acknowledged, and by operation of the Final Judgment acknowledges, that he/she/it is aware that he/she/it **may hereafter discover facts other than or different from those that they know or believe to be true with**

> **respect to the subject matter of the Released Claims, but it is his/her/its intention to, and each of them shall be deemed upon the Effective Date to have, waived and fully, finally, and forever settled and released** any and all Released Claims, whether known or unknown, suspected or unsuspected, asserted or unasserted, contingent or non-contingent, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

*See* Settlement Agreement, Dkt. 358-1 at 14-16 (emphasis added).

Class certification is improper because this zero-recovery subclass is not adequately represented. In order to proceed as a class action, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Dukes*, 131 S. Ct. at 2550 (internal quotation and citation omitted); *see Bishop v. Comm. on Prof'l Ethics and Conduct of Iowa State Bar Ass'n*, 686 F.2d 1278, 1289 (8th Cir. 1982). Among other criteria, a class action cannot be certified unless the court determines that the class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The purpose of Rule 23(a)(4) is to assure that the absent class members' interests are represented in the litigation so as to make it fair to bind them to the release and settlement of the action. *Amchem*, 521 U.S. at 621. The court must

> determine that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, **and that there is no conflict between the individual's claims and those asserted on behalf of the class**. This inquiry is vital, as class members with divergent or conflicting interests from the named plaintiffs and class counsel cannot be adequately represented.

*In re Community Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (internal quotation marks and citation omitted) (emphasis added).

*Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012), is an example of the conflicts that may arise between a class representative and a class. In *Dewey*, representatives of a single settlement class negotiated reimbursement for one set of car owners, but the remaining car-owner class members could only make "goodwill" claims on the residual amount of the settlement fund, if any. *Id.* at 173. Because none of the class representatives were in the

"residual group," and the residual group did not have separate representation for their competing interests, the class could not be certified under Rule 23(a)(4). "The structure of the settlement agreement itself, which divides a single class into two groups of plaintiffs that receive different benefits, supports the inference that the representative plaintiffs are inadequate." *Id.* at 187. "Put simply, representative plaintiffs had an interest in excluding other plaintiffs from the reimbursement group, while plaintiffs in the residual group had an interest in being included in the reimbursement group. This is precisely the type of allocative conflict of interest that exacerbated the misalignment of interests in *Amchem*, 521 U.S. at 626-27." *Id.* at 188; *see also Day v. Whirlpool Corp.,* 2014 U.S. Dist. LEXIS 169026, at *13-20 (W.D. Ark. Dec. 3, 2014) (denying approval because "[p]laintiffs might not share interests with—or at least might not vigorously pursue the interests of—putative subclass members"); *Henke v. Arco Midcon, LLC,* 2014 U.S. Dist. LEXIS 31810, at *31 (E.D. Mo. Mar. 12, 2014) (holding that named representative with personal injury claims could not represent class with only property damage claims).

Here, the class representatives incurred the types of expenses and costs identified in Question 3 of the Claim Form and are eligible to submit claims for class relief. *Compare* Claim Form, Dkt. 358-1 at 38, *with* Amended Complaint, Dkt. 258 at 1-55. The class representatives are thus not part of the uncertified zero-recovery subclass. The class representatives had an incentive to maximize their recovery at the expense of the subclass members. Because of this intra-class conflict, Rule 23(a)(4) is not met. *Ortiz,* 527 U.S. at 856; *Amchem*, 521 U.S. at 627.[1]

---

[1] *See Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010) ("Conflicts of interest may arise when one group within a larger class possesses a claim that is neither typical of the rest of the class nor shared by the class representative."); *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 982 F.2d 721, 741-43 (2d Cir. 1992) (decertifying class under Rule 23(a)(4) because of conflicts of interest between different segments of class), *modified on reh'g on other grounds sub nom. In re Findley*, 993 F.2d 7 (2d Cir. 1993). The general interest in redressing damages is not sufficient to show that named class members are adequate. *In re GM Pick-Up*, d at 797 ("To

Indeed, this conflict is worse than the one in *Dewey*. In *Dewey*, the Third Circuit noted that the unrepresented and uncertified subclass had at least a chance at contingent recovery if there were leftover settlement funds. Here, however, the intra-class conflict is particularly egregious because the subclass is releasing their claims for no consideration. *See Ferrington v. McAfee*, Inc., No. 10-cv-01455-LHK, 2012 U.S. Dist. LEXIS 49160, at *42 (N.D. Cal. Apr. 6, 2012) (denying approval where "necessary … to protect the rights of the absent class members of the subclass of claimants who … are essentially releasing their claims against [defendants] for no consideration."); *Daniels v. Aeropostale West*, No. C 12-05755 WHA, 2014 U.S. Dist. LEXIS 74081, at *8 (N.D. Cal. May 29, 2014) ("No one should have to give a release and covenant not to sue in exchange for zero (or virtually zero) dollars."); *see also Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (rejecting settlement approval as abuse of discretion where subclass was shut out without any lower-court finding that underlying claim of subclass was meritless).

Olson is part of the subclass that receives nothing. Olson made credit- and debit-card purchases at Target between November 27, 2013, through and December 18, 2013, and Olson received direct notice that he was a class member. Olson Decl. ¶¶ 3-5. Olson did not incur any of the costs or expenses described in Question 3 of the Claim Form. Olson Decl. ¶ 6. Thus, Olson is a class member, but he is not eligible for any benefit or recovery under the Settlement. There are doubtless many more class members who are part of this subclass and will receive nothing.

Class members like Olson should not be bound by a settlement when they had no representative prosecuting their interests in the action. As in *Dewey*, the parties either need to create a single settlement class with a single entitlement to relief (and permit those previously frozen out of the settlement to make claims), or there needs to be separate subclassing with

state that class members were united in the interest of maximizing over-all recovery begs the question.").

separate representation. 681 F.3d at 189-90. But the current single settlement class cannot be certified under the current settlement payment structure that freezes out numerous class members.

**B.    The claims process shows that common questions of fact do not predominate and the artificial judicial program created by the settlement is not a superior method of adjudication.**

Rule 23(b)(3) has two requirements: predominance and superiority. To meet the predominance requirement, the settling parties must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The superiority requirement involves showing "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Neither is satisfied here.

