

ROPES & GRAY LLP
THREE EMBARCADERO CENTER
SAN FRANCISCO, CA 94111-4006
WWW.ROPESGRAY.COM

September 30, 2015

Michelle Visser
T +1 415 315 6347
F +1 415 315 4875
michelle.visser@ropesgray.com

**VIA E-FILING**
The Honorable Jeffrey J. Keyes
United States District Court for the District of Minnesota
646 Warren E. Burger Federal Courthouse
316 N. Robert Street
St. Paul, MN 55101

      **RE:** *In re Target Corporation Customer Data Security Breach Litigation* **(Financial Institution Cases) MDL No. 14-2522 (PAM/JJK)**

Dear Judge Keyes:

    Plaintiffs' motion to compel leaves the impression that Target has relied on an improper interpretation of the attorney-client privilege and work product doctrine to shield from Plaintiffs all facts regarding the 2013 data breach. This is not the case. Target has produced a substantial volume of non-privileged documents regarding the data breach and Target's response to it, and has permitted Target employees to testify about the data breach and Target's response to it on multiple occasions. To the extent the documents plaintiffs now seek to compel reflect facts relating to these topics, they are nonetheless protected from disclosure because they are not ordinary course business documents, but instead reflect legal advice and/or were created pursuant to counsel's efforts to understand the information necessary to defend Target and provide legal advice to Target in the wake of the breach.

**I.    Communications With Privileged Verizon and the Data Breach Task Force Are Protected from Disclosure by the Attorney-Client Privilege.**

    Plaintiffs are wrong in asserting that a team from Verizon Business Network Services Inc. ("Privileged Verizon") and the Data Breach Task Force ("DBTF") performed regular business functions. As an initial matter, there was nothing "regular" about the data breach, which plaintiffs themselves describe as "one of the largest data security breaches in United States history." Compl. ¶ 1. Upon learning of the potential breach, and continuing after the breach was confirmed, Target rallied in-house counsel and retained external counsel to advise upon an unprecedented and extraordinary event that had complex legal ramifications, including consumer lawsuits, litigation with financial institutions, and regulatory inquiries from state and federal agencies. Baer Decl. ¶¶ 4–6; Wugmeister Decl. ¶¶ 3–6.

    Concurrent with "ordinary course" work being conducted by Target's incident

- 2 -                                                    September 30, 2015

response teams and an investigation conducted by a team from Verizon Business Network Services Inc. ("PFI Verizon") on behalf of the payment card brands, Target asked Morrison & Foerster and Target's in-house counsel (together, "Counsel") to separately investigate the event in order to provide Target legal advice regarding it.  Baer Decl. ¶ 6; Wugmeister Decl. ¶ 6.  To help Counsel understand the incident and effectively provide legal counsel to Target, Counsel engaged Privileged Verizon.  Wugmeister Decl. ¶¶ 7–8; Ostertag Decl. ¶¶ 3, 5.  Target also formed the DBTF, co-chaired by its Chief Legal Officer and comprised of attorneys and non-attorneys, to coordinate activities conducted on behalf of Counsel and to enable Counsel to provide legal advice to the company.  Baer Decl. ¶¶ 9–11.

### A.   Communications Generated During Internal Investigations Done For Purposes of Securing Legal Advice Are Privileged.

Communications generated during a party's internal investigation of an event are protected by the attorney-client privilege when they are confidential and made for the purpose of securing legal advice.  *Marvin Lumber & Cedar Co. v. PPG Indus.*, 168 F.R.D. 641, 644 (D. Minn. 1996) (applying Minnesota law); *see also Cardenas v. Prudential Ins. Co. of Am.*, No. CIV. 99-1421JRTFLN, 2004 WL 234404, at *2 (D. Minn. Jan. 30, 2004).

