# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Target Corporation Customer Data Security Breach Litigation<br><br>This Document Relates to:<br><br> All Consumer Cases | MDL No. 14-2522 (PAM/JJK) |

## CONSUMER PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND IN FURTHER SUPPORT OF MOTION FOR PAYMENT OF SERVICE AWARDS TO CLASS REPRESENTATIVES AND FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

109190

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION .......................................................................... 1

    A.    Consumer Plaintiffs' Claims and Procedural HistoryHighlights. ............................................................. 1

    B.    The Settlement Agreement. ................................................. 2

    C.    Mediated Settlement Negotiations. ..................................... 5

II.    ARGUMENT ................................................................................ 6

    A.    Standards Governing Final Approval. ................................. 6

    B.    The Settlement Resulted from Arm's-Length Negotiations Among Experienced Counsel. ............................................. 8

    C.    The Settlement Satisfies the Standards for Final Approval. ............. 9

            1.    Balancing the Strength of Plaintiffs' Case Against the Terms of the Settlement Supports Final Approval. ............................................................... 9

            2.    The Defendant's Financial Condition. ................................. 12

            3.    The Complexity and Expense of Further Litigation. ............ 13

            4.    The Amount of Opposition to the Settlement. ...................... 15

    D.    The Objections to the Settlement Are Without Merit and Should be Overruled. ...................................................... 17

            1.    Objections to the Sufficiency of Relief. ................................ 17

            2.    Objection that the Settlement Will Only Benefit the Consumer Plaintiffs and Class Counsel. ............................... 21

            3.    Objections to Certification of the Settlement Class. ............. 23

            4.    There Are No Fundamental Conflicts Among Class Members. .......................................................................... 25

            5.    Objections to the Plan of Allocation. ................................... 28

i

6.      Objections to the Procedures for Objecting and
        Other Judicial Administration Matters...................................32

7.      The Service Awards Are Reasonable....................................34

8.      Objections to the Attorneys' Fees Request. .........................35

E.      The Settlement Class Satisfies the Requirements of Rule
        23(a) and 23(b)(3) and Should be Finally Certified for
        Purposes of Settlement. ....................................................41

F.      Adequate Notice Was Provided to the Settlement Class
        Pursuant to the Court's Preliminary Approval Order. .....................41

III.    CONCLUSION .........................................................................43

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Nat'l Football League*,
No. 4-76-Civil-123, 1977 WL 1497 (D. Minn. Aug. 1, 1997) ...................................... 9

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .................................................................................................... 24

*Bell Atlantic Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993) .......................................................................................... 17

*Burrows v. Purchasing Power, LLC*,
No. 1:12-cv-22800, 2013 WL 10167232 (S.D. Fla. Oct. 7, 2013) .............................. 21

*Charron v. Wiener*,
731 F.3d 241 (2d Cir. 2013) ........................................................................................ 21

*City of Livonia Emps.' Retirement Sys. v. Wyeth*,
No. 07-Civ.10329 (RJS), 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013) ...................... 23

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ................................................................................................ 25

*DeBoer v. Mellon Mortg. Co.*,
64 F.3d 1171 (8th Cir. 1995) ........................................................................................ 9

*DeHoyos v. Allstate Corp.*,
240 F.R.D. 269 (W.D. Tex. 2007) ............................................................................... 37

*Dennis v. Kellogg Co.*,
697 F.3d 858 (9th Cir. 2012) ....................................................................................... 41

*Dryer v. Nat'l Football League*,
Civ. No. 09-2182 (PAM/AJB), 2013 WL 5888231 (D. Minn. 2013) ... 9, 12, 13, 15, 16

*Elliott v. Sperry Rand Corp.*,
680 F.2d 1225 (8th Cir. 1982) ..................................................................................... 16

*Eubank v. Pella Corp.*,
753 F.3d 718 (7th Cir. 2014) ....................................................................................... 41

*Fastener Dimensions, Inc. v. Mass. Mut. Life Ins. Co.*,
Nos. 12cv8918, 13cv4782 (DLC), 2014 WL 5455473 (S.D.N.Y. Oct. 28,
2014) ............................................................................................................................ 37

*Fraley v. Facebook, Inc.*,
    966 F. Supp. 2d 939 (N.D. Cal. 2013) ........................................................................ 18

*George v. Uponor Corp.*,
    Civ. No. 12-249 (ADM/JJK), 2015 WL 5255295 (D. Minn. Sept. 9, 2015) .............. 28

*Grier v. Chase Manhattan Auto. Fin. Co.*,
    No. Civ. A. 99-180, 2000 WL 175126 (E.D. Pa. Feb. 16, 2000) ................................. 8

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ................................................................................. 7, 9

*Halvorson v. Auto-Owners Ins. Co.*,
    718 F.3d 773 (8th Cir. 2013) ................................................................................... 25

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................................... 18, 25

*Hartless v. Clorox Co.*,
    273 F.R.D. 630(S.D. Cal. 2011) .............................................................................. 40

*Hispanics United of DuPage Cnty. v. Vill. of Addison*,
    988 F. Supp. 1130 (N.D. Ill. 1997) .......................................................................... 20

*In re Agent Orange Prods. Liab. Litig.*,
    818 F.2d 216 (2d Cir. 1987) .................................................................................... 40

*In re Airline Ticket Comm'n Antitrust Litig.*,
    953 F. Supp. 280 (D. Minn. 1997) ...................................................................... 18, 19

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ....................................................................... 32

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ................................................................................... 41

*In re Checking Account Overdraft Litig.*,
    830 F. Supp. 2d 1330 (S.D. Fla. 2011) .................................................................... 33

*In re Cmty. Bank of N. Va.*,
    418 F.3d 277 (3d Cir. 2005) ..................................................................................... 25

*In re Emp. Benefit Plans Sec. Litig.*,
    Civ. No. 3-92-708, 1993 WL 330595 (D. Minn. June 2, 1993) ............................... 8, 9

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995)...................................................................................36, 41

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) ..........................................................21, 30, 38

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
   517 F.3d 220 (5th Cir. 2008) .......................................................................40

*In re HP Inkjet Printer Litig.*,
   716 F.3d 1173 (9th Cir. 2013) ......................................................................41

*In re Law Office of Jonathan E. Fortman, LLC*,
   No. 4:13MC00042 AGF, 2013 WL 414476 (E.D. Mo. Feb. 1, 2013) .......................23

*In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.*,
   No. 99-MDL-1309 PAM/JCL, 2004 WL 2931352 (D. Minn. Dec. 16, 2004)...........24

*In re Magsafe Apple Power Adapter Litig.*,
   No. 5:091-CV-1911-EJD, 2015 WL 428105 (N.D. Cal. Jan. 30, 2015) ....................23

*In re Metris Cos., Inc., Sec. Litig.*,
   No 02-cv-3677JMR/FLN, 2008 WL 1947095 (D. Minn. Apr. 24, 2008)..................28

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*,
   MDL No. 2492, No. 13 C 9116, 2014 WL 7237208 (N.D. Ill. Dec. 17,
   2014) ..............................................................................................30, 31

*In re Netflix Privacy Litig.*,
   No. 5:11-cv-00379-EJD, 2013 WL 6173772 (N.D. Cal. Nov. 25, 2013)...................32

*In re Oil Spill by Oil Rig Deepwater Horizon*,
   295 F.R.D. 112 (E.D. La. 2013)......................................................................19

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) .....................................................................23, 39

*In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998)...........................................................................17

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*,
   No. 888, 1994 WL 202394 (E.D. La. May 18, 1994)...............................................23

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
   11-md-2258-ABJ (MDD), 2014 WL 7800046 (S.D. Cal. July 10, 2014)..................33

v

*In re St. Paul Travelers Sec. Litig.*,
  No. Civ. 04-3801 JRTFLN, 2006 WL 1116118 (D. Minn. Apr. 25, 2006) ............... 37

*In re Target Corp. Customer Data Sec. Breach Litig. (Financial Track)*,
  No. 14-md-2522-PAM/JJK, 2015 WL 5432115 (D. Minn. Sept. 15, 2015) .............. 25

*In re Uponor Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
  No. 11-MD-2247ADM/JJK, 2012 WL 2512750 (D. Minn. June 29, 2012) .............. 17

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
  716 F.3d 1057 (8th Cir. 2013) ............................................................... 12, 14

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
  No. 11-MD-2247 ADM/JJK, 2012 WL 3984542 (D. Minn. Sept. 11, 2012) ........... 34

*In re Wirebound Boxes Antitrust Litig.*,
  993 F.2d 152 (8th Cir. 1993) ................................................................. 31

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
  396 F.3d 922 (8th Cir. 2005) ........................................................ 7, 16, 26

*In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig.*,
  364 F. Supp. 2d 980 (D. Minn. 2005) ............................................... 21, 35, 37

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  No. 08-MDL-1958 ADM/AJB, 2012 WL 5055810 (D. Minn. Oct. 18,
  2012) ......................................................................................... 10, 22, 38

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  No. 08-MDL-1958 ADM/AJB, 2013 WL 716088 (D. Minn. Feb. 27, 2013) ........... 7, 8

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  No. 08-MDL-1958 ADM/AJB, 2013 WL 716460 (D. Minn. Feb. 27, 2013) ............. 35

*Johansson-Dohrmann v. Cbr Sys., Inc.*,
  No. 12-cv-1115-MMA (BGS), 2013 WL 3864341 (S.D. Cal. July 24, 2013) ...... 19, 30

*Johnston v. Comerica Mortg. Corp.*,
  83 F.3d 241 (8th Cir. 1996) .............................................................. 35, 36

*Keith v. Back Yard Burgers of Neb.*,
  11-cv-0135, 2014 WL 4781914 (D. Neb. Sept. 23, 2014) ........................... 33

*Lane v. Facebook, Inc.*,
  696 F.3d 811(9th Cir. 2012), *cert denied, Marek v. Lane*,
  134 S. Ct. 8 (2013) ........................................................................... 27