As the Supreme Court explained, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). It requires the district court "to take a 'close look' at whether common questions predominate over individual ones." *Id.* In *Comcast*, the Supreme Court held that the appeals court wrongly affirmed certification because the damages model used for certification did not measure damages attributable to plaintiffs' theory. *Id.* at 1433. The Court found that respondents could not "show Rule 23(b)(3) predominance: **Questions of individual damage calculations** will inevitably overwhelm questions common to the class." *Id.* (emphasis added).

Here, plaintiffs' theory is that they are entitled to statutory and actual damages and that their actual damages are those injuries identified on Question 3 of the Claim Form. *Compare* Amended Complaint, Dkt. 258 at 7-9, 121, *with* Claim Form, Dkt. 358-1 at 38. The Claim Form identifies eight types of injuries a class member may have suffered and a ninth "catch all" for any other types of expenses or costs. *See* Claim Form, Dkt. 358-1 at 38. To recover those losses, the claimant must submit documentation for each of those different

"loss type[s]." *Id.* at 39. One by one, the settlement administrator will evaluate each claimant's claim and determine if there is "reasonable documentation that the claimed losses were actually incurred and **more likely than not arose from the Intrusion**." *See* Distribution Plan, Dkt. 358-1 at 35 (emphasis added). The claims process demonstrates that like *Comcast*, individual causation and damages calculations inevitably overwhelm questions common to the class.

Following *Comcast*, the Eighth Circuit recently reversed certification of a class, finding that the district court abused its discretion because the certified class did not meet the predominance requirements of Rule 23(b)(3). *See Halvorson v. Auto-Owners Insurance Co.*, 718 F.3d 773, 777 (8th Cir. 2013). In *Halvorson,* the court held that predominance was not satisfied because the action required "individual fact inquiries for each member of the class." *Id.* at 780. The Eighth Circuit concluded that a "class action w[ould] not be a **superior method** of adjudicating this case because the reasonableness of any claim payment may have to be individually analyzed." *Id.* at 780 (emphasis added). As in *Halvorson*, because individual fact inquiries are required, a class action is not the superior method for adjudication of this case.

Indeed, the claims process in this case further demonstrates why a class action is not a superior method for adjudication of plaintiffs' claims. The claims process here substitutes a real judicial forum (if class members had brought their own claims) with an artificial judicial forum (created under the Settlement's Distribution Plan). This artificial judicial forum created by the Settlement includes its own judge, rules, and procedures:

| Artificial Judicial Forum Under the Settlement | |
|---|---|
| Judge | "Settlement Administrator, in its sole discretion …." Distribution Plan, Dkt. 358-1 at 36. |
| Evidentiary Standards | "Reasonable documentation of losses is objective proof of losses …." Distribution Plan, Dkt. 358-1 at 35. |
| Burden of Proof | "…that the claimed losses were actually incurred and **more likely than not arose from the Intrusion**." Distribution Plan, Dkt 358-1 at 35 (emphasis added). |

14

| Appeals Process | "After receipt of the claimant's rejection of the final determination, the Settlement Administrator will provide Plaintiffs' Lead Counsel and Target's Counsel (together 'Counsel') with a copy of the Claim Form and documentation submitted by the claimant, and the communications between the Settlement Administrator and the claimant (the 'Claim File'). … If Counsel agree that the claimant is entitled to the amount of Substantiated Losses requested on the Claim Form, **their determination will be final.**" Distribution Plan, Dkt 358-1 at 36-37 (emphasis added). |
| --- | --- |

It cannot be superior for class members to submit analysis of their individual claims to an artificial judicial forum (run by the consulting group hired by the defendant) with absolute discretion over claims instead of a court of law that offers the protections of procedural rules and the Constitution. Indeed, the methodology used by the administrator is too vague to apprise the class members of what would be sufficient to convince the administrator that the losses "more likely than not" arose from the intrusion. This has a direct effect on the value and fairness of the Settlement. *See In re NCAA Student-Athlete Concussion Injury Litig.,* 2014 U.S. Dist. LEXIS 174334, at *33 (N.D. Ill. Dec. 17, 2014) (denying preliminary approval because "the review criteria [for claims] bear directly on the settlement's anticipated benefits to the class as well as the sufficiency of the proposed Fund").

One of the largest problems with this artificial judicial forum is how the settlement administrator is going to effectively deal with class members who submit fraudulent claims: How will the administrator determine if the charges on a credit card statement were actually unauthorized? How will the administrator determine whether those unauthorized charges were actually later reimbursed? (Federal law limits a credit-card holder's liability for unauthorized uses. *See, e.g.,* 15 U.S.C. § 1643.) For each different "loss type" included in the Claim Form, there is great potential for submission of fraudulent claims, particularly when claimants can receive up to $10,000 in recovery. The possibility that some class members will be paid for losses that they never incurred while other class members will receive no compensation highlights why this class action is an inferior method of adjudication in fairness or efficiency.

Finally, the zero-recovery subclass provides an additional reason why a class action is not a superior method of adjudication in this case. Superiority must be contemplated from the perspective of absent putative class members. What is best for them? Even if the possibility of attaining damages by that subclass is small, that possibility is superior to releasing those claims for no compensation. *See Brown v. Wells Fargo & Co.*, No. 11-1362 (JRT/JJG), 2013 U.S. Dist. LEXIS 181262, at *16-17 (D. Minn. Dec. 30, 2013) (concluding that superiority was not satisfied where individuals would be "entitled to between $100 and $1,000 dollars in statutory damages" in successful individual litigation, but only $55 as a class member); *Sonmore v. CheckRite Recovery Servs.*, 206 F.R.D. 257, 265-66 (D. Minn. 2001) (same); *cf. Daniels v. Aeropostale West*, No. C 12-05755 WHA, 2014 U.S. Dist. LEXIS 74081, at *8 (N.D. Cal. May 29, 2014) ("No one should have to give a release and covenant not to sue in exchange for zero (or virtually zero) dollars…."). Under this settlement, some class members release their rights in exchange for no compensatory relief. From the perspective of a class member, that cannot be a superior method of adjudicating this controversy.