Although neither Minnesota courts nor the Eighth Circuit have applied the "primary purpose" test that plaintiffs cite, courts of appeal construe that test broadly in the context of internal investigations.  *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759–60 (D.C. Cir. 2014) (upholding privilege in internal investigation supervised by in-house counsel).  In *Kellogg*, the D.C. Circuit rejected the notion that communications are not privileged simply because they might also have a business purpose, holding that "if one of the significant purposes of the internal investigation was to obtain or provide legal advice, the privilege will apply."  *Id.* at 760.  *See also Sandra T.E. v. South Berwyn Sch. Dist. 100*, 600 F.3d 612, 620 (7th Cir. 2010) (holding that communications regarding factual investigation by outside counsel were privileged).  The *Kellogg* court's holding is consistent with the Eighth Circuit's holding that communications can be protected by the attorney-client privilege and the work product doctrine when the communications mix business and legal advice or "impliedly" request legal advice regarding business decisions.  *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 404 (8th Cir. 1987) (citation omitted).  This is so because "legal advice concerning commercial transactions is often intimately intertwined with and difficult to distinguish from business advice."  *Sedco Int'l, S. A. v. Cory*, 683 F.2d 1201, 1205 (8th Cir. 1982), *cert. denied*, 459 U.S. 1017 (1982); *In re Bieter Co.*, 16 F.3d 929, 939 n.9 (8th Cir. 1994) (absent evidence indicating a purpose other than the seeking of legal advice, a "presumption [of privilege] applies" to a lawyer's discussion of business and legal topics).

### B.   Communications with the DBTF Are Privileged.

Counsel's investigation of the data breach is analogous to the investigation conducted in *Kellogg*.  The most significant purpose of Counsel's internal investigation—

- 3 -                           September 30, 2015

including aspects of it relating to remediation plans (Pls.' Br. at 4)—was to put Counsel in a position to provide Target legal advice regarding how to meet legal requirements and to defend itself against regulatory inquiries and litigation. Baer Decl. ¶¶ 9–10. *See also Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 610 (8th Cir. 1977) (applying federal common law) (holding that a matter committed to a legal advisor is "prima facie committed for the sake of legal advice and . . . within the privilege absent" evidence to the contrary).

Unlike the defendants in the cases plaintiffs cite, Target did not delegate ordinary course tasks regarding core business functions to Counsel in connection with the breach. *See Marvin Lumber*, 168 F.R.D. at 646 (investigation of ordinary course customer complaints not privileged); *Mission Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 160–65 (D. Minn. 1986) (insurer's delegation of routine investigation of insurance claim to lawyers not privileged). There was nothing "ordinary" about the data breach. Ordinary course information security investigations do not involve incidents that result in class actions and regulatory investigations.[1] Unlike the defendants in those cases, moreover, Target *has produced* documents relating to other investigations of the data breach, including "ordinary course" investigative work by Target employees, to the extent that any investigative work regarding the data breach could be considered ordinary course work.

The DBTF facilitated Counsel's investigation and provision of legal advice to Target. From its inception, the DBTF served the critical purpose of addressing the fact that many distinct groups at Target were dealing with matters that could have profound legal implications for the company as a whole. Baer Decl. ¶¶ 9–10. In order to centrally manage these legal implications, the DBTF needed to solicit the views, input and data from Target team members. And, as Harold McElhinny, counsel for Target, explained in a hearing before this court earlier this year, in order for counsel to provide Target with legal advice, Target employees and third parties must be able to provide counsel with details about technology issues so that counsel can analyze the legal impact and advise Target accordingly. *See* Disc. Mot. Hr'g Tr. 25:13–20 Feb. 24, 2015 (ECF No. 346).

The vast majority of communications that plaintiffs seek to compel, including nearly all examples cited in their letter brief,[2] either included attorneys or discussed communications with attorneys. To provide counsel with the information it required to advise Target, there were certain instances where DBTF members communicated outside the presence of counsel. Contrary to Plaintiffs' assertions, the attorney-client privilege

---

[1] Further, despite plaintiffs' suggestions, learning about ordinary course information security investigations was not a part of Beth Jacob's regular job functions. Salters Decl. ¶ 5.