*Leyva v. Medline Indus., Inc.*,
716 F.3d 510 (9th Cir. 2013) ............................................................... 25

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
222 F.3d 1142 (9th Cir. 2000) ............................................................. 38

*Lonardo v. Travelers Indem. Co.*,
706 F. Supp. 2d 766 (N.D. Ohio 2010) ................................................ 23

*Marshall v. Nat'l Football League*,
787 F.3d 502 (8th Cir. 2014) ................................ 1, 5, 7, 12, 13, 14, 16, 19, 20, 26, 27

*Nichols v. SmithKline Beecham Corp.*,
No. Civ.A00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ................................. 41

*Nwabueze v. AT&T Inc.*,
No. C 09-01529 SI, 2013 WL 6199596 (N.D. Cal. Nov. 27, 2013) ............................ 19

*Petrovic v. Amoco Oil Co.*,
200 F.3d 1140 (8th Cir. 1999) .................................................... 7, 9, 12, 20, 22, 26, 28

*Rexam, Inc. v. United Steel Workers of Am.*,
No. 03-cv-2998-PJS/JJG, 2007 WL 2746595 (D. Minn. Sept. 17, 2007) ................... 17

*Schmidt v. Fuller Brush Co.*,
527 F.2d 532 (8th Cir. 1975) ............................................................... 13

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ........................................................... 15, 24

*Van Horn v. Trickey*,
840 F.2d 604 (8th Cir. 1988) ......................................................... 7, 9, 16

*Varacallo v. Mass. Mut. Life Ins. Co.*,
226 F.R.D. 207 (D.N.J. 2005) ............................................................. 31

*Weeks v. Kellogg Co.*,
No. CV 09-08102(MMM)(RZx), 2013 WL 6531177 (C.D. Cal. Nov. 23,
2013) ...................................................................................... 38

*White v. Nat'l Football League*,
822 F. Supp. 1389 (D. Minn. 1993) ........................................................ 7

*Yarrington v. Solvay Pharm. Inc.*,
697 F. Supp. 2d 1057 (D. Minn. 2010) .................................................... 36

vii

## **Rules**

Fed. R. Civ. P. 23...................................................................................41, 42

Fed. R. Civ. P. 23(a) ....................................................................................41

Fed. R. Civ. P. 23(b)(3) ...............................................................................41

Fed. R. Civ. P. 23(e) ....................................................................................42

Fed. R. Civ. P. 23(e)(2) ............................................................................1, 6

Fed. R. Civ. P. 83(b)....................................................................................32

## **Other Authorities**

*Manual for Complex Litigation* § 21.661 (4th ed. 2015) ..................................28

Bruce D. Greenberg, *Keeping the Flies out of the Ointment: Restricting
    Objectors to Class Action Settlements*, 84 St. John's Law Rev. 949, 976-78
    (2010) ...................................................................................................24

Consumer Plaintiffs' Lead Counsel Vincent J. Esades respectfully asks the Court to grant final approval to a Settlement, reached after arms-length negotiations under the supervision of the Honorable Arthur J. Boylan, which provides significant monetary and equitable relief for the benefit of the Settlement Class. The Settlement is fair, reasonable and adequate; it meets and exceeds the established legal standards governing final approval. Fed. R. Civ. P. 23(e)(2); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2014). Class Counsel has submitted a separate motion and supporting papers seeking approval of service awards for Class Representatives and for reimbursement of attorneys' fees and expenses (ECF Nos. 481-485).

I.   **INTRODUCTION**

A.   **Consumer Plaintiffs' Claims and Procedural History Highlights.**

Consumer Plaintiffs ("Plaintiffs") filed their First Amended Consolidated Class Action Complaint ("Complaint") (ECF No. 258) on December 1, 2014. Plaintiffs allege claims against Defendant Target Corporation ("Target") arising from the breach of Target's computer systems first announced by Target on December 19, 2013, including claims asserting violations of state consumer laws and state data breach statutes, as well as negligence, breach of implied and express contract, bailment and unjust enrichment.

Target moved to dismiss (ECF No. 202). On December 18, 2014, the Court issued its Memorandum and Order (ECF No. 281), granting in part and denying in part Target's motion to dismiss and allowing the majority of Plaintiffs' claims to proceed.

1

On March 19, 2015, following briefing and a hearing, the Court entered its Order

Certifying a Settlement Class, Preliminarily Approving Class Action Settlement and

Directing Notice to the Settlement Class ("Preliminary Approval Order") (ECF No. 364).

### B.      The Settlement Agreement.

On March 9, 2015, Plaintiffs, on behalf of the Settlement Class, and Target, by its

Counsel, entered into a Settlement Agreement and Release, including attached exhibits

("Settlement Agreement" or "Settlement"),[1] resolving all claims asserted in the

Consumer Cases. The Settlement Class is:

> All persons in the United States whose credit or debit card information
> and/or whose personal information was compromised as a result of the data
> breach that was first disclosed by Target on December 19, 2013.
> Excluded from the class are the Court, the officers and directors of Target,
> and persons who timely and validly request exclusion from the Settlement
> Class.

Settlement ¶ 3.1; Prelim. Approval Order ¶ 1.

Target has agreed to provide a Settlement Fund of $10 million to fund

distributions to Settlement Class Members pursuant to the Distribution Plan approved by

the Court in its Preliminary Approval Order (¶ 12) and to pay any service awards to

Settlement Class Representatives approved by the Court. Settlement ¶¶ 1.20, 5.

---

[1] The Settlement is attached as Exhibit 1 (ECF No. 358-1) to the Declaration of
Consumer Plaintiffs' Lead Counsel Vincent J. Esades filed March 18, 2015 ("Esades
Decl. I") (ECF No. 358). Mr. Esades subsequently filed the Declaration of Consumer
Plaintiffs' Lead Counsel Vincent J. Esades in Support of Motion for Payment of Service
Awards to Class Representatives and for an Award of Attorneys' Fees and
Reimbursement of Expenses ("Esades Decl. II") (ECF No. 483) and today is filing the
Declaration of Consumer Plaintiffs' Lead Counsel Vincent J. Esades in Support of
Motion for Final Approval of Class Action Settlement ("Esades Decl. III").

Importantly, no part of the Settlement Fund will revert to Target.  *Id.* ¶ 5.1.3. Any

residual amount in the Settlement Fund remaining after payment of any approved service

awards, claims and any feasible supplemental distributions to Class Members will be

distributed as directed by the Court. *Id.* ¶¶ 5.1.2, 5.1.3, 7.1.

The Settlement provides for a consumer-friendly process for Class Members to

submit claims to the Court-appointed Settlement Administrator, Rust Consulting, Inc.

Prelim. Approval Order ¶ 6. Claims are submitted and processed primarily online through

the dedicated website, www.TargetBreachSettlement.com, which was activated on April

30, 2015 (with an option for submission of claims by U.S. mail). Settlement ¶ 1.16.

The Distribution Plan is efficient, fair and beneficial to all Class Members. Class

Members who submit a Documentary Support Claim and reasonable documentation

showing their losses (for example, a credit card statement, invoice or receipt) are eligible

for reimbursement up to a maximum of $10,000. Settlement, Ex. 1, Distribution Plan ¶

1.1. Such Class Members are also eligible for reimbursement of two hours of lost time (at

$10 per hour) for each type of documented loss they incurred (for example, unauthorized

charges or replacement of a driver's license, etc.). *Id*. ¶ 1.1.2. Class Members who submit

a valid Self-Certification Claim need not provide documents evidencing losses caused by

the data breach and are eligible to receive equal shares of the Settlement Fund after

payment of any service payments and approved Documentary Support Claims. *Id.* ¶ 4.1.

The amount paid to such Class Members will be calculated by dividing the amount

remaining in the Settlement Fund by the total number of valid Self-Certification Claims.

The Claim Form for Documentary Support and Self-Certification Claims is attached as

Exhibit 1 to the Distribution Plan (Settlement, Ex. 1). The Distribution Plan further provides for a claim validation procedure and a procedure for resolving any disputes relating to Documentary Support Claims. *Id.* ¶¶ 2, 3.

The Settlement also provides for significant non-monetary relief that benefits each Class Member by improving Target's data retention and security practices. For five years after the Settlement, Target will implement the following data security measures:

a. **Chief information security officer**. Target will designate a high level executive to coordinate and take responsibility for its information security program entrusted with the protection of consumers' personally identifiable information;

b. **Maintain a written information security program**. Target will identify internal and external risks to the security of consumers' personally identifiable information that could result in unauthorized access to Target's system and periodically review the sufficiency of safeguards to control such risks. Target will develop metrics to measure its security program and will ensure that those metrics are periodically reviewed and approved by senior Target leadership;

c. **Maintain a process to monitor for information security events and respond to such events determined to present a threat**. Target will design and implement reasonable safeguards to control information security risks, including through reasonable and appropriate software security testing; and

4

       d.  **Provide security training to Target employees**. Target will educate
and train relevant employees concerning the importance of the security
of consumers' personally identifying information.

Settlement ¶ 5.2.

Independent of (and in addition to) the $10 million Settlement Fund, Target will
also pay all costs of providing class notice and all administrative costs, including the
Settlement Administrator's fees. *Id.* ¶¶ 4.3, 5.1.4. Consequently, class notice and
administrative costs will not reduce the amount of the Settlement Fund and therefore will
not decrease the amount of benefits distributed to any Class Member.