### C.  Application of consumer-protection laws from 37 states and the District of Columbia, and unjust-enrichment laws from 50 states and the District of Columbia, are fatal to the predominance requirement.

The predominance requirement cannot be satisfied here because of the outcome-determinative differences in consumer protection laws and unjust enrichment laws. *First*, "[s]tate consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) (quoting *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002)). Just last month the Eighth Circuit confirmed that the differences in state consumer-protection laws would prevent certification. *Perras v. H&R Block*, ---F.3d---, 2015 U.S. App. LEXIS 10330, *11 (8th Cir. Mo. June 18, 2015). In *Perras*, the Eighth Circuit held that "[t]he law applicable to each class member would be the consumer-protection statute of that member's state. Thus, questions of law common to the

class members do not predominate over any individual questions of law." *Id.*; *see also* 7A Charles Alan Wright *et al.*, FEDERAL PRACTICE & PROCEDURE § 1780.1 (3d ed. 2014) ("As a matter of general principle, the predominance requirement of Rule 23(b)(3) will not be satisfied if the trial court determines that the class claims must be decided on the basis of the laws of multiple states" because "the legal issues no longer pose a common question"). Common questions of law do not predominate regarding consumer-protection laws from more than three dozen states.

In addition to the consumer-protection laws, the individual questions involved in unjust enrichment claims also prevent certification. *Tyler v. Alltel Corp.*, 265 F.R.D. 415, 429 (E.D. Ark. 2010) (predominance and commonality could not be satisfied because it required application of unjust enrichment and consumer protection laws from 25 states). "As countless courts have found, the states' different approaches to, or elements of, unjust enrichment are significant." *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 513-514 (D. Minn. 2014) (citations omitted) (collecting cases).

In *Rapp v. Green Tree Servicing,* the court found that individual factual questions would predominate regarding the unjust enrichment claims because the laws of the 50 states differ including how "unjust" the retention of the benefit was and the court would have to determine how much the defendant was enriched for each particular transaction. 302 F.R.D. at 519. The same is true here. This Court dismissed one of plaintiffs' theories regarding unjust enrichment and the only remaining theory is that plaintiffs "would not have shopped" at Target after the breach if they had they known about the breach. Order, Dkt. 281 at 44. This would require individual inquiries as to (1) whether that individual would have shopped again after the breach if it had been disclosed and (2) how much Target was unjustly enriched, i.e., each class member's transaction after the breach. These individual questions predominate. Accordingly, the proposed class fails the requirements of Rule 23(b)(3).

### III.   Even if the class is certifiable, the settlement is unfair because it provides preferential treatment to class counsel.

If the Court disagrees with that and concludes that the settlement class should be certified, then it should still disapprove the settlement as unfair. A class-action settlement may not confer preferential treatment upon class counsel to the detriment of class members. "Such inequities in treatment make a settlement unfair," for neither class counsel nor the named representatives are entitled to disregard their "fiduciary responsibilities" and enrich themselves while leaving the class behind. *Pampers*, 724 F.3d at 718-21 (reversing settlement where class counsel received $2.73 million and absent class members were offered a money-back refund program with a likely small claims rate, prospective labeling changes, and a *cy pres* donation)).

A settlement can be unfair even when negotiated at arms' length: class counsel can achieve an impermissible self-dealing settlement simply through a defendant's indifference to the allocation. The relevant inquiry is whether class counsel are unfairly attuned to their self-interest at the expense of the class. *Pearson*, 772 F.3d at 787 (7th Cir. 2014) (nixing "selfish deal"). Similarly, the Ninth Circuit in *In re Bluetooth Headset Prods. Liab. Litig.,* identified three warning signs of self-dealing by class counsel: **(1)** a disproportionate distribution of fees to counsel; **(2)** a "clear sailing agreement" (the defendant's agreement not to oppose a certain sum in fees); and **(3)** a "kicker" (a segregated fund for fees that reverts any excess fees to the defendant)). 654 F.3d 935, 947 (9th Cir. 2011). As in *Bluetooth*, there are "multiple indicia" of self-dealing and unfairness present here.

### A.   Class counsel's fee request is a disproportionate 40% share of class benefit.

Class counsel's request for 40.3% of the class benefit ($6.75 million fees ÷ $16.75 million total benefit) is excessive and reflects class counsel's self-dealing. As an initial matter, class counsel correctly recognize that the settlement should be treated as a constructive common fund. *See* Consumer Plaintiffs' Memorandum in Support of Motion for Payment of Service Awards to Class Representatives and For an Award of Attorneys' Fees and

Reimbursement of Expenses ("Fee Motion"), Dkt. 482 at 25-26. Unlike an all-inclusive pure common fund, the class benefits are formally segregated from the attorneys' fees to class counsel. This segregation forms what is known as a "constructive common fund." *See Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241 (8th Cir. 1996) ("[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal."); *Dennis v. Kellogg Co.*, 697 F.3d 858, 862-63 (9th Cir. 2012) (evaluating a similar "constructive common fund" settlement); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig. ("In re GM Pick-Up"),* 55 F.3d 768, 820 (3d Cir. 1995) (A severable fee structure "is, for practical purposes, a constructive common fund."). Because "the adversarial process" between the settling parties cannot safeguard "the manner in which that [settlement] amount is *allocated* between the class representatives, class counsel, and unnamed class members," it is no surprise that the most common settlement defects are ones of allocation. *Pampers*, 724 F.3d at 717 (emphasis in original). Allocational issues cannot be waived away simply by structuring the settlement as a constructive common fund with segregated fees rather than a traditional common fund. *See, e.g., Bluetooth*, 654 F.3d at 943; *Pampers*, 724 F.3d at 717.