[2] Entries 172–182, 513–516, 746–749, and 2004–2005 include communications with counsel, and Entries 89 and 599 reference communications with counsel. The remaining documents, Entries 763–764, 988–989, 1313–1314, 1670–1672, and 1877 (the Board of Director updates), are protected under the work product doctrine.

applies to such communications where, as here, they were incident to securing legal advice, were made by members of a "designated" team, and "were not disseminated beyond those with a need to know." *Safco Prods. Co. v. Welcom Prods.*, 2010 U.S. Dist. LEXIS 145172, at *6–7 (D. Minn. Feb. 18, 2010) (citing *In re Bieter Co.*, 16 F.3d 929, 935 (8th Cir. 1994)).

### C.  Communications With Privileged Verizon Are Privileged.

To conduct its investigation regarding the data breach and provide Target related legal advice, it also was imperative that Counsel have assistance from an outside expert that could facilitate counsel's understanding of the highly technical issues. In this context, communications with the outside expert are protected by the attorney-client privilege. *See Genesco, Inc. v. Visa U.S.A.*, Inc., 296 F.R.D. 559, 581 (M.D. Tenn. 2014) (outside consultant's investigation into cyberattack was privileged where consultant was retained by counsel in contemplation of litigation and to assist counsel in providing legal advice regarding the cyberattack); *cf. In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994) (holding that the attorney-client privilege can protect communications with outside consultants).

The circumstances surrounding Morrison & Foerster's engagement of Privileged Verizon confirm that the retention was for legal, not business, purposes. Plaintiffs are incorrect in suggesting outside counsel was not in attendance when the decision to engage Privileged Verizon was made, and the *agenda* (not minutes) that plaintiffs cite does not set forth the ultimate basis upon which that decision was made. Wugmeister Decl. ¶¶ 7–8. As set forth in its engagement letter, Privileged Verizon was engaged by Morrison & Foerster to "enable Counsel to provide legal advice to Target, including legal advice in anticipation of litigation and regulatory inquiries." Wugmeister Decl. ¶ 11. Privileged Verizon understood that its services were being provided to assist counsel in providing legal advice to Target, Privileged Verizon reported to Counsel, and Counsel participated in virtually every conversation about the investigation. Ostertag Decl. ¶¶ 5–8.

## II.  The Documents at Issue Were Prepared in Anticipation of Litigation.

### A.  Documents Generated by Reason of the Work of the DBTF and Privileged Verizon Satisfy the Standard for Work Product Protection.

Plaintiffs argue that documentation stemming from Target's DBTF and Privileged Verizon's work is ineligible for work product protection because it was created in the regular course of business. This argument mischaracterizes Target's business activities and impermissibly narrows the legal standard for work product in this Court.

To warrant work product protection, litigation must be one of the reasons for a document's creation, not necessarily the only one. *See, e.g., Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987) (noting that the doctrine protects documents that "can fairly be said to have been prepared or obtained because of the prospect of litigation");

- 5 -                                                              September 30, 2015

*United States v. Deloitte LLP*, 610 F.3d 129, 138 (D.C. Cir. 2010) ("[A] document can contain protected work-product material even though it serves multiple purposes . . . .").

It is impossible to separate the anticipation of litigation from the work of the DBTF and Privileged Verizon. Target hired Morrison & Foerster to conduct an investigation and advise Target in anticipation of regulatory inquiries and litigation with the card brands and other persons and entities arising out of the data breach. Baer Decl. ¶¶ 4, 6; Wugmeister Decl. ¶¶ 5–6. To provide these services, Morrison & Foerster needed the assistance of Privileged Verizon. *See* Wugmeister Decl. ¶¶ 7–8. On January 3, 2014, following the filing of at least five consumer class actions related to the breach, Target created the DBTF. Baer Decl. ¶¶ 8–9. In the ensuing weeks and months, Target faced over 100 other lawsuits, including the class actions that were consolidated into this litigation. *Id.* ¶ 8. Against this backdrop, the DBTF was staffed with five lawyers and coordinated activities on behalf of counsel to better position Target's Law Department and outside counsel to defend Target against this myriad of legal claims. *Id.* ¶¶ 9–11. The anticipation of litigation drove the purpose and work of Privileged Verizon, Wugmeister Decl. ¶ 8, and the DBTF, Baer Decl. ¶ 10; therefore, documents generated in the course of their work are protected.