The Settlement requires Target to pay any attorneys' fees and expenses awarded
by the Court to Settlement Class Counsel. *Id.* ¶ 7.2. As with class notice and
administrative costs, Target's agreement to pay an award of attorneys' fees and expenses
approved by the Court is in addition to the Settlement Fund, so any fee award will not
decrease a Class Member's benefits. The Settlement's finality is not dependent on the
Court awarding attorneys' fees and expenses. There is no "clear-sailing" agreement on
attorneys' fees. Target reserves the right to object to Settlement Class Counsel's request
for attorneys' fees in any amount but waives its right to appeal any award of attorneys'
fees that does not exceed $6.75 million. *Id.*

## C.    Mediated Settlement Negotiations.

While aggressively prosecuting the litigation, Consumer Plaintiffs' Lead Counsel
pursued good faith, arm's length and strongly contested negotiations with Target's
Counsel. Negotiations were supervised by the Honorable Arthur J. Boylan, who

5

conducted nine in-person mediation sessions (and numerous telephone communications) extending over five months from August 2014 to January 2015. The details of the mediation process are discussed in Plaintiffs' preliminary approval memorandum at 6-8 (ECF No. 357). Judge Boylan opines that the Settlement "provides for substantial benefits and relief to the Class and is a fair, adequate and reasonable settlement reached through arm's length negotiations by skilled, well informed counsel." Decl. of Hon. Arthur J. Boylan (Ret.) ¶ 10 ("Judge Boylan Decl. I"), ECF No. 360.

In his supplemental declaration, Judge Boylan notes that during the mediation process, "[t]he parties' counsel demonstrated a very high level of professionalism" and that "[t]he significant benefits provided for all class members . . . were achieved in a settlement in which counsel for both sides fairly and skillfully advocated for their clients' interests with consummate professionalism." Declaration of the Hon. Arthur J. Boylan (Ret.) in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ¶¶ 5, 12 ("Judge Boylan Decl. II"). Judge Boylan again explains that only after the parties reached agreement on settling the merits of Plaintiffs' claims did they discuss the issue of attorneys' fees and expenses (*id.* ¶ 6) and that the parties did not include any "clear sailing" agreement or "kicker" provision in the Settlement (*id.* ¶ 8).

## II.   ARGUMENT

### A.   Standards Governing Final Approval.

A Settlement must be "fair, reasonable, and adequate" to be approved. Fed. R. Civ. P. 23(e)(2). District courts within the Eighth Circuit consider four factors: (1) the merits of plaintiffs' case weighed against the settlement terms; (2) the defendant's

financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005) (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975). The Eighth Circuit has identified as a guiding principle that "a class settlement is a private contract negotiated between the parties." *Id.* at 934. "The court's role in reviewing a negotiated class settlement is 'to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned.'" *Marshall v. Nat'l Football League*, 787 F.3d at 509 (citation omitted). The determination is placed in the hands of the district court who occupies the front and center seat:

> "Such a determination is committed to the sound discretion of the trial judge. Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly."

*Van Horn v. Trickey*, 840 F.2d 604, 606-07 (8th Cir. 1988) (citation omitted).

The law strongly favors resolving litigation through settlement, particularly in the class action context. *White v. Nat'l Football League*, 822 F. Supp. 1389, 1416 (D. Minn. 1993); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08-MDL-1958 ADM/AJB, 2013 WL 716088, at *6 (D. Minn. Feb. 27, 2013). The Eighth Circuit has recognized that "'strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor.'" *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) (citation omitted).

**B.      The Settlement Resulted from Arm's-Length Negotiations Among Experienced Counsel.**

Courts attach "[a]n initial presumption of fairness . . . to a class settlement reached in arms-length negotiations between experienced and capable counsel after meaningful discovery." *Grier v. Chase Manhattan Auto. Fin. Co.*, No. Civ. A. 99-180, 2000 WL 175126, at *5 (E.D. Pa. Feb. 16, 2000). "The court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." *In re Emp. Benefit Plans Sec. Litig.*, Civ. No. 3-92-708, 1993 WL 330595, *5 (D. Minn. June 2, 1993) (citation omitted); *see also Zurn Pex*, 2013 WL 716088, at *6 ("Settlement agreements are presumptively valid, particularly where a 'settlement has been negotiated at arm's length, discovery is sufficient, [and] the settlement proponents are experienced in similar matters . . . .'") (citation omitted).

Judge Boylan confirmed that the mediation negotiations were strongly contested, hard-fought and conducted at arm's length, and opined that continued litigation posed significant risks for both sides. Judge Boylan Decl. I ¶¶ 7, 8, ECF No. 360; Judge Boylan Decl. II ¶¶ 5, 12, 13. Judge Boylan describes the Settlement as providing "substantial benefits and relief to the Class" and representing a "fair, adequate and reasonable settlement reached through arm's-length negotiations by skilled, well informed counsel." Judge Boylan Decl. I ¶ 10, ECF No. 360.

When, as here, the parties are represented by experienced counsel and rigorous negotiations were conducted at arm's length, the judgment of the litigants and their counsel concerning the adequacy of the Settlement may and should be considered. *See*

*Petrovic*, 200 F.3d at 1148-49; *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995).

## C.     The Settlement Satisfies the Standards for Final Approval.

The Settlement easily satisfies the four-factor test for determining whether a settlement is fair, reasonable and adequate.

### 1.     Balancing the Strength of Plaintiffs' Case Against the Terms of the Settlement Supports Final Approval.

"The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Van Horn*, 840 F.2d at 607 (citation omitted); *Dryer v. Nat'l Football League*, Civ. No. 09-2182 (PAM/AJB), 2013 WL 5888231, at *2. (D. Minn. 2013). The Court must balance the risks and benefits of litigation against immediate recovery for class members. *Grunin*, 513 F.2d at 124; *Petrovic*, 200 F.3d at 1150. In considering this factor, courts are "not to reach any conclusions as to the merits . . . nor . . . substitute [their] opinion" for that of counsel or the class members. *In re Emp. Benefit Plans Sec. Litig.*, 1993 WL 330595, at *4 (citation omitted); *see also Alexander v. Nat'l Football League*, No. 4-76-Civil-123, 1977 WL 1497, at *12-13 (D. Minn. Aug. 1, 1997) (stating that "the Court does not have the responsibility for trying the case or ruling on the merits of the matters resolved by agreement" but rather "'the very purpose of compromise is to avoid the delay and expense of such a trial'") (quoting *Grunin*, 513 F.2d at 124).

The Settlement provides significant benefits to the Class. The $10 million Settlement Fund will be distributed pursuant to a fair proposed Distribution Plan as discussed above. The distribution process uses a simple claim form and process that is primarily administered online by a very experienced Settlement Administrator, Rust Consulting, Inc. No portion of the $10 million Settlement Fund will revert to Target. Target will pay all administrative costs and class notice expenses in addition to the Settlement Fund. As a result, no Class Member's benefits will be reduced by administrative or notice costs. The same is true of any attorneys' fees or expenses awarded by the Court. *See In re Zurn Pex Plumbing Prods. Liab. Litig.,* No. 08-MDL-1958 ADM/AJB, 2012 WL 5055810, at *5 (D. Minn. Oct. 18, 2012) (approving settlement in which the defendants agreed to pay for costs of claims administrator, an engineering consultant, the costs of class notice and up to $8.5 million in attorneys' fees, in addition to paying up to $20 million for class members' claims, "making the total value of this settlement approximately $30 million"). Additionally, the Settlement provides substantial benefits to all Class Members in the form of non-monetary relief designed to safeguard customers' sensitive information held by Target. Settlement ¶ 5.2, ECF No. 358-1.

Dr. Larry Ponemon, an expert on data security, found that the non-monetary relief provided in the Settlement is of substantial value to all consumers impacted by the Target breach as well as to consumers whose card data and personal information is held by Target now and in the future:

In my opinion, the equitable relief provided by this Settlement is of substantial value to the millions of consumers who are victims of the Target data breach incident and to consumers whose credit or debit card data and/or personal information is maintained or in the future will be maintained by Target, in the following ways:

- Increases accountability and centralizes responsibility for data breach incident management;

- Improves the company's ability to quickly detect and contain security threats through aggressive monitoring and agile response;

- Raises the level of awareness and understanding about data security and privacy issues among the company's employees (who serve as the first line of defense); and

- Reduces the risk of future data breaches for customers, consumers, employees and other stakeholders.

Ponemon Decl. ¶ 17, ECF No. 361. Dr. Ponemon further opines that "[w]hile a corporate information security or privacy program can never guarantee the mitigation of all privacy and data protection risks, I believe that implementation of the requirements included in the Settlement will lead to important improvements in Target's protection of customer data to the benefit of all members of the proposed Settlement Class." *Id.* ¶ 18.

The Settlement also compares favorably with settlements reached in numerous other retailer data security breach cases. Esades Decl. I ¶ 46 & Ex. 2, ECF Nos. 358, 358-2).

Absent the Settlement, Class Members may not have been able to recover their losses. Target asserted numerous arguments and defenses that would have raised complicated and challenging factual and legal questions at trial. Class Counsel considered these significant risks, as well as the delay in Class Members' recovery due to continued

11

litigation. Class Counsel agreed to the Settlement based on careful consideration of various factors, including the significant monetary and equitable relief benefits of the Settlement, and the uncertainty of trial, recognizing that both sides faced the risks that a jury could react unfavorably to the evidence presented, as well as the uncertainties, risks, substantial expenses and significant delays associated with appeals that would inevitably be pursued following trial. Esades Decl. I ¶¶ 48-49, ECF No. 358.

In *Dryer*, this Court found that the merits of plaintiffs' case balanced against the terms of the settlement weighed heavily in favor of approval, considering the fact that "it is likely that the law of many different jurisdictions will apply to Plaintiffs' claims," class members' varying damages, and the numerous benefits of the settlement for class members. 2013 WL 5888231, at *4-7. On appeal, the Eighth Circuit agreed, affirming and tracking this Court's analysis and reasoning. *Marshall*, 787 F.3d at 514-521. *See also In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063-65 (8th Cir. 2013) (upholding Judge Montgomery's determination that the merits of plaintiffs' case and the favorable settlement terms warranted settlement approval).

The first factor weighs in favor of final approval.