1. **When notice and administrative costs are properly excluded, the fee request is excessive under the percentage of recovery method.**

The Court has recognized that "[m]ost courts applying the percentage-of-the-fund approach award fees in the 25% to 30% range, adjusting up or down for the circumstances of the case." *In re Monosodium Glutamate Antitrust Litig.*, 2003 U.S. Dist. LEXIS 1970, at *4 (D. Minn. Feb. 6, 2003) ("*MSG*"); *Zilhaver v. UnitedHealth Group, Inc.*, 646 F. Supp. 2d 1075, 1084 (D. Minn. 2009) (awarding 14% and noting that it fell within reasonable range); *cf. Dennis*, 697 F.3d at 868 (38.9% "clearly excessive" under Ninth Circuit's 25% benchmark); *Redman*, 768 F.3d at 630-32 (55%-67% allocation unfair). A fair settlement requires a fair allocation of the proceeds; "[t]he ratio that is relevant is the ratio of (1) the fee to (2) the fee plus what the class members received." *Pearson*, 772 F.3d at 781 (quoting *Redman v. RadioShack Corp.*, 768

F.3d 622, 630 (7th Cir. 2014); *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) ("*HP Inkjet*") ("Where both the class and its attorneys are paid in cash … [t]he district court can assess the relative value of the attorneys' fees and the class relief simply by comparing the amount of cash paid to the attorneys with the amount of cash paid to the class."); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 170 (3d Cir. 2013) ("[C]ourts need to consider the level of direct benefit provided to the class in calculating attorneys' fees."). Even assuming that the class will actually receive all of the $10 million settlement fund (because of the claims deadline and claims process, it is unclear how much the class members will *actually* receive)[2], class counsel's request is grossly excessive. Applying the *Redman* ratio here, class counsel's fee of $6.75 million compared to the $16.75 million total relief ($6.75 million fees + $10 million settlement fund for class recovery) results in an excessive 40.3% ratio.

Here, class counsel argue that their $6.75 million fee request amounts to only 28.9% of the recovery because "[t]he total value of the common benefits secured by the Settlement to Class Members is approximately $23,320,816" made up of $10 million settlement fund; $6.57 million in notice and administration costs; and $6.75 million in fees. *See* Fee Motion, Dkt. 482 at 35.[3] Class counsel's math wrongly includes the notice and administration costs. This is double-counting.

---

[2] The class representatives will receive $58,000 from the settlement fund. *See* Fee Motion, Dkt. 482 at 43.

[3] Class counsel correctly excluded from its valuation the business changes made by Target: designation of chief information security officer; maintaining written information security program; maintaining process to monitor information security risks; providing security training to "relevant" Target employees. *See* Settlement, Dkt. 358-1 at 17-18. These changes are largely cosmetic. *See Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 269 n.28 (E.D.N.Y. 2009) ("Although other remedial relief in the form of changes to the privacy notice, the appointment of a Chief Privacy Officer and Class Counsel's ongoing responsibility to monitor the defendant's privacy practices were included in the Settlement Agreement, the value of these essentially cosmetic steps is minimal."). Further, to the extent these changes are required by law or were in place prior to the lawsuit, they do not constitute a class benefit. *See Galloway v. Kan. City Landsmen*, No. 4:11-1020-CV-W-DGK, 2012 U.S.

The notice and "administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class." *Redman*, 768 F.3d at 630 (distinguishing *Staton*). Settlement notice is only valuable to the class to the extent that it causes the class to realize benefits—and those benefits are already counted in the $10 million settlement fund that class counsel is seeking credit for. Settlement notice is a benefit to the defendant, because without it, the defendant does not meet due-process standards for enforcing the settlement release. *See e.g., Hecht v. United Collection Bureau*, 691 F.3d 218 (2d. Cir. 2012) (permitting relitigation of class action because of inadequacy of class notice in previous settlement); *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1226-29 (11th Cir. 1998) (same); *Besinga v. United States*, 923 F.2d 133, 137 (9th Cir. 1991) (same) (citing cases). Refusing to count notice costs is just one instantiation of the general principle that costs imposed on the defendant—divorced from class benefits—are not the measure of compensable class value. *See Bluetooth*, 654 F.3d at 944 ("[T]he standard [under Rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class." (quoting *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009)). As *Redman* noted, to award class counsel a commission on notice and administrative costs creates perverse incentives to overspend on the third parties. 768 F.3d at 630. When notice and administrative costs are correctly excluded, class counsel's fee request is an excessive 40%.

40% is particularly excessive given the circumstances of this case. In *MSG*, the court awarded 30% and noted that the litigation involved complex antitrust issues, pending for almost three years, with $2 million substantial investment in expenses; class counsel's 32,000 hours of work; and settlement funds that exceeded plaintiffs' experts' estimate of liability.

---

Dist. LEXIS 147148, at *18 (W.D. Mo. Oct. 12, 2012) ("Likewise, the provision whereby Defendants agree to obey the law in the future provides no marginal value to the class members, because Defendants are already in compliance.").

2003 U.S. Dist. LEXIS 1970, at *5-*6 (D. Minn. Feb. 6, 2003). This case could be no different. Here, the consolidated complaint was filed on August 25, 2014, and the motion for approval of a settlement was filed just over six months later. *See* Complaint, Dkt. 182; Motion for Approval of Settlement, Dkt. 355. The $10 million in relief is not substantial given that 41.9 million class members had credit card information stolen, 60 million class members had personal information stolen, and a subclass of class members will receive no compensation under the Settlement. *See* Exhibit 9 to Settlement Agreement, Dkt. 358-1 at 94-96. A 30% fee request would be too much here and the requested 40% is untenable.

## 2. The lodestar improperly includes time for 45 law firms and the Court should not award a multiplier higher than one.

Class counsel also argue that their fee award is justified under the lodestar method. The Eighth Circuit has noted that the percentage of recovery is the preferred method in calculating attorneys' fees in common fund (including constructive common fund) cases. *Johnston*, 83 F.3d at 245. The lodestar cross-check, however, can "confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate." *Bluetooth*, 654 F.3d at 945; *Roeser v. Best Buy Co.*, 2015 U.S. Dist. LEXIS 88471, *17 (D. Minn. June 17, 2015) (noting cross-check could be used to test fairness "under one method against the other.").

Here, class counsel submits a combined lodestar of *45 law firms* for fees and expenses of $5.12 million for time spent *after* appointment of lead and liaison counsel on May 15, 2014. *See* Fee Motion, Dkt. 482 at 43; Exhibit 3 to Declaration of Consumer Plaintiffs' Lead Counsel Vincent J. Esades ("Esades Decl."), Dkt. 483-3 at 2-3. As an initial matter, the $5.12 million post-appointment time should be greatly reduced because it represents time from 45 firms. This Court appointed *6 firms* to act as lead or liaison counsel and who were designated settlement class counsel under the Preliminary Approval Order. Dkt. 364 at 4. The combined lodestar post-appointment for those 6 firms totals $3,739,200. *See* Exhibit 3 to Esades Decl., Dkt. 483-3 at 2. The post-appointment time, however, represents $1.376 million in additional time from these other 39 firms. There was

likely duplication of effort and overstaffing with the 6 appointed firms, but with 45 law firms, the overstatement would be outrageous.[4] This Court should disregard at least $1.376 million of the claimed lodestar.