### B.     Plaintiffs Fail to Show Substantial Need.

In an attempt to sidestep the protections of the work product doctrine, plaintiffs contend that they face substantial need and are unable to secure the substantial equivalent of the items through alternate means without undue hardship. Br. at 6 (citing *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997)). This is simply not the case.

Target has produced a significant number of documents regarding how the data breach occurred and Target's response to it, including (i) emails and board presentations describing Target's non-privileged investigation findings and the steps Target was taking to contain the data breach, *see, e.g.*, Visser Decl. Exs. 1–6; (ii) the 131-page report that PFI Verizon prepared for the card brands, which describes in detail how PFI Verizon believes the data breach occurred and which provides detailed descriptions of the malware that the criminals used, Visser Decl. Ex. 7; and (iii) Target's appeals of the Visa and MasterCard assessments relating to the data breach, which set forth Target's key disagreements with PFI Verizon's conclusions regarding the facts of the data breach, Visser Decl. Exs. 8–10.[3] Target employees that were involved in the non-privileged investigation also have testified about their knowledge of the breach and Target's efforts to contain it. *See, e.g.*, Visser Decl. Exs. 11–13. Furthermore, plaintiffs are scheduled to take the deposition of a member of the PFI Verizon team on October 1, 2015, have noticed a pending 30(b)(6) deposition regarding

---

[3] Target has no material disputes with the facts set forth in PFI Verizon's report about the steps the intruders took to perpetrate data breach, but does dispute some of PFI Verizon's conclusions about the significance of, and inferences that can be drawn from, those facts.

the 2013 data breach generally, and have served requests for admissions on Target relating to the data breach, thereby giving plaintiffs more than sufficient opportunity to gather non-privileged information about facts and causes of the breach.  Finally, Target has produced to plaintiffs underlying evidence—forensic images—such that plaintiffs are positioned to conduct their own investigation, with the assistance of the substantial background materials described above, if they believe that they need additional information regarding how the breach occurred.  Plaintiffs have thus failed to make the showing required to override the protections the work product doctrine affords to the documents at issue.  And, of course, even had plaintiffs made such a showing, these documents would still be protected by the attorney-client privilege and, as such, would still not be discoverable.

### III. Documents Regarding Privileged Verizon are Protected from Disclosure by the Non-Testifying Expert Privilege.

Discovery of documents concerning the work of Privileged Verizon are further protected from disclosure under Fed. R. Civ. P. 26(b)(4)(D), which restricts discovery of facts known and opinions held by non-testifying experts to "exceptional circumstances under which it is impracticable . . . to obtain facts on the same subject by other means." *Kuster v. Harner*, 109 F.R.D. 372, 375 (D. Minn. 1986).

The declarations submitted herewith confirm that Privileged Verizon is a non-testifying expert retained by Counsel in anticipation of litigation. Wugmeister Decl. ¶ 8; Ostertag Decl. ¶ 5.  Moreover, Target currently has no intention of calling Privileged Verizon to testify at trial in this litigation.  Visser Decl. ¶ 4.  Accordingly, Privileged Verizon's work relative to the data breach and the documents related to that work fall squarely under Rule 26(b)(4)(D). *See Genesco, Inc. v. Visa U.S.A., Inc.,* 302 F.R.D. 168, 189–90 (M.D. Tenn. 2014) (sustaining objections to discovery requests concerning Genesco's privileged investigator following a data breach); *see also In re TJX Cos. Data Sec. Breach Litig.*, Case No. 07-cv-10162-WGY (D. Mass. Nov. 9, 2007) (finding work of forensic investigator retained by outside counsel protected by the non-testifying expert privilege). *See* Visser Decl. ¶¶ 18-20 and Exs. 14-15.

While courts permit discovery of non-testifying consulting experts upon a showing of exceptional circumstances, *Genesco*, 302 F.R.D. at 189, no such showing has been made. *See supra* Section II.B.

                    Very truly yours,

                    /s/ Michelle Visser
                    Michelle L. Visser, Esq.

cc:     All Counsel of Record (via ECF)