2.      The Defendant's Financial Condition.

Courts also consider the compensation provided in the settlement and the defendant's ability to pay. *See Petrovic*, 200 F.3d at 1152 (citation omitted).  There is no reason for concern that Target will be unable to pay the full amount of the Settlement Fund, together with notice and administrative costs and any attorneys' fees and expenses awarded by the Court. Where the defendant's ability to pay is not at issue, this factor

12

should be considered neutral. *Dryer*, 2013 WL 5888231, at *4, *aff'd*, *Marshall*, 787 F.3d
at 512.

### 3.    The Complexity and Expense of Further Litigation.

The Court must also evaluate whether the expense and complexity of further
litigation weighs in favor of final approval. Class actions "place an enormous burden of
costs and expenses upon [ ] parties." *Schmidt v. Fuller Brush Co.*, 527 F.2d 532, 535 (8th
Cir. 1975). In *Dryer*, this Court approved a settlement where "[t]here is no doubt that
further litigation in this matter would be both complex and extraordinarily expensive";
"[t]he class certification process would undoubtedly be hard-fought and would also
require a detailed analysis of the claims of the class members"; "Plaintiffs' claims
themselves are complex"; and damages determinations would be "exceedingly time-
consuming and complex." 2013 WL 588231, at *3. In affirming, the Eighth Circuit
concurred, pointing out that where class members' claims present complex legal issues,
require conflicts of law analyses and involve application of numerous states' laws and
difficult individualized damages determinations, "the enormity of the burden is obvious."
*Marshall*, 787 F.3d at 512.

Class Counsel has already devoted substantial time and resources to litigating this
case. *See* Esades Decl. I ¶¶ 10-25, ECF No. 358; Esades Decl. II ¶¶ 13-29, ECF No. 483.
Absent the Settlement, much work nevertheless lay ahead in this complex, expensive
litigation. Even though Class Counsel were successful in largely defeating Target's
motion to dismiss, and despite their firm belief that the record evidence would establish
Target's liability and prove damages on a class-wide basis, they faced multiple, ongoing

and potentially case-ending risks. These include the significant risks and challenges of obtaining and maintaining class certification through trial on the claims that survived Target's motion to dismiss, which are based on state statutory and common law cutting across multiple jurisdictions. Risks further included establishing causation, an issue that has proved to be challenging and a barrier to consumer plaintiffs' success in retailer data breach litigation. Additional risks related to proving damages for class members, both those who suffered unauthorized charges, loss of access to their accounts and costs such as late fees, card replacement fees and credit monitoring services, as well as claims that all class members suffered imminent, certainly impending harm from potential fraud and identity theft. Even if a litigation class were certified and the Class were successful in establishing liability at trial, the jury could award damages in an amount lower than that sought by the Class or the amount offered in the Settlement. Both sides also faced the uncertainties, risks, expense and significant delays associated with appeals that would inevitably be pursued following trial. *See* Esades Decl. I ¶ 49, ECF No. 358; Judge Boylan Decl. I ¶ 7, ECF No. 360.

If the parties had not settled, trial would have involved extensive pretrial briefing and preparation and the marshaling, presentation and consideration of a substantial evidentiary record. The prospect of an expensive, lengthy, complicated trial and the inevitable subsequent appeals underscore the appropriateness of the settlement. *See*, *e.g.*, *Marshall*, 787 F.3d at 512 (noting that "the district court correctly reasoned that this factor heavily favors approval of the settlement agreement"); *Uponor*, 716 F.3d at 1163.

14

The Settlement provides all members of the Settlement Class relief that is both significant and avoids further delay. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 321 (3d Cir. 2011).

This factor strongly favors final approval.

### 4.   The Amount of Opposition to the Settlement.

Every one of the 113 Plaintiffs the Court appointed as Settlement Class Representatives (Prelim. Approval Order 3, ECF No. 364) has approved the Settlement. Esades Decl. III ¶ 5. Following notice to a class estimated to include over 97 million persons, the Settlement Administrator reports that as of September 23, 2015, it has received 386 requests for exclusion (seven of which are from class members who also submitted timely claims). Declaration of Amy Lake Regarding Settlement Administration ("Lake Decl.") ¶ 13. There are only ten objections from Class Members.[2] The number of exclusion requests reflects approximately .00039% of the Class and the number of objections constitutes about .0000103% of the Class.

The overwhelmingly positive response from Class Members favors final approval. In approving the settlement in *Dryer*, this Court noted that "only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement." 2013 WL 5888231, at *2. The Eighth Circuit agreed this amount of

---

[2] Another objection was submitted by Sam A. Miorelli, Esq. However, Objector Miorelli's affidavit in support of the objection indicates that he is not a member of the Class because his credit card use was outside of the breach period. Lead Class Counsel informed him via email and correspondence dated August 14, 2014, that based on the affidavit Objector Miorelli submitted, he is not a class member. Mr. Miorelli did not respond. Plaintiffs nevertheless address all objections, including Mr. Miorelli's, below.

CASE 0:14-md-02522-PAM   Document 612   Filed 10/09/15   Page 25 of 53

objections was insubstantial. *Marshall*, 787 F.3d at 513. As the Eighth Circuit noted, "[w]e have previously approved class-action settlements even when almost half of the class objected to it" (citing *Van Horn*, 840 F.2d at 606 (approval granted where 180 out of 400 inmates objected)), and that "[w]e have approved a class-action settlement even when all named plaintiffs opposed it" (citing *Elliott v. Sperry Rand Corp.*, 680 F.2d 1225, 1226-27 (8th Cir. 1982) (approving settlement even though both plaintiffs and 790 of approximately 3,000 members objected)). *Id.*

This Court serves as guardian of the absent class members. *Dryer*, 2013 WL 5888231, at *2. In affirming, the Eighth Circuit discussed the meaning of that important judicial role: "It is obvious that in approving the settlement, the district court overwhelmingly believed the settlement was fair, reasonable, and adequate for the majority of the class, which happened to be the quiet, absent majority." *Marshall*, 787 F.3d at 513. The Eighth Circuit found that the Court's refusal "to give credence to the vocal minority" and focus on the vast majority of class members "was in accord with the district court's 'duty to the silent majority as well as the vocal minority.'" *Id.* (citing *In re Wireless*, 396 F.3d at 933). The Eighth Circuit stated that "we believe the amount of opposition from the substantial absent majority is better indicative of the opposition to the settlement as a whole" and concluded that "we find this factor, too, favors approval of the Settlement Agreement." *Marshall,* 787 F.3d at 514.

In light of the miniscule number of objections and opt-out requests, and, more importantly, because as discussed below the objections lack merit, the strong positive reaction of the Class to the Settlement further supports final approval. *See, e.g.*, *In re*

16

*Uponor Inc., F1807 Plumbing Fittings Prods. Liab. Litig.,* No. 11-MD-2247ADM/JJK, 2012 WL 2512750, at *8 (D. Minn. June 29, 2012) ("Twenty-six Objectors, out of a class likely totaling more than 30,000, represents only token opposition to this Settlement.") *aff'd*, 716 F.3d 1057 (8th Cir. 2013); *Rexam, Inc. v. United Steel Workers of Am.*, No. 03-cv-2998-PJS/JJG, 2007 WL 2746595, at *7 (D. Minn. Sept. 17, 2007) (approving settlement despite objections by over 4% of class members); *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313-14 (3d Cir. 1993) (noting that "[l]ess than 30 of approximately 1.1 million class members objected," representing an "infinitesimal" fraction of the class); and *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (affirming determination that class response was favorable in light of facts that 19,000 policyholders out of eight million opted out and 300 class members objected).

### D.      The Objections to the Settlement Are Without Merit and Should be Overruled

None of the objections presents any basis for the Court to deny final approval.

####           1.      Objections to the Sufficiency of Relief.

Several objectors argue that the Settlement amount is insufficient.[3] Courts generally discount such objections that fall into a "category of suggestions as to how the

---

[3] Objector Miorelli asserts that the amount of the settlement should be based on either the economic value of the stolen data on the black market or an evaluation of "the losses reported . . . [by] group of named plaintiffs" that is then extrapolated "as a representative sample of the class." Miorelli Obj. 10-14. Objectors Daron and Arlene Stein argue that Class Members should receive lifetime credit monitoring and

settlement might be made *better*, particularly from the perspective of the plaintiff class."

*Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 948 (N.D. Cal. 2013). In considering a

proposed settlement, courts should not determine "whether the final product could be

prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *see also In re Airline*

*Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 282 (D. Minn. 1997) ("A settlement

sum is, in virtually in every case, less than the claimed loss. A settlement is, necessarily,

a compromise between plaintiffs, who did not win their case, and defendants, who did not

lose theirs. These settlements, like all others, reflect each side's considered view of the

risks of an adverse judgment and the value of buying peace."). A review of settlements in

other data breach class actions confirms that the Consumer Plaintiffs have negotiated an

extremely favorable settlement. *See* Esades Decl. I Ex. 2, ECF No. 358-2  (chart

summarizing terms of settlements in data breach cases).