Class counsel also claim $3.78 million in lodestar prior to their appointment. *See* Fee Motion, Dkt. 482 at 43. The $3.78 million pre-appointment time should be disregarded for several reasons. *First*, it is unclear whether that the pre-appointment time includes time for those same 45 firms as class counsel has provided no breakdown by firm or by category of the $3.78 million. *Second*, although counsel has submitted monthly time and expenses to the Court after appointment of lead and liaison counsel, they have not submitted records of their $3.78 million pre-appointment time and have had no accountability to the Court for that time. *Third*, this MDL was first created in April 2, and lead and liaison were appointed just over a month later. *See* Transfer Order, Dkt. 1; Appointment Order, Dkt. 64. While this pre-appointment work constitutes 40% of their lodestar, class counsel's description of the work they performed (e.g., motion practice, discovery, and depositions) is all post-appointment work. *See* Fee Motion, Dkt. 482 at 17. It is unknown how much of the pre-appointment time involved opposing MDL transfers or jockeying with other firms for the position of lead counsel. The class should not have to pay for squabbles over counsel leadership. Accordingly, the $3.78 million pre-appointment time should also be discounted.

Class counsel argue that the $5.12 million lodestar (post-appointment work) reflects a 1.29 multiplier. *See* Fee Motion, Dkt. 482 at 20. If the lodestar is discounted to include only

---

[4] Rule 23(g) requires the district court to select the best applicant among those seeking to be class counsel. Fed. R. Civ. Proc. 23(g). Is not uncommon for counsel to agree who will be lead class counsel "in exchange for commitments to share the legal work and fees." Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.272 (2004). "To guard against overstaffing and unnecessary fees, **the court should order the attorneys to produce for court examination any agreements they have made relating to fees or costs**." *Id.* (emphasis added). Class counsel has not disclosed how those other 39 firms will be compensated from any fee award, which is another reason the Settlement is objectionable. *See* Section IV.

the post-appointment work of the 6 firms appointed as class counsel, the $3,739,200 lodestar results in a multiplier of 1.8. Any multiplier over 1 is not appropriate here. The Supreme Court has established a "strong presumption that the lodestar is sufficient" without an enhancement multiplier. *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1669 (2010). A lodestar enhancement is justified only in "rare and exceptional" circumstances where "specific evidence" demonstrates that an unenhanced "lodestar fee would not have been adequate to attract competent counsel." *Id.* at 1673; *accord Forshee v. Waterloo Indus., Inc.,* 178 F.3d 527, 532 (8th Cir. 1999) (noting that only in "rare" and "exceptional" cases, "counsel may be entitled to a multiplier to reward them for taking on risk and high-quality work"). "[T]he burden of proving that an enhancement is necessary must be borne by the fee applicant." *Id.*

 *Kenny A's* limitation on enhancements was made in the context of interpreting 42 U.S.C. § 1988's language of "reasonable" fee awards, but it applies equally to "reasonable" fee awards in class actions made under Fed. R. Civ. P. 23(h). *See e.g., In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 361 (3d Cir. 2010) (Weis, J. concurring/dissenting) (referring to *Kenny A* as an "analogous statutory fee-shifting case."); *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 Fed. Appx. 496, 500 (6th Cir. 2011); *see also Roeser v. Best Buy Co.*, 2015 U.S. Dist. LEXIS 88471, at *30-31 (D. Minn. June 17, 2015) (citing *Forshee* and rejecting request for 1.9 multiplier because case "settled early, efficiently, and non-contentiously").

 In short, any multiplier greater than one would be improper.

**B.** **The settlement's "clear sailing" and "kicker" provisions show self-dealing and unfairly prevent decreases in fees from returning to the class.**

The settlement has a "clear sailing" provision providing that Target may object to a fee request (although it has not) but it waives the right to appeal any attorneys' fee award up to $6.75 million. Settlement, Dkt. 358-1 at 21. A clear-sailing clause stipulates that attorney awards will not be contested by opposing parties. "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great N. Nekoosa Corp.*,

925 F.2d 518, 525 (1st Cir. 1991). The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Id.* at 525. The clear-sailing clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for redcarpet treatment on fees." *Id.* at 524; *accord Bluetooth*, 654 F.3d at 947. Here, class counsel put its own fees ahead of the interests of the class by negotiating a provision that insulated those fees from challenge by the defendant. Class counsel provide no justification for this self-serving clause.

Not only does the settlement contain a "clear sailing" provision forbidding defendant from appealing a $6.75 million fee award, but there is a "kicker" agreement providing that any reduction in the fee award reverts to Target rather than the class. The settlement agreement effectuates this by stipulating that fees will be considered separate and apart from class relief. Settlement, Dkt. 358-1 at 21. This is the third red flag pinpointed by *Bluetooth*: when the "parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Bluetooth*, 654 F.3d at 947.

This "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Id.* at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.* In a typical common-fund settlement, the district court may, at its discretion, reduce the fees requested by plaintiffs' counsel—and when it does so, the class will benefit from the surplus. *E.g., Michel v. Wm Healthcare Solutions*, No. 1:10-cv-638, 2014 U.S. Dist. LEXIS 15606, at *52 (S.D. Ohio Feb. 7, 2014) ("[B]y reducing the amount of the fund paid to Class Counsel, the Court augments the benefit to each Class Member."). A constructive common fund like here, however, is an inferior settlement structure for one principal reason: the segregation of parts means that the Court cannot remedy allocation issues by reducing fee awards or named-representative payments. *See Pearson*, 772 F.3d at 786; *Bluetooth*, 654 F.3d at 949. This constitutes a red flag of a lawyer-driven settlement and begets a "strong

presumption of…invalidity." *Pearson*, 772 F.3d at 787; *accord Redman*, 768 F.3d at 637 (kicker is a "defect"); *Eubank*, 753 F.3d at 723 (kicker is a "questionable provision").