   The proposed Settlement is the product of thoughtful and zealous negotiation, and

takes into account the types of damages that Class Members have suffered as a result of

the data breach and the strongest theories available to pursue those damages. The fatal

---

compensation for pain and suffering. Daron Stein Obj. 1, Arlene Stein Obj. 1. Objector
Chanronda Virgin (in making a claim for herself for $3.7 million) argues that the
settlement should compensate class members for embarrassment, stress, loss of personal
information, loss of safety, risk of future identity theft, and destruction of credit. Virgin
Obj. 1. Objector Tracey Thompson says that Class Members should receive amounts
ranging from $25,000 to $75,000. Thompson Obj. 4. And Objector John Finn simply says
that the amount of the settlement is inadequate. Finn Obj. 1.

flaw of all these objections is that none of the Objectors provides support for their alternative theories of recovery, or acknowledges the procedural and substantive hurdles involved in obtaining other forms of relief on a class wide basis. *See In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 152 (E.D. La. 2013) (finding objections that "lack factual, scientific, or legal support are deficient and are hereby rejected because they do not aid the Court in its evaluation of the settlement" and "[o]bjections that seek to renegotiate terms of the settlement based on individual preferences are unhelpful and improper"); *Nwabueze v. AT&T Inc.*, No. C 09-01529 SI, 2013 WL 6199596, at *8 (N.D. Cal. Nov. 27, 2013) (rejecting objections that were "largely conclusory and fail to provide legal support or evidence"); *Johansson-Dohrmann v. Cbr Sys., Inc.*, No. 12-cv-1115-MMA (BGS), 2013 WL 3864341, at *7 (S.D. Cal. July 24, 2013) (rejecting the objection that the settlement of a data breach case should provide compensation for emotional distress and lifetime reimbursement for identity theft because it "merely seeks a better result without consideration for whether the settlement is fair"); *see also Marshall*, 787 F.3d at 520 ("[T]here is a well-established remedy that any class member may elect to preserve what he believes to be a claim worth more than what he may receive under the settlement—opt out.").

Objector Miorelli argues that because the Court denied in part Target's motion to dismiss, the case is strong and the settlement amount should be far greater. Miorelli Obj. 21-22. But the Court's ruling does not necessarily mean that Plaintiffs will successfully surmount the other procedural and substantive hurdles in the case, including class certification, summary judgment and trial. *See Airline Ticket Comm'n*, 953 F. Supp. at

19

283 ("The objectors do not appreciate that, although the Court denied defendants'
motions, it did not thereby determine that the plaintiffs had a winning case."); *see also
Marshall*, 787 F.3d at 515 (pointing out the risks created by class certification and
affirmative defenses and noting that "[w]e have repeatedly rejected arguments 'that
compromise was unnecessary because [the party] would have prevailed at trial'")
(citation omitted). Objector Miorelli also says that the Court "should not allow such a
sell-out settlement when the defendant clearly has the capacity to pay the absent class
members for the full value of their damages." Miorelli Obj. 23. He points to no legal
authority to support his argument that a settlement is insufficient because a defendant has
the ability to pay more. To the contrary, even where it is "undisputed that [the defendant]
could pay more than it is paying in [the] settlement, this fact, standing alone, does not
render the settlement inadequate." *Petrovic*, 200 F.3d at 1152.

Objector Robert Mosebar argues the opposite point – the Settlement is unfair
because Target was the victim and should not be held liable for the data breach at all.
Mosebar Obj. 2. In settling, Target has not admitted liability but avoids the costs of
further litigation and the risk of a potential finding of liability. *See Hispanics United of
DuPage Cnty. v. Vill. of Addison*, 988 F. Supp. 1130, 1167 (N.D. Ill. 1997) (an objection
that the defendant was not liable did not recognize that the settlement actually benefitted
the defendant by mitigating risk and litigation costs). All objections grounded in the
amount of the relief afforded the class – whether too little or too great – should therefore
be rejected.

2.      Objection that the Settlement Will Only Benefit the Consumer
        Plaintiffs and Class Counsel.

Three Objectors argue that the primary beneficiaries of the proposed Settlement

are Plaintiffs and Class Counsel. Miorelli Obj. 27; Finn Obj. 1; Thompson Obj. 3. In fact,

the Settlement provides extensive benefits for Class Members, totaling $10 million,

together with equitable relief benefiting all Class Members. All Class Members who

suffered losses and provide reasonable documentation of their losses as a result of the

data breach will be compensated. Other courts have approved similarly structured

settlements in data breach cases. *See, e.g.*, *In re Heartland Payment Sys., Inc. Customer*

*Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1049 (S.D. Tex. 2012) (approving

settlement that created a fund of up to $2.4 million and prioritized out-of-pocket

expenses); *Burrows v. Purchasing Power, LLC*, No. 1:12-cv-22800, 2013 WL 10167232,

at *10 (S.D. Fla. Oct. 7, 2013) (approving  settlement in data breach case that established

settlement fund to compensate class members for losses).

Class Members also benefit from the equitable relief in this case, which requires

Target to implement certain data security measures. *See In re Xcel Energy, Inc., Sec.,*

*Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 1003 (D. Minn. 2005) (finding that a

provision in a settlement agreement requiring corporate governance changes provided

meaningful benefits to class members); *see also Charron v. Wiener*, 731 F.3d 241, 253

(2d Cir. 2013) (finding that tenant class members benefitted from injunctive relief in a

settlement requiring landowners to maintain "best practices" with respect to setting initial

rents and rent increases, eviction proceedings, repairs and staff training). Objector James

Sciaroni argues that the non-monetary relief is inadequate because the Settlement does not impose any new obligations on Target. Sciaroni Obj. 1-3. This objection ignores the important distinction between Target's *voluntary* actions versus actions now *required* under the Settlement. Target is now obligated to implement and maintain enhanced security measures for the next five years that increase accountability and centralize responsibility for data breach incident management, improve the company's ability to quickly detect and contain security threats through aggressive monitoring and agile response, raise the level of awareness and understanding about data security and privacy issues among the company's relevant employees (who serve as the first line of defense), and reduce the risk of future data breaches going forward. Ponemon Decl. ¶¶ 17-18, ECF No. 361. This Court will retain jurisdiction to enforce these terms under the Settlement Agreement. Settlement ¶ 10, ECF No. 358-1.[4]

Finally, Target's payment of notice costs, administrative costs, and litigation costs directly benefits all Class Members. *See Zurn Pex,* 2012 WL 5055810, at *5, *7 (considering the cost of claims administrator and class notice as part of the value of the

---

[4] Objector Sciaroni suggests that the notice was inadequate because it did not say that the non-monetary relief was limited to five years. Sciaroni Obj. 3. The Long Form Notice posted on the dedicated website, www.TargetSetlement.com, and available to all Class Members, summarized each of the security measures Target has agreed to implement and referred viewers seeking more details to the Settlement Agreement itself, which clearly states the five-year time period and is posted on the website and is also available by calling a toll-free number. Courts have found that "notice need only satisfy the broad reasonableness standards imposed by due process," and need not "provide a complete source of information." *Petrovic*, 200 F.3d at 1153 (internal quotations and citations omitted).

settlement fund); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953

(9th Cir. 2015) ("[A]dministrative costs in particular make it possible to distribute a

settlement award 'in a meaningful and significant way.'").

3.   <u>Objections to Certification of the Settlement Class.</u>

Objector Leif Olson argues that the Settlement Class should not be certified

because individual issues predominate and there is a conflict of interest among Class

Members. Olson Obj. 8-17.[5] Courts generally discount objections to class certification

because they in essence urge the court to deprive the class of the settlement benefits and

instead require class members to litigate their claims on an individual basis. *See In re*

*Magsafe Apple Power Adapter Litig.*, No. 5:091-CV-1911-EJD, 2015 WL 428105, at *5

(N.D. Cal. Jan. 30, 2015) (noting that an objection to class certification would "result in

no recovery for anyone," and that if the objector believed her circumstances differed from

the rest of the class "her remedy would have been to opt out"); *In re Prudential-Bache*

*Energy Income P'ships Sec. Litig.*, No. 888, 1994 WL 202394, at *11 (E.D. La. May 18,

---

[5] Objector Olson is represented by the Center for Class Action Fairness, which has represented numerous objectors in class actions. Theodore H. Frank, the founder of the Center for Class Action Fairness, has been criticized by courts on multiple occasions. *See, e.g.*, *City of Livonia Emps.' Retirement Sys. v. Wyeth*, No. 07-Civ.10329 (RJS), 2013 WL 4399015, at *5 (S.D.N.Y. Aug. 7, 2013) (rejecting Mr. Frank's objections because they did "not seem grounded in the facts of this case, but in [his] objection to class actions generally"); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 785 (N.D. Ohio 2010) (finding a brief filed by Mr. Frank on behalf of an objector to be "'long on ideology and short on law'") (citation omitted). "[W]hen assessing the merits of an objection to a class action settlement, courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first." *In re Law Office of Jonathan E. Fortman, LLC*, No. 4:13MC00042 AGF, 2013 WL 414476, at *1 (E.D. Mo. Feb. 1, 2013).

1994) ("much of [the objector firm's] work . . . may have actually hurt the class, for example the objection to class certification"); *see also* Bruce D. Greenberg, *Keeping the Flies out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 St. John's Law Rev. 949, 976-78 (2010) (noting that professional objectors "often find it easier to attack abstract class certification criteria than to understand the details of the settlement or the particular underlying facts of the case").

Objector Olson contends that common issues do not predominate because of differences in state consumer protection and unjust enrichment law. Olson Obj. 16-17. Variations in state law do not defeat predominance when certifying a class for settlement purposes. *See, e.g.*, *Sullivan v. DB Invs., Inc.*, 667 F.3d at 301 (citation omitted). The manageability issues that may arise when litigating class claims asserted under different states' laws are not an issue for certification of a settlement class. *Id.* at 302. When "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is there be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). *See also In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.*, No. 99-MDL-1309 PAM/JCL, 2004 WL 2931352, at *8 (D. Minn. Dec. 16, 2004). The cases Mr. Olson cites are not relevant because they address predominance and choice of law in the context of litigation, not settlement.

Objector Olson also argues that common issues do not predominate because of the need for individualized damages determinations. Olson Obj. 13-14. Even when addressing certification of a litigation class, however, courts hold that the need for

individual damages calculations do not defeat certification. *See, e.g., In re Target Corp. Customer Data Sec. Breach Litig. (Financial Track)*, No. 14-md-2522-PAM/JJK, 2015 WL 5432115, at *5 (D. Minn. Sept. 15, 2015) ("[T]he need for individualized damages decisions does not ordinarily defeat predominance where there are . . . disputed common issues as to liability.") (citation omitted); *see also Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013) (holding that the district court abused its discretion in denying class certification because of individualized damages calculations). This is particularly true in the settlement context because the court does not need to consider issues of manageability. *See, e.g., In re Cmty. Bank of N. Va.*, 418 F.3d 277, 306 (3d Cir. 2005). Objector Olson again relies on cases that address predominance in the litigation context. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 777 (8th Cir. 2013).