Indeed, a court has more incentive to scrutinize a fee award because the kicker combined with the clear-sailing agreement means that any reversion benefits only the defendant that had already agreed to pay that initial amount. Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack"); Lester Brickman, LAWYER BARONS 522-25 (2011) (same; further arguing that reversionary kicker should be considered per se unethical). A clear-sailing agreement with a kicker to defendants is presumptive evidence of unfair self-dealing by class counsel. *Bluetooth*, 654 F.3d at 948-49; *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (finding no justification for a kicker provision and holding that there should be a strong presumption that a "kicker" clause is invalid). The problem is not merely hypothetical. If this Court decreases the $6.75 million excessive fee award, the excess returns to Target rather than the class. The settlement should be rejected until and unless the kicker agreement is removed. *See Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014) (suggesting that the district court should have deleted the kicker provision to allow any fee excess to return to the class).

Finally, by structuring the settlement to include the kicker agreement, class counsel has also breached their duty to their putative clients, the class members. Class counsel breach their fiduciary obligation when they agree to a fee arrangement to the detriment of the class. *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000) ("[C]lass counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class."); *see In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) (Easterbrook, J.) (holding that lawyers who bring a class action solely for their own benefit at the expense of the class fail to meet the adequacy requirement under Rule 23(a)(4)). Class counsel breached their fiduciary obligation by failing to demand a settlement structure that would return any reversion to the class.

C.     **The court cannot fully assess class counsel's fee without disclosure of the number and amount of claims.**

Without information regarding the actual value of the settlement, class counsel can more readily disguise the excessiveness of their fee request and their self-dealing. *Cf. Dennis*, 697 F.3d at 868 (requiring that settlement valuation "be examined with great care to eliminate the possibility that it serves only the self-interests of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious"); *HP Inkjet*, 716 F.3d at 1179 (observing similar problems). The value of the settlement is critical in determining whether class counsel's fee request is disproportionate to class recovery. *Bluetooth*, 654 F.3d at 943 (reversing and remanding after district court failed to make comparison between attorney award and value of settlement benefit to class); *In re GM Pick-Up*, 55 F.3d at 822 ("At the very least, the district court on remand needs to make some reasonable assessment of the settlement's value and determine the precise percentage represented by the attorneys' fees."); *Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014) (holding that district court erred because it "made no attempt to estimate how many claims were likely to be filed, though without such an estimate no responsible prediction of the value of the settlement to the members of the class could be made"); *see also* Procedural Guidance for Class Action Settlements, available at http://cand.uscourts.gov/ClassActionSettlementGuidance ("The motion for final approval should include information about … the number of class members who submitted valid claims").

Here, the claims deadline is the same as the objection deadline. (The Preliminary Approval Order does not set a claims deadline, but the settlement website sets a claim deadline of July 31, 2015. *See* Preliminary Approval Order, Dkt. 364; https://targetbreachsettlement.com/mainpage/ClaimForm.aspx.) While the distribution plan is designed to distribute all of the $10 million settlement fund, the Court and class members cannot conduct the disproportionality analysis without knowing the *actual* amount

of claims. Indeed, the Settlement recognizes that some of the fund might not be distributed and provides that the remaining funds will be "distributed by the Settlement Administrator as directed by the Court." Settlement, Dkt. 358-1 at 16.[5]

Further, without the claim information, the Court and class members do not know the total number of claims and total dollar value of "Documentary Support Claims" (claims seeking reimbursement for specific losses) and the total number of claims and total dollar value of "Self Certification Claims" (claimants who will receive an equal share of settlement fund remaining after payment of documentary support claims and incentive awards). *See* Distribution Plan, Dkt. 358-1 at 35. But in addition to the critical disproportionality analysis (fee v. total value of recovery to the class), understanding the number of class members who receive relief and the amount of those claims reflect whether the class got a good deal. *See Wheeler v. Mo. Transp. Comm'n,* 348 F.3d 744, 754 (8th Cir. 2003) ("In awarding attorney fees, the most critical factor is the degree of success obtained."). Class counsel's 40% fee request is excessive, but the Court and class members cannot fully analyze *how* excessive until the settling parties disclose the number and amount of claims.

**IV.     Rule 23(h) requires class counsel to disclose any agreement with each other and the other 39 law firms who submitted lodestar time regarding how the fee award will be allocated.**

Rule 23(h) authorizes the Court to award "reasonable" attorneys' fees only when notice of the fee request is "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h), (h)(1); *Redman v. RadioShack Corp.*, 768 F.3d 622, 637-38 (7th Cir. 2014). "Because

---

[5] The Settlement does not include provisions for redistributing remaining funds to claimants or non-claimant class members. This presents the potential danger that the remaining funds will be distributed to *cy pres* recipients ahead of class members, particularly because there is an entire subclass that is not entitled to any relief under the Settlement. Class members, however, are "not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either." *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013). The Settlement should be structured so that class members are the "foremost beneficiaries" of the Settlement. *See Baby Prods.*, 708 F.3d at 179.

members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party, notice is required in all instances." Notes of Advisory Committee on 2003 Amendments to Rule 23. "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process." *Id.* And Rule 23(e)(3) requires that "The parties seeking approval must file a statement identifying any agreement made in connection with the proposal."

It is not sufficient that class members are able to make "generalized arguments about the size of the total fee"; the notice must enable them to determine which attorneys seek what fees for what work. *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010). The fee request in this case lacks basic information; it fails to provide even the bare bones of who seeks what, instead providing for lump sum for the six firms appointed as "class counsel" to distribute amongst themselves (and the other 39 firms that submitted lodestar time). *See* Exhibit 3 to Esades Decl., Dkt. 483-3 at 2-3. This extra-judicial award undermines Rule 23(h)'s policy of "ensur[ing] that the district court, acting as a fiduciary for the class, is presented with adequate, and adequately-tested, information to evaluate the reasonableness of a proposed fee." *In re Mercury*, 618 F.3d at 994.