4.      There Are No Fundamental Conflicts Among Class Members.

Objector Olson argues that there is a conflict between Class Members who have suffered actual losses and those who, like him, have not. He characterizes himself as "part of a zero-recovery *de facto* uncertified subclass," and contends that none of the Plaintiffs can represent him because they all suffered actual losses. Olson Obj. 8-13, 16. It is not clear what monetary compensation Objector Olson believes he should receive from the Settlement given his admission that he has suffered no losses as a result of the data breach. *See Hanlon*, 150 F.3d at 1027 (if any objector thought "his or her personal claim was being sacrificed for the greater good . . . they had the right to opt-out of the class").

25

The Eighth Circuit's decision in *Marshall*, which Objector Olson does not cite
despite its being both controlling precedent and the principal decision on point on the
issue he raises, is dispositive of his objection. In that case, the class asserted various
claims against the NFL alleging that NFL Films used the names, images and likeness of
former NFL players. 787 F.3d at 506. The settlement approved by this Court and
affirmed on appeal provided, *inter alia*, for creation of a non-profit organization, the
Common Good Entity, payment of up to $42 million by the NFL to the Common Good
Entity for use for the benefit of NFL players, establishment of a licensing agency,
payment by the NFL of $100,000 worth of media value annually, and payment of
attorneys' fees and settlement administration expenses. *Marshall,* 787 F.3d at 506-07.
Objectors argued the settlement provided no benefit to the class because it did not
provide for direct payments to class members. *Id.* at 509. The Eighth Circuit made short
work of this objection: "Plainly, this is not true and the argument is wholly without
merit." *Id.* The *Marshall* Court reasoned:

> Appellants also argue the settlement fails because the financial payout for
> the class is made through a third-party organization and not directly to each
> class member. But we have never required that a settlement agreement
> specifically provide for a direct financial payment to each class member,
> and the mere fact that some members of a class may not receive a direct
> payment is not dispositive. *See In re Wireless*, 396 F.3d at 934; *see also
> Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ("It seems
> to us that almost every settlement will involve different awards for various
> class members.").

*Id.* The Eighth Circuit explained that "*[a]ll* class members receive a direct benefit from
the settlement." *Id.* "Thus, even in the absence of any financial payout, the settlement
would not fail as a matter of law." *Id.* (citations omitted). The *Marshall* Court went on to

state, "This is not a case in which the district court approved a settlement with no direct benefit to each class member" and that "[c]ourts have specifically found settlement agreements with a structure similar to the one in this case as a permissible and favorable way to resolve complex litigation disputes." *Id.* at 510. The Court cited *Lane v. Facebook, Inc.*, 696 F.3d 811, 816 (9th Cir. 2012), *cert denied*, *Marek v. Lane*, 134 S. Ct. 8 (2013). In *Lane*, plaintiffs alleged the defendant improperly published private information about its members' Internet use. *Id.* Under the settlement, Facebook paid $9.5 million, the 22 named plaintiffs received $39,000, the over three million unnamed class members received no financial payment and the settlement funds were primarily used to create a charitable foundation to fund organizations dedicated to online privacy education. *Id.* at 817.

Like the settlement in *Marshall*, under the Target Settlement, all class members receive a benefit. Those with documented claims will receive direct payments for their documented losses up to $10,000 per claim. Those Class Members who filed undocumented claims will receive a pro rata direct payment after documented claims and any court-approved service awards are paid. All class members, whether they filed a claim or not, as well as members of the public who shop at Target in the future, benefit from the non-monetary relief provided under the Settlement, the significant value of which is confirmed by Dr. Ponemon. There is no "zero recovery, *de facto* uncertified subclass." The Settlement provides substantial benefits to all Class Members.

Additionally, Objector Olson has not identified any conflicts among Class Members that would require the creation of subclasses or separate representation. There

are none. Subclasses are not necessary just because class members receive different amounts from a settlement. *Petrovic*, 200 F.3d at 1146 ("If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable.").

There is no conflict here because all Class Members who have incurred actual damages as a result of the data breach will receive compensation, including those who do not submit documentation of their losses. And all Class Members, including those who like Objector Olson incurred no actual damages at all, will benefit from the equitable relief.

5.    Objections to the Plan of Allocation.

Objector Olson argues that that the Settlement substitutes an "artificial judicial forum" for a court of law and that it is not a superior method for resolving Class Members' claims. Olson Obj. 14-15. But the use of an administrator to administer a settlement and allocate funds is widely accepted. *See Manual for Complex Litigation* § 21.661 (4th ed. 2015) (courts often appoint a claims administrator whose duties include "taking custody of settlement funds, [and] administering the distribution procedures"); *George v. Uponor Corp.*, Civ. No. 12-249 (ADM/JJK), 2015 WL 5255295, at *5 (D. Minn. Sept. 9, 2015) (approving use of a claims administrator to distribute settlement funds to class members); *In re Metris Cos., Inc., Sec. Litig.*, No 02-cv-3677JMR/FLN, 2008 WL 1947095, at *3 (D. Minn. Apr. 24, 2008) (same). Objector Olson's suggestion that the class be decertified so that a judge can individually determine damages for each

28

class member will benefit no one and is contrary to well-established procedures for distributing settlement funds.

Objector Olson contends that the claims administration process is "run by the consulting group hired by the defendant" and that the Distribution Plan is "too vague" about the method the Settlement Administrator will use to determine whether a claim is valid. Olson Obj. 15. Rust Consulting was selected to serve as the Settlement Administrator after a request for proposal process in which several qualified companies submitted proposals. Rust Consulting is an experienced settlement administrator and is independent of Target, and Target has nothing to gain if it were able to control the distribution process, as no part of the settlement funds will revert back to Target. Settlement ¶ 5.1.3, ECF No. 358-1.

The Distribution Plan describes the process the Settlement Administrator will use to evaluate claims, as well as the process for resolving disputes. The Settlement Administrator will review each Document Support Claim to determine whether it demonstrates that the Class Member more likely than not suffered Substantiated Losses attributable to the data breach. Settlement Ex. 1 ¶ 2.4.1, ECF No. 358-1. The Settlement Administrator may also request supplemental information if necessary. *Id.* ¶ 2.2. Class Members who do not claim Substantiated Losses only have to file a claim form, with no supporting documentation. *Id.* ¶ 4.1. Combined with the two-page claim form, the Distribution Plan provides Class Members with sufficient information about the type of information and documents they may provide to file a claim. There is also a method for Class Members to challenge the Settlement Administrator's determination. Class

29

Members can send an email or letter, the Settlement Administrator will reconsider the determination, and any unresolved disputes will be reviewed by counsel for the Plaintiffs and Target. *Id.* ¶¶ 3.1-3.4. If counsel are unable to agree or if they decide that the Class Member is entitled to receive less than the amount requested, the dispute will be submitted to one or more third parties designated by agreement of the parties for a final decision. *Id.* 3.3.3-3.4.

Other courts have approved similar procedures in settlements of data breach claims. *See Cbr Sys.*, 2013 WL 3864341, at *2 (approving a settlement in a data breach case where the claims administrator had the discretion to evaluate class members' documentation of identity theft and determine whether it "occurred more likely than not" as a result of the data breach); *Heartland*, 851 F. Supp. 2d at 1049 (approving a settlement where the claims administrator determined whether class members proved by a preponderance of the evidence that out-of-pocket losses resulted from the data breach).

The case Objector Olson relies on involved very different procedures. In *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, MDL No. 2492, No. 13 C 9116, 2014 WL 7237208, at *3 (N.D. Ill. Dec. 17, 2014), to determine whether class members qualified for a monitoring program, the parties assigned a group of medical experts to create a questionnaire to screen for symptoms of concussion-related health problems. The parties' failure to provide the standards the medical experts would use to determine whether a class member qualified for continued monitoring made it impossible for the court to evaluate the settlement, since the review criteria would impact whether the settlement fund would be sufficient to compensate all class members or

30

endanger the health of those who did not qualify. *Id.* at *8-9. There is no similar risk here.

Objectors Thompson and Keith Reiter object to having to provide documentation as part of the claims process because of the sensitive nature of the requested information. Thompson Obj. 1; Reiter Obj. 1. The documentation requirement is essential to ensure the fair administration of the Settlement Fund. *See In re Wirebound Boxes Antitrust Litig.*, 993 F.2d 152, 154 (8th Cir. 1993) ("Requiring documentation for claims against the settlement fund was entirely appropriate and essential to insure equitable distribution among the class members."). Objector Thompson also says that she was unprepared to save receipts and did not have time to collect the necessary documentation. Thompson Obj. 1, 5. The comprehensive Court-approved notice program was implemented and gave class members at least 32 and up to 92 days to compile documentation and complete claims forms. Wheatman Decl. ¶ 32 & Ex. 2; Lake Decl. ¶¶ 6-7. This timing provided Class Members with sufficient time to submit their claims. *See Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 227 (D.N.J. 2005) (finding that class members who received notice within 45 to 60 days before the deadline had sufficient time to review the notice, find additional information and even consult with counsel, and noting that "[i]t has been held that notice mailed even one month before any of the deadlines was still timely").

Objector Sciaroni argues that the Distribution Plan does not say how unclaimed or remaining funds will be distributed. Sciaroni Obj. 3; *see also* Olson Obj. 28 n.5. The Settlement provides that no portion of the Settlement Fund will be returned to Target and

that any amounts remaining after payment of any taxes, service awards and distribution to

Class Members shall be distributed as directed by the Court. Settlement Agreement ¶¶

5.1.2, 5.1.3 , ECF No. 358-1.