As the Fifth Circuit noted: "In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prod. Liab. Litig.,* 517 F.3d 220, 227 (5th Cir. 2008). The district court "must not … delegate that duty to the parties." *Id.* at 228 (internal quotation omitted). The appellants in *High Sulfur*, lawyers dissatisfied with their share, complained that the district court had sealed the fee-allocation list, such that they could not compare their fee awards to those of other attorneys. The Fifth Circuit agreed: "One cannot compare apples to oranges without knowing what the oranges are." *Id.* at 232. The Fifth Circuit explained:

It is likely that lead counsel may be in a better position than the court to evaluate the contributions of all counsel seeking recovery of fees. But our precedents do not permit courts simply to defer to a fee allocation proposed by a select committee of attorneys, in no small part, because "counsel have inherent conflicts." *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring). As Judge Ambro noted, "They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?" *Id.*

*High Sulfur*, 517 F.3d at 234-35; *cf. In re "Agent Orange" Prods. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987) (noting that allowing counsel to divide award among themselves "overlooks the district court's role as protector of class interests under Fed. R. Civ. P. 23(e) and its role of assuring reasonableness in awarding of fees in equitable fund cases").

The *High Sulfur* fee agreement is comparatively inoffensive to the one here: in *High Sulfur*, at least the district-court judge had the fee committee's recommendation available. Here the allocation is made in an out-of-court backroom agreement among class counsel without any judicial involvement. It is impossible to reconcile this with the *High Sulfur* requirement that fee awards be allocated openly by the court.

In short, this Court should require class counsel to disclose any agreement regarding allocation of a fee award in this action.

## V. The settling parties have artificially burdened the right of objection and opt-out; no inference should be drawn from a small number of dissenters.

Almost any given class-action settlement, no matter how much it betrays the interests of the class, will produce only a small percentage of objectors. The predominating response will always be apathy because objectors without counsel must expend significant resources on an enterprise that will create little direct benefit for themselves. *See Vought v. Bank of Am.*, 901 F. Supp. 2d 1071, 1093 (C.D. Ill. 2012) (citing, inter alia, a 1996 FJC survey that found between 42% and 64% of settlements engendered no filings by objectors). Another common response from non-lawyers is the affirmative avoidance, whenever possible, of anything involving a courtroom.

Without pro bono counsel to look out for the interests of the class, filing an objection is economically irrational for any individual. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re GM Pick-Up*, 55 F.3d at 812 (internal citation omitted). Moreover, "where notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a fait accompli." *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 680-81 (7th Cir. 1987).

"[T]he absence or silence of class parties does not relieve the judge of his duty and, in fact, adds to his responsibility." *Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971). The Court should draw no inference in favor of the settlement from the number of objections, especially given the vociferousness of the objectors that do appear. *In re GM Pick-Up*, 55 F.3d at 812-13; *Vought*, 901 F. Supp. 2d. at 1093. "One good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement." *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013).

"One hallmark of a reasonable settlement agreement is that it makes participation as easy as possible, whether class members wish to make a claim, opt out, or object." *McClintic v. Lithia Motors*, No. C11-859RAJ, 2012 U.S. Dist. LEXIS 3846, at *17 (W.D. Wash. Jan. 12, 2012) (critiquing comparable opt-out and objection process and ultimately rejecting settlement). Together, the hurdles imposed on exclusion and objection in this Settlement do not appropriately respect class members' Fed. R. Civ. P. 23 rights. Moreover, the Court loses the benefit of valuable adversarial perspectives that objectors can bring to the evaluation of a settlement's fairness. Not only do the hurdles constitute a reason to reject the settlement in this case, they provide an added reason to discredit any argument that the lack of objectors signals the class members' approval of the settlement. The settling parties have added unnecessary burdens to objections in several respects.

**A.    The objection and opt-out process unnecessarily requires three signed copies to be mailed to the settling parties and the court.**

There is no justification for requiring three copies of an objection or opt-out to be mailed. In *Newman v. Americredit Financial Services*, the court explained that it was not "not inclined to approve a settlement which makes it unnecessarily burdensome to submit a claim or opt out." 2014 U.S. Dist. LEXIS 15728, at *17 (S.D. Cal. Feb. 3, 2014). That court rejected the argument that mailing was required for the class member's affirmation because an affirmation could "be provided through an online form or by phone with adequate identification of the class member." *Id.*; *see also Galloway v. Kan. City Landsmen*, No. 4:11-1020-CV-W-DGK, 2012 U.S. Dist. LEXIS 147148, at *16 (W.D. Mo. Oct. 12, 2012) (denying settlement in part based on parties' failure to allow class members to opt out via email alone), *later proceeding reported at* 2013 U.S. Dist. LEXIS 92650, at *10-*11 (W.D. Mo. Jul. 2, 2013) (noting that after the initial settlement rejection "[t]he parties have simplified the opt-out provision so that in order to opt-out, class members need only send a single email to defense counsel."). Here, objectors must print and sign multiple copies of their objection and mail them to three different locations. *See* Exhibit 3 to Settlement, Dkt. 358-1 at 60-61. Such requirement is both expensive and outdated in 2015. *E.g., Newman, supra.*

Rather than requiring class members to snail-mail an objection to three recipients, other cases permit the relatively efficient (indeed, close to costless) method of transmitting objections and opt-outs by a single electronic submission. *See e.g., In re Motor Fuel Temperature Sales Practices Litig.*, No 07-md-01840-KHV-JPO, Order (Dkt. No. 3019), at 2 (D. Kan. Nov. 10, 2011) ("If Costco plans to proceed with email notification, it must allow class members to opt out of the class and object to the settlement electronically"); *Boring v. Bed Bath & Beyond*, No. 12-cv-05259-JST (N.D. Cal. Nov. 21, 2013) ("The Court notes that the filing of objections with the Court constitutes service upon counsel for the parties, as the parties' counsel are registered to receive filings through the Court's Electronic Case Filing system."). Likewise, there is no valid reason why a class member in this settlement should receive

notice via email but have to print, sign, and mail an objection or exclusion in this day and age. See, e.g., http://ebayfeaturedplusclassaction.com/#qf (allowing email opt out); http://www.copyrightclassaction.com/exclusion.php3 (online opt out); http://www.fraleyfacebooksettlement.com/faq#Q14 (same).