      6.   <u>Objections to the Procedures for Objecting and Other Judicial Administration Matters.</u>

Objectors Olson and Miorelli argue that the procedures for objecting deterred

objections because they are onerous. Olson Obj. 32-35; Miorelli Obj. 25-27. It is evident

that neither Olson nor Miorelli was deterred, and other Class Members also followed the

procedures and provided the Court with their objections. *See In re AT&T Mobility*

*Wireless Data Servs. Sales Tax Litig.,* 789 F. Supp. 2d 935, 970 (N.D. Ill. 2011) ("[T]he

objectors have not presented any evidence that [the deposition requirement] deterred

anyone from objecting, including themselves."). It is well within the Court's discretion to

set reasonable guidelines for the objection process. Fed. R. Civ. P. 83(b) ("A judge may

regulate practice in any manner consistent with federal law . . . .").

Courts often require objectors to make themselves available for deposition. *See,*

*e.g., In re Netflix Privacy Litig.,* No. 5:11-cv-00379-EJD, 2013 WL 6173772, at *5 (N.D.

Cal. Nov. 25, 2013) (finding that objectors "have voluntarily inserted themselves into this

action, and as such, depositions of the Objectors are relevant and proper"); *AT&T*

*Mobility,* 789 F. Supp. 2d at 970) (finding that an objection that the deposition

requirement served "the purpose only of discouraging objections . . . is not a well-

founded objection. Apprising objectors of their legal rights and obligations is entirely

proper, even if such notification has a marginal deterrent effect"). Courts have also

required objectors and their counsel to provide information about other cases in which they have objected or represented objectors. *See, e.g.*, *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 11-md-2258-ABJ (MDD), 2014 WL 7800046, at *4 (S.D. Cal. July 10, 2014) (requiring the objector and objector's counsel to state whether they have previously objected, or served as a named plaintiff or class counsel); *Keith v. Back Yard Burgers of Neb.*, 11-cv-0135, 2014 WL 4781914, at *5 (D. Neb. Sept. 23, 2014) (requiring objectors to identify all other cases in which they filed an objection).

Objector Olson argues that "a sample" of the Plaintiffs should be made available for deposition so he can determine whether they are adequate representatives. Olson Obj. 34. There is no need for discovery of any of the Plaintiffs because the Court has already found that they are adequate representatives. *See* Order ¶ 2, ECF No. 364; *see also In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1337 n.6 (S.D. Fla. 2011) (finding that "the sole purpose of settlement-related discovery is to ensure the Court has sufficient information before it to enable the Court to determine whether to approve the Settlement," and the record was more than sufficient). None of Objector Olson's assertions raises any credible challenges to their adequacy. *See id.* (rejecting requests by objectors to conduct discovery because it was evident they "were seeking to engage in a broad 'fishing expedition'").

Objector Olson also argues that the Court should require Plaintiffs' Lead Counsel to disclose all cases in which they paid an objector to dismiss an objection and enjoin the parties from paying objectors to dismiss their objections. Olson Obj. 5-6. He cites no cases in which a court has imposed a similar requirement on class counsel. There is no

33

need to do so here. Requiring objectors to disclose other cases in which they objected to a

class action settlement will deter professional objectors, "whose objections amount to a

'tax that has no benefit to anyone other than to the objectors' but serves to 'tie up the

execution of [a] Settlement and further delay payment to the members of the Settlement

Class. . . .'" *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-

2247 ADM/JJK, 2012 WL 3984542, at *5 (D. Minn. Sept. 11, 2012) (citation omitted).

Objector Olson has identified no similar benefit that would be achieved by requiring

Class Counsel to make his requested disclosures.

Objector Miorelli argues that he and other objectors should be allowed to submit

further briefing as to whether Class Members endorse the Settlement once the number of

claims, objections, and opt outs are known. Miorelli Obj. 24-25. Objector Olson has said

he intends to appear at the Fairness Hearing. He will have the opportunity to present

those arguments at that time. As noted, each and every one of the 113 Settlement Class

Representatives, whom the Court found to be typical and adequate class representatives

(ECF No. 364), has approved the Settlement.  Esades Decl. III ¶ 5.

### 7.   The Service Awards Are Reasonable.

Objector Miorelli argues that the disparity between the service awards and the

distributions to other Class Members is too great. Miorelli Obj. 27-29. In fact, Class

Members may receive up to $10,000 for documented out-of-pocket losses compared to

the requested $1,000 and $500 service awards. *See* Distribution Plan ¶ 1.1 (Ex. 1 to

Settlement, ECF No. 358-1). Objector Sciaroni argues that the Plaintiffs who were not

deposed should not receive incentive awards. Sciaroni Obj. 5. While only some were

deposed, all Plaintiffs contributed to the prosecution and settlement of this case by providing their counsel with documents and information about their purchases at Target that formed the basis of the Consolidated Amended Complaint, as well as responding to follow up inquiries from counsel related to Rule 26 disclosures and other preparations for discovery. Esades Decl. II ¶ 57, ECF No. 483. Courts routinely approve service awards to plaintiffs who contribute in this way to the successful resolution of class action cases. *See, e.g., In re Zurn Pex Plumbing Prods. Liab. Litig.,*  No. 08-MDL-1958 ADM/AJB, 2013 WL 716460, at *2 (D. Minn. Feb. 27, 2013) (awarding $5,000 to class representatives who "assisted with the investigation and preparation of these suits, gathered documents for production, and helped class counsel"); *Xcel Energy,* 364 F. Supp. 2d at 1003 (awarding $2,000 to each of the representative plaintiffs, who "reviewed pleadings, conferred with counsel, provided information about the plan, responded to discovery, and reviewed and consented to the settlement").

8.      Objections to the Attorneys' Fees Request.

Six objectors argue that the request for attorneys' fees is too high and several contend that the Court should award Class Counsel a fee based on a percentage of the Settlement Fund rather than their lodestar. Thompson Obj. 2; Sciaroni Obj. 3-4; Miorelli Obj. 14-18; Lindsay Gibson Obj. 1-2; Finn Obj. 1; Olson Obj. 18-30. Courts within the Eighth Circuit may use either the lodestar method or the percentage of the fund method to calculate attorneys' fees. *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244-45 (8th Cir. 1996). The Eighth Circuit has said that lodestar is the preferred method for statutory fee-shifting cases because it is reasonably objective, neutral, and does not require an

35

assessment of the monetary value of intangible rights. *Id.* at 244-45; *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) ("Because the lodestar award is de-coupled from the class recovery, the lodestar assures counsel undertaking socially beneficial litigation (as legislatively identified by the statutory fee shifting provision) an adequate fee irrespective of the monetary value of the final relief achieved for the class."). Since the Plaintiffs invoked fee-shifting consumer laws in their Complaint, it is appropriate for the Court to use the lodestar approach in this case. *See* Compl. ¶ 263, ECF No. 258.[6]

In the memorandum in support of their motion for attorneys' fees, Class Counsel addressed the factors that courts within the Eighth Circuit use to determine whether an attorneys' fee request is reasonable. Mem. 16-22, ECF No. 482. Class Counsel request an award of attorneys' fees and expenses in the amount of $6.75 million, which is far less than their total lodestar of $8,893,103.80 (as of May 2015). *See* Esades Decl. II ¶ 61 & Ex. 2, ECF Nos. 483 & 483-2. The fee request represents a negative multiplier of .74 on the lodestar, or a modest multiplier of 1.29 if all lodestar incurred before the Court appointed lead counsel is excluded. *See, e.g., Yarrington v. Solvay Pharm. Inc.*, 697 F. Supp. 2d 1057, 1067 (D. Minn. 2010) (finding a 2.6 multiplier was "modest" and reasonable "given the risk of continued litigation, the high-quality work performed, and

---

[6] In their motion for attorneys' fees, Class Counsel also demonstrated that their fee request is reasonable when calculated as a percentage of the Settlement Fund. *See* Mem. 23-41, ECF No. 482.

the substantial benefit to the Class"); *In re St. Paul Travelers Sec. Litig.,* No. Civ. 04-3801 JRTFLN, 2006 WL 1116118, at *1 (D. Minn. Apr. 25, 2006) (awarding a 3.9 multiplier); *Xcel Energy,* 364 F. Supp. 2d at 999 (awarding a 4.7 multiplier).[7]

Objectors Miorelli and Olson argue that Plaintiffs' Counsel's lodestar should not include attorneys who do not serve as lead or liaison counsel. Olson Obj. 22-23; Miorelli Obj. 17. But attorneys who contribute to the successful prosecution and resolution of a case should recover for their time and effort. *See Fastener Dimensions, Inc. v. Mass. Mut. Life Ins. Co.*, Nos. 12cv8918, 13cv4782 (DLC), 2014 WL 5455473, at *6 (S.D.N.Y. Oct. 28, 2014). Objector Miorelli argues that Class Members are unable to evaluate the fee request without more detailed information about how the attorneys spent their time. Miorelli Obj. 16-17. This is refuted by Class Counsel's detailed submissions in conjunction with the motion for attorneys' fees and expenses. Courts do not require counsel to make their time records available to objectors, particularly given their highly confidential nature. *See, e.g., DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 336 (W.D. Tex. 2007) ("Even presuming the class members could fully comprehend the detailed time records, this objection fails to explain how these individuals are qualified to pass

---

[7] Plaintiffs' Counsel has and will continue to incur significant time and expenses to present the Settlement for final approval, defend it on any appeal, and assist Class Members in the claims procedure. Since the fees and expense papers were submitted and through September 15, 2015, Class Counsel has already expended an additional $89,556 in fees for work including responding to Class Members' many inquiries, working with the court-appointed notice expert and the Settlement Administrator including working on claims verification and sampling issues, and preparing preliminary and final approval papers. Esades Decl. III ¶ 3.

judgment on the daily time records of attorneys in a complex, national class action."); *see also Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000) (holding that "[t]he district court did not err in denying [the objector's] request for discovery of class counsel's contemporaneous time records" where the objector "failed to show any legitimate need for the records she sought"). Objector Miorelli argues that Plaintiffs' Counsel improperly used "block billing," Miorelli Obj. 16, but Plaintiffs' Counsel kept time in accordance with a detailed time keeping protocol established at the outset of this litigation in discussion with the Court, billed their time by task, and submitted their time monthly to Class Counsel for review. *See* Order for Appointment of Lead & Liaison Counsel at 3, ECF No. 64; Tr. 19:3-20:2, ECF No. 70; Esades Decl. II ¶ 62, ECF No. 483.