Where electronic modes of opting-out and objecting are available, the "vast majority" of participating class members will use those avenues. *Motor Fuel Temperature*, 2012 U.S. Dist. LEXIS 57981, at *76 (D. Kan. Apr. 24, 2012); *id.* at *74 n.13 (nearly three times more people opted-out electronically than by mail); *Fraley v. Facebook, Inc.*, No. 11-cv-01726 RS (N.D. Cal. Jun. 7, 2013), Declaration of Jennifer M. Keough Regarding Settlement Administration (Dkt. 341) at ¶12 (6,884 of 6,946 opt-out requests (99.1%) were submitted electronically via the settlement website when that option was available).

Imposing a costly, inefficient alternative over affordable, seamless electronic processes can only give rise to the inference that the parties wished to undermine the autonomous decisions of class members. It has been known for at least a half-decade that "the ease and cost-efficiency of such direct internet submissions increases the likelihood of absent class member participation." Robert H. Klonoff, *Making Class Actions Work: The Untapped Potential of the Internet*, 69 U. PITT. L. REV. 727, 766 n. 251 (2008); Leslie, *The Significance of Silence*, 59 FLA. L. REV. at 128-29. Indeed, notice was almost entirely distributed via the internet, yet absent class members' expressions of dissent cannot be made in the same medium. Class counsel is not licensed to consign objectors and opt-outs to second-class status.

**B.    The threat of deposition will unnecessarily depress objections; class representatives should be made available to test adequacy.**

The Preliminary Approval Order also requires that any objector "may be required to sit for a deposition" and if he fails to comply, "shall waive and forfeit any and all rights he or she may have to object, and shall be bound by all the terms of the Settlement Agreement." *See* Preliminary Approval Order, Dkt. 364 at 11. Without indicating where the deposition

would take place, potential objectors may be dissuaded from objecting because they fear that they would have to travel to Minnesota at great expense to comply with this requirement. Including this provision unnecessarily discourages objections. *Cf. In re Chiron Corp. Sec. Litig.,* 2007 U.S. Dist. LEXIS 91140 (N.D. Cal. Nov. 30, 2007) ("Frustrating the settlement is exactly what class members are entitled to do, if they think the settlement is not fair. The class' 'frustration rights' should not themselves be frustrated."). Indeed, just as objectors must be made available, the settling parties should make the class representatives available for depositions. Only three of the 110 class representatives have been deposed. *See* Class Counsel Fee Request, Dkt. 482 at 9. Olson challenges the adequacy of the class representatives because the Settlement creates a zero-recovery subclass. *See* Section II.A. As the adequacy of the representatives was never tested by Target, a sample of those representatives identified by Olson should be made available for deposition.

### C.     Objectors that have retained counsel have unnecessary additional hurdles for objection.

The Settlement places additional unnecessary restrictions on objectors who retain counsel. The objector must include his attorney's experience with class actions, including the capacity in which the attorney participated in each class action and the outcome of each case, and for each case in which the attorney has previously represented an objector in a class action, the disposition or effect that any objection had on each class action case, and whether the attorney was paid for each case that was voluntary dismissed, at any time, including on appeal. *See* Preliminary Approval Order, Dkt. 364 at 10. Such requirement is **ineffective at preventing bad-faith objectors** but creates an additional hurdle for objectors to jump through. *See Trabakoolas v. Watts Water Tech., Inc.*, No. 3:12-cv-01172-WHO (EDL) (Dkt. 276) (N.D. Cal. Feb. 14, 2013) (excising from class notice the requirement to list past suits in which the objector or his attorney has objected). *See generally* Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, 3 (2010), available at

http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf (last visited July 17, 2015) (directing courts to avoid notice language that places "burdensome hurdles" for "free exercise of rights, such as onerous requirements to submit a 'satisfactory' objection or opt-out request").

Finally, an objector who has retained counsel must still sign the objection personally, attesting that the objector has discussed the objection with his or her attorney and has fully reviewed the written objection. Under Rule 11, the attorney signing the paper is attesting that it is not filed for an improper basis and that there is a basis for the legal and factual contentions therein. *See* Fed. R. Civ. P. 11(b). Indeed, Rule 11 specifically provides that "unless a rule or statute specifically state otherwise, a pleading need not be verified." *See* Fed. R. Civ. P. 11(a). This requirement is unnecessary based on counsel's Rule 11 obligations and is unduly burdensome as it places a higher standard on objectors than most parties.

## CONCLUSION

The Court should deny approval. Even if the Court were to approve the settlement, it should defer awarding fees until the actual number and amount of claims is known to ensure that the "$10 million" figure ascribed to class relief is not illusory. Class counsel should not be allowed to harass objectors without submitting to reciprocal discovery.


Dated: July 30, 2015.
/s/ Melissa A. Holyoak
Melissa A. Holyoak, (DC Bar No. 487759)
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW, No. 236
Washington, DC 20036
Phone: (573) 823-5377
Email: melissaholyoak@gmail.com

*Attorneys for Objector Leif Olson*


I, Leif A. Olson, personally attest that I have discussed the foregoing Objection with my counsel and I have fully reviewed and endorse the Objection.

Dated: July 30, 2015.     _____
LEIF A. OLSON
*Objector*

## CERTIFICATE OF SERVICE

The undersigned certifies she electronically filed the foregoing Objection via the ECF system for the District of Minnesota, thus effecting service on all attorneys registered for electronic filing. Additionally she caused to be served via overnight courier a copy of this Objection upon the following:

| | |
|---|---|
| Clerk of the Court<br>USDC, District of Minnesota 734 Federal Building<br>316 North Robert Street<br>St. Paul, MN 55101<br><br>David F. McDowell<br>Morrison & Foerster LLP<br>707 Wilshire Boulevard<br>Los Angeles, CA 90017-3543 | Vincent J. Esades<br>Heins Mills & Olson, P.L.C.<br>310 Clifton Avenue<br>Minneapolis, MN 55403 |

Additionally, she caused to be mailed a courtesy copy of the foregoing via overnight courier to:

Hon. Paul A. Magnuson
United States District Court
734 Federal Building
316 N. Robert Street
St. Paul, MN 55101

Dated: July 30, 2015.                                    /s/ Melissa A. Holyoak