Several objectors contend that Class Counsel are seeking a greater percentage of the Settlement Fund because the total value of the Settlement should exclude notice and administrative costs and the amount of the service awards. Finn Obj. 1; Olson Obj. 19-22; Gibson Obj. 1-2; Miorelli Obj. 14-15; Sciaroni Obj. 3-4. Courts recognize that these aspects of a settlement benefit class members and are therefore appropriately included when calculating the total value of a settlement. *See, e.g., Zurn Pex*, 2012 WL 5055810, at *5 (including the costs of a claims administrator, an engineering consultant, class notice, attorneys' fees, and service awards when determining the total settlement value); *Weeks v. Kellogg Co.*, No. CV 09-08102(MMM)(RZx), 2013 WL 6531177, at *29 (C.D. Cal. Nov. 23, 2013) (including service awards, notice costs and administrative costs in the value of the settlement); *Heartland*, 851 F.Supp. 2d at 1075-1080 (considering direct

relief, *cy pres* relief, notice costs, claims administration costs and attorneys' fees when

determining value of settlement fund); *Online DVD-Rental*, 779 F.3d at 953 (rejecting

Theodore Frank's argument that notice and administrative costs should be excluded from

the value of the settlement because administrative costs "make it possible to distribute a

settlement award 'in a meaningful and significant way'" and "notice costs allow class

members to learn about a settlement") (citation omitted). *See also* Consumer Pls.' Mem.

Supp. Mtn. for Payment of Service Awards to Class Reps. & Award of Attys. Fees &

Reimbursement of Expenses 24-26 (discussing cases), ECF No. 482.

Objector Miorelli argues, without any support, that the parties improperly

negotiated the class benefits and attorneys' fees simultaneously. Miorelli Obj. 7. In fact,

the parties did not discuss attorneys' fees in this case until after reaching agreement on

the benefits for Class Members. *See* Judge Boylan Decl. I ¶ 9, ECF No. 360; Judge

Boylan Decl. II ¶ 6; Esades Decl. I ¶ 49, ECF No. 483. In addition, the parties did not

reach any agreement as to the amount of attorneys' fees that Target will pay. Judge

Boylan Decl. II ¶ 8. Instead, Target reserved the right to object to the fee request. *Id.*;

Settlement ¶ 7.2, ECF No. 358-1. There is therefore no merit to Objectors Miorelli's and

Olson's contention that the parties improperly included "clear sailing" and "kicker"

provisions in the settlement terms. Miorelli Obj. 18-20; Olson Obj. 24-26. A clear sailing

provision is an agreement by the defendant to refrain from challenging plaintiff counsel's

request for attorneys' fees. A "kicker" provision directs that any fees not awarded by the

court will revert to the defendant. Neither appears in the Settlement Agreement because

there is no negotiated fee. Judge Boylan Decl. II ¶¶ 7, 11.

Objector Olson argues that Class Counsel should disclose how the fee will be allocated among the firms that contributed to case prosecution. Olson Obj. 28-30. But as Class Counsel explain in their fee memorandum, courts typically leave allocation to lead counsel, who are familiar with the contributions of each firm. *See* Mem. 21-22 & n.3 (citing cases), ECF No. 482. Objector Olson cites *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, but there the Fifth Circuit addressed complaints by attorneys dissatisfied with the fee allocated to them. 517 F.3d 220, 228 (5th Cir. 2008); *see also In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 216, 217-18 (2d Cir. 1987) (addressing allocation of fees on appeal by member of plaintiffs' management committee). Objector Olson does not explain what interest he has in how the fees are ultimately allocated. Class Counsel's fee motion papers, available on the Settlement website, provide Class Members with sufficient information to assess whether they think the requested fee is reasonable and the Class notices informed Class Members that Plaintiffs' Counsel would seek fees of up to $6.75 million. *See Hartless v. Clorox Co.*, 273 F.R.D. 630, 646 (S.D. Cal. 2011) (noting that "[t]he allocation of those fees amongst class counsel does not affect the monetary benefit to class members"), *aff'd in part*, 473 F. App'x 716 (9th Cir. 2012).

Finally, Objector Olson objects that the Court and Class Members cannot determine whether the fee request is reasonable without knowing the number of valid claims submitted. Olson Obj. 27-28. That information is not necessary to evaluate the fee request because the entire Settlement Fund (less escrow account taxes) will be distributed to Class Members. In the cases Objector Olson cites, the courts were unable to determine

the value of the settlement because the settlement provided only for a procedure for class members to claim damages from the defendant, the distribution of coupons to class members, or payment only to class members who made valid claims with *cy pres* distribution of the remainder. *See Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014) (claims-made settlement); *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1179 (9th Cir. 2013) (settlement for coupons and injunctive relief); *Dennis v. Kellogg Co.*, 697 F.3d 858, 862-63 (9th Cir. 2012) (claims-made settlement with *cy pres* distribution of remaining funds); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 939-40 (9th Cir. 2011) (*cy pres* distribution and injunctive relief); *General Motors*, 55 F.3d at 780 (3d Cir. 1995) (coupons toward the purchase of a new truck). By contrast, the Court and Class Members are able to evaluate the reasonableness of Class Counsel's fee request because the Settlement Fund will be distributed in its entirety to Class Members.

### E.    The Settlement Class Satisfies the Requirements of Rule 23(a) and 23(b)(3) and Should be Finally Certified for Purposes of Settlement.

Class Counsel respectfully submit that the Court should finally certify this Class for purposes of settlement, because it meets all applicable requirements of Rule 23, as more fully discussed in Consumer Plaintiffs' Memorandum in Support of Motion for Certification of a Settlement Class and Preliminary Approval of Class Action Settlement, at 13-25 (ECF No. 357), incorporated here by reference.

### F.    Adequate Notice Was Provided to the Settlement Class Pursuant to the Court's Preliminary Approval Order.

Due process requirements and the Federal Rules of Civil Procedure mandate that adequate notice of a proposed settlement be given to Settlement Class Members. *Nichols*

41

*v. SmithKline Beecham Corp.*, No. Civ.A00-6222, 2005 WL 950616, at *9 (E.D. Pa. Apr.

22, 2005); Fed. R. Civ. P. 23(e). The Court previously approved a multifaceted notice

program. Prelim. Approval Order 5-7, ECF No. 364. Notice expert Shannon R.

Wheatman, Ph.D., President of Kinsella Media, LLC, explains that the Notice Plan

included direct notice, paid and earned media and an informational website. Wheatman

Decl. ¶ 4. Ms. Wheatman confirms and provides the details of implementation of each

element of the Notice Plan. *Id.* ¶ 5. The executed Notice Plan reached approximately 83%

of potential Class Members. Ms. Wheatman opines that "the Notices and Notice Plan

provided members of the Class constitute the best notice practicable under the

circumstances," and "comport with Rule 23 . . . and satisfy due process requirements." *Id.*

¶¶ 33, 34.

Rust Consulting, Inc. has also submitted a declaration describing its ongoing work

in the Class notification and settlement administrative process. Declaration of Amy Lake

Regarding Settlement Administration. Rust Consulting reports that as of October 6, 2015,

Rust has received a total of 10,565 timely submitted documented claims and 215,215

timely submitted undocumented claims. *Id.* ¶ 14. Under the Settlement, Rust Consulting

will not undertake the claim validation analysis until after Final Approval.  Nevertheless,

Rust Consulting has already undertaken an initial review of the high-dollar claims. *Id*. ¶

15. Class Counsel estimate based on this initial analysis (an update of further validation

will be submitted to the Court on November 3, 2015, pursuant to the Court's Preliminary

Approval Order, ECF No. 364), is that after paying verified documented claims, each

eligible Claimant who submitted timely undocumented claims should receive no less than $25.00 and as much as $40.

## III.   CONCLUSION

For the above reasons and those in Plaintiffs' supporting documents and all the files of record, Plaintiffs' Lead Counsel, on behalf of the Settlement Class, respectfully requests that the Court enter the proposed Final Judgment (Settlement Ex. 2, ECF No. 358-1), grant final approval of the Settlement, approve the requested service awards to Class Representatives and grant Class Counsel's motion for fees and expenses.

Date: October 9, 2015

Respectfully submitted,

s/ *Vincent J. Esades*
Vincent J. Esades (249361)
David Woodward (018844X)
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Tel.: (612) 338-4605
Fax: (612) 338-4692
vesades@heinsmills.com
dwoodward@heinsmills.com

**Lead Counsel Consumer Cases**

E. Michelle Drake (0387366)
NICHOLS KASTER, PLLP
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel.: (612) 256-3200
Fax: (612) 338-4878
drake@nka.com

**Liaison Counsel Consumer Cases**

John A. Yanchunis
MORGAN & MORGAN COMPLEX
LITIGATION GROUP, PA
201 North Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505
Fax: (813) 223-5402
jyanchunis@forthepeople.com

**Executive Committee - Coordinating
Lead and Liaison Counsel**

Daniel C. Girard
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
Tel.: (415) 981-4800
Fax: (415) 981-4846
DCG@girardgibbs.com

Ariana J. Tadler
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Tel.: (212) 594-5300
Fax: (212) 868-1229
atadler@milberg.com

Norman E. Siegel
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel.: (816) 714-7100
Fax: (816) 714-7101
siegel@stuevesiegel.com

**Steering Committee Consumer Cases**

44