# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re: Target Corporation Customer
Data Security Breach Litigation,

MDL No. 14-2522 (PAM)

This document relates to:
    **Consumer Cases.**

**MEMORANDUM AND ORDER**

---

This matter is before the Court on limited remand from the Eighth Circuit Court of Appeals. For following reasons, Consumer Plaintiffs' renewed Motion to Certify Class in Accordance with Limited Remand Order is granted.

## BACKGROUND

On November 17, 2015, after nearly two years of litigation, this Court approved the settlement of the consumer cases in this multi-track Multi-District Litigation arising out of a massive data breach that involved tens of millions of Target customers' personal financial information. (Docket No. 645.) In doing so, the Court overruled the objections of Objector Leif Olson (Docket No. 513) that the settlement class was not appropriately certified under Rule 23. Olson appealed, and the Eighth Circuit Court of Appeals determined that this Court's evaluation of class certification was not the "rigorous analysis" that precedent required. In re Target Corp. Customer Data Sec. Breach Litig., 847 F.3d 608, 612 (8th Cir. 2017). The Eighth Circuit thus remanded the matter for a more detailed analysis of one of Olson's objections to certification, specifically whether

class representatives and class counsel can adequately represent the class as a whole.[1]

As the Eighth Circuit stated, this Court must "evaluate upon remand" the following issues:

> First, whether an intraclass conflict exists when class members who cannot claim money from a settlement fund are represented by class members who can. Second, if there is a conflict, whether it prevents the class representatives "from fairly and adequately protecting the interests of all of the class members." Third, if the class is conflicted, whether the conflict is "fundamental" and requires certification of one or more subclasses with independent representation.

Id. at 613 (citations omitted).

Plaintiffs then brought a renewed Motion to Certify Class in accordance with the limited remand. Olson opposes the Motion. The Court held a hearing on the Motion on May 10, 2017, at which Plaintiffs, Olson, and Target weighed in on the issues.

## DISCUSSION

### A.    The Class and Settlement

The class as preliminarily and finally certified consists of Target customers in the United States "whose credit or debit card information and/or whose personal information

---

[1] Both Consumer Plaintiffs and Olson argue other bases for or against class certification, such as predominance and superiority under Rule 23, and issues regarding alleged self-dealing by class counsel. Olson's counsel stated at the hearing that the Eighth Circuit's recent amendment of its remand order in this case allowed Olson to pursue these issues now. (Hr'g Tr. (Docket No. 790) at 17.) But the Eighth Circuit in fact determined that Olson could raise the additional issues "[i]n proceedings following the limited remand." In re Target Corp. Customer Data Sec. Breach Litig., No. 15-3909, 2017 WL 1573829, at *3 (8th Cir. May 2, 2017). The Court will therefore not address these additional issues here.

was compromised as a result of the [December 2013] data breach."   (Docket No. 645 at 1.) The parties estimate that the personal information of nearly 100 million American consumers was compromised in the breach.

Target agreed to settle the consumers' claims by paying $10 million directly to class members, instituting substantial reforms to prevent the occurrence of another data breach, paying all expenses of class notice and settlement administration in addition to the $10 million settlement payment, and paying attorney's fees of slightly less than 30% of the total fund—also separate from the $10 million settlement payment.

The settlement provides for consumers to be reimbursed for all of their documented losses from the Target data breach, up to a maximum of $10,000. [2]   Customers who did not suffer any direct loss but who purchased identity theft protection or credit monitoring services after the data breach are eligible for reimbursement of those expenses.   And, once all claims and class representative service awards are paid, the settlement funds will be distributed on a pro-rata basis to individuals who do not have any documented proof of loss.   At the time of the final settlement approval hearing, Consumer Plaintiffs estimated that such payments would amount to approximately $40 per claimant.

Since the November 2015 settlement approval, more than 225,000 individuals have submitted claims for reimbursement under the settlement.   No claims have yet been paid, however, because of the pending appeals by Olson and one other objector.

---

[2] There is no indication that any member of the class actually suffered damages greater than $10,000.

**B.     Rule 23**

> A district court may not certify a class until it "is satisfied, after a rigorous analysis," that Rule 23(a)'s certification prerequisites are met.  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)) (internal quotation marks omitted). Consistent with the Supreme Court's premise that "actual, not presumed, conformance with Rule 23(a) remains . . . indispensable," Falcon, 457 U.S. at 160, after initial certification, the duty remains with the district court to assure that the class continues to be certifiable throughout the litigation, Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1145 (8th Cir. 1999).  See also Barney v. Holzer Clinic, Ltd., 110 F.3d 1207, 1214 (6th Cir. 1997) ("The district court's duty to assay whether the named plaintiffs are adequately representing the broader class does not end with the initial certification . . . .").  Where, as here, adequacy of class representation is at issue, "close scrutiny" in the district court is even more important given the need to protect the due process rights of absent class members.  See Rattray v. Woodbury Cnty., 614 F.3d 831, 835 (8th Cir. 2010).

In re Target, 847 F.3d at 612.  As the Eighth Circuit repeatedly emphasized, this Court must conduct a "rigorous analysis" of the requirements for class certification.  That analysis must examine whether the named representatives have common interests with the class, and whether those representatives will prosecute those interests vigorously through class counsel.  Id. (citing Fed. R. Civ. P. 23).

**1.     Intra-Class Conflict**

There are two components to the class-conflict analysis.  First is whether there are class representatives who have suffered the same or similar injury as the class members they seek to represent.  Second is whether some class representatives and class counsel have interests that are so at odds with other class representatives and class members that a singular class is inappropriate.

4

The class representatives in this case include individuals who suffered no demonstrable or quantifiable injury. Indeed, there are numerous class representatives who, like Olson, allege only that their personal information was stolen in the data breach and do not allege any other element of damages. (See, e.g., 1st Am. Compl. (Docket No. 258) ¶¶ 35, 36, 45, 64, 65, 66; see also Esades Aff. (Docket No. 782) ¶ 6.) The class representatives thus meet the first factor in the conflict analysis.

Olson insists that there is a fundamental conflict between class members who suffered monetary loss in the Target data breach and those who did not. Under Olson's theory, any difference in the injuries class members suffered means that there is a conflict requiring separate subclasses and separate representation. But the question is not whether there is any potential or theoretical conflict among class members, it is whether class members' different interests are antagonistic to each other. See U.S. Fid. & Guar. Co. v. Lord, 585 F.2d 860, 873 (8th Cir. 1978) (noting that adequacy of representation requires that "the plaintiff must not have interests antagonistic to those of the class"); see also Ward v. Dixie Nat'l Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010) ("For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.' . . . Moreover, a conflict will not defeat the adequacy requirement if it is 'merely speculative or hypothetical.'") (quoting Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003)); Reynolds v. Nat'l Football League, 584 F.2d 280, 286 (8th Cir. 1978) (affirming district court's conclusion that "theoretical conflicts of interest did not require subclassification, disqualification of the named parties and class counsel, or disapproval of

5

the settlement").

As the Eighth Circuit has determined, "the antagonism which will defeat maintenance of a class action must relate to the subject matter in controversy, as when the representative's claim conflicts with the economic interests of the class . . . ." Sperry Rand Corp. v. Larson, 554 F.2d 868, 874 (8th Cir. 1977). Olson's oft-repeated mantra that some class members were "frozen out" of a recovery (Olson's Opp'n Mem. (Docket No. 784) at 9, 13, 17, 25, 26), does not substitute for evidence of an actual, fundamental conflict of interest that relates to the subject matter at issue. See Reynolds, 584 F.2d at 286 (noting that objectors presented "[n]o evidence . . . of improper actions or actual conflict of interest on the part of the named plaintiffs or their counsel"). Moreover, "the mere fact that some members of a class may not receive a direct payment is not dispositive" of the fairness of the settlement to all class members. Marshall v. Nat'l Football League, 787 F.3d 502, 509 (8th Cir. 2015); see also Sperry Rand, 554 F.2d at 874 (finding that "disagreements as to the remedy do not necessarily defeat a class action"). Olson presents no evidence regarding an actual, fundamental conflict because he has none, only rank speculation that a conflict exists.[3] Olson has not established that the representatives' claims conflict with the economic interests of the class.

---

[3] Olson similarly offers no evidence or argument regarding what recovery an individual who had sustained no quantifiable damages would be entitled to receive, even putting aside the obvious standing issues presented by a separate no-injury class.

a.    <u>Amchem</u> and <u>Ortiz</u>

Olson contends that the different interests among class members in this case is similar to those found to require subclasses with separate representation in two Supreme Court decisions, <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591 (1997), and <u>Ortiz v. Fibreboard Corporation</u>, 527 U.S. 815 (1999).   Those cases, which both involved wide-ranging global settlements in the massive nationwide asbestos litigation, instead establish that any differences in class members' interests here are not fundamental and do not require subclasses, separate representation, or decertification of the class.

In <u>Amchem</u>, plaintiffs and defendants presented to the district court on the same day a class-action complaint, answer, proposed settlement agreement, and a joint motion for class certification.   521 U.S. at 601-02. [4]   The single "sprawling" class included individuals who had been diagnosed with an asbestos-related illness as well as individuals who had been exposed to asbestos either personally or through a parent or spouse but had not been diagnosed with any illness as a result.   <u>Id.</u> at 602; <u>see also</u> <u>id.</u> at 624 ("No settlement class called to our attention is as sprawling as this one.").   The settlement provided that class members who suffered certain diseases would receive monetary relief. It also waived all class members' claims for loss of consortium and medical monitoring.

---

[4] The Eighth Circuit has determined that the same-day presentation of complaint, class certification, and settlement in <u>Amchem</u> and <u>Ortiz</u> was responsible for those cases' insistence that Rule 23's requirements deserved "heightened attention" in the class-action settlement context.   <u>Petrovic</u>, 200 F.3d at 1145.   Because those circumstances were not present in <u>Petrovic</u>, the Eighth Circuit found that no such heightened attention was required.   <u>Id.</u>

Id. at 604.   The damages awards were not adjustable for inflation, and did not include any provision for advancement in medical monitoring for asbestos injuries.   Id.   Only class members who suffered from a compensable disease were entitled to an award under the settlement, and the settlement limited the number of individuals who could opt out of the settlement in a given year.   Id.

Large numbers of putative class members objected to the settlement.   The objectors argued that there was a fundamental conflict between claimants whose injuries had become manifest and claimants without such injuries, so that the district court should have appointed independent counsel and should have divided the class into subclasses.   Id. at 607-08.   The Supreme Court agreed, finding that the interests of currently injured plaintiffs and exposure-only plaintiffs were adverse to one another, because those with current injuries would seek only to maximize current payments, while those with future injuries would sacrifice immediate payment for a stable and ample future fund available to pay them in the event they developed a compensable disease.   Id. at 626.

The holding in Ortiz stems from the same concern, albeit in the very different context of a mandatory limited-fund class action under Rule 23(b)(1).[5]   The class in Ortiz also included those with present injuries and "exposure-only" plaintiffs, and attempted to bind all of these plaintiffs to a limited fund, with no opportunity to opt out of the settlement.   In addition to the substantial due process problems such a settlement

---

[5] By contrast, both Amchem and this case involve opt-out classes under Rule 23(b)(3).

presented, the Court reiterated that <u>Amchem</u> required:

> that a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.

<u>Ortiz</u>, 527 U.S. at 856 (citing <u>Amchem</u>, 521 U.S. at 627).   Olson latches onto this statement to insist that, in every case involving both present and future injuries, subclasses are required.   Olson overlooks, however, the substantial and dispositive differences between the two subclasses <u>Amchem</u> and <u>Ortiz</u> described and subclasses Olson urges on the Court in this case.   <u>See, e.g.</u>, <u>Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski</u>, 678 F.3d 640, 647 (8th Cir. 2012) ("The conflicts appellant describes are far from the 'extraordinarily various' injuries that sharply divided the interests of present and future claim holders in attempting to allocate the limited funds available in <u>Amchem</u> and <u>Ortiz</u>.").

    First, as <u>Ortiz</u> noted, the future-injury subclass included individuals who were not yet born, <u>Ortiz</u>, 527 U.S. at 856, and in both <u>Amchem</u> and <u>Ortiz</u> the future-injury class included individuals who might not be or could not be aware of their membership in the class.   A court's overarching concern is with affording such individuals due process, and thus the prospect of foreclosing these individuals' claims without guarantees that they could be notified of the litigation gave the Court great pause.   <u>See Amchem</u>, 521 U.S. at 628 ("[W]e recognize the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and

amorphous.").  Here, in contrast, there are no unascertainable members of the class, and no attendant due process concerns, because all class members received adequate notice and had the opportunity to protect their own interests by opting out of the class.

In addition, although Olson tries to equate uninjured class members in this case with the future-injury subclasses in Ortiz and Amchem, as a practical matter there are no remaining future injuries in the class here.  See Petrovic, 200 F.3d at 1146 (noting difference between "stark conflicts" in Amchem and Ortiz and the class at issue in Petrovic, which was "discrete and identified" and had "suffered a harm the extent of which has largely been ascertained").  Nearly four years after the data breach, all those whose personal financial information was stolen both know that their information was stolen and have suffered any injury they are reasonably likely to suffer.[6]  Plaintiffs who have suffered a monetary injury have had the opportunity to seek compensation for that injury. Plaintiffs who have not suffered any monetary injury likely have no claim to any future payment and thus the equitable relief from the settlement, in addition to the possible pro-rata share of the remaining settlement fund, constitutes all of the relief they could hope to reap from this litigation.

The Amchem and Ortiz global classes failed the adequacy test because the

_____

[6] Olson's implication that class members may still suffer future injuries is unsupported by any evidence and is belied by the evidence presented in the Financial Institution track of this Multi-District Litigation, in which financial institutions sought compensation from Target for the replacement of the credit and debit cards of every consumer involved in the data breach.  Moreover, the fact that the Complaint alleged future damages does not mean that this alleged future harm remains at issue three years later.

settlements in those cases disadvantaged one group of plaintiffs to the benefit of another. There is no evidence that the settlement here is similarly weighted in favor of one group to the detriment of another.   Rather, the settlement accounts for all injuries suffered. Plaintiffs who can demonstrate damages, whether through unreimbursed charges on their payment cards, time spent resolving issues with their payment cards, or the purchase of credit-monitoring or identity-theft protection, are reimbursed for their actual losses, up to $10,000.   Plaintiffs who have no demonstrable injury receive the benefit of Target's institutional reforms that will better protect consumers' information in the future, and will also receive a pro-rata share of any remaining settlement fund.   It is a red herring to insist, as Olson does, that the no-injury Plaintiffs' interests are contrary to those of the demonstrable-injury Plaintiffs.   All Plaintiffs are fully compensated for their injuries.

Thus, this case is not akin to In re Literary Works in Electronic Databases Copyright Litigation, 654 F.3d 242 (2d Cir. 2011).   The In re Literary Works settlement divided the class into three claimant groups, called categories A, B, and C.   The settlement capped the defendants' total liability and provided that, if the claims exceeded that cap, the compensation for category C claims would be reduced pro rata.   Id. at 246.   In other words, the settlement protected the category A and B claims at the expense of category C claims, providing that those claims could be reduced to zero depending on the amount of category A and B claims.   The Second Circuit determined that the interests of category C claimants were fundamentally antagonistic to the interests of the other claimants and a single class could not adequately represent those antagonistic interests.   See id. at 252

11

(describing the settlement as "[t]he selling out of one category of claim for another").

But the mere fact that one group of claimants recovers less than another group does not mean that a single class is inadequate to represent both groups. Id. at 253 ("We therefore disagree with objectors to the extent that they cite Category C's inferior recovery as determinative evidence of inadequate representation."); see also Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 186-87 (3d Cir. 2012) ("To hold that [] differing valuations by themselves render the representative plaintiff inadequate would all but eviscerate the class action device."). The adequacy of representation is called into question when there is no way, absent independent representation, for a court (or plaintiffs) to assess the value of the different claims. In re Literary Works, 654 F.3d at 253. This danger is not present here, where claims either have demonstrable value or they do not—the value of all Plaintiffs' claims is easily ascertainable and independent representation is not required for Plaintiffs to understand the damages they suffered.

Consideration of the fairness of the settlement does not, as Olson insists, improperly conflate Rule 23(a)(4)'s adequacy of representation requirement and Rule 23(e)(2)'s fairness, adequacy, and reasonableness analysis. Whether the representation of named Plaintiffs and class counsel is adequate under Rule 23(a)(4) "cannot be determined solely by finding that the settlement meets the aggregate interests of the class or 'fairly' compensates the different types of claims at issue." In re Literary Works, 654 F.3d at 254. The adequacy of representation in this case is evidenced by much more than the settlement. It is evidenced by the relief sought in the Complaint, the fact that Plaintiffs insisted on

receiving substantial equitable relief as part of their negotiations, and the fact that Plaintiffs sought to ensure that all class members were fully compensated for whatever type of demonstrable injury they suffered, whether in the form of impermissible charges on their payment cards, the time a class member had to spend to remedy fraudulent charges or other identity-theft-related issues, and payment for any credit monitoring or identity-theft protection a class member felt compelled to purchase because of the Target data breach. Olson has failed to establish either that the interests of the no-demonstrable-injury Plaintiffs fundamentally conflict with the interests of the demonstrable-injury Plaintiffs, or that the representation any Plaintiffs received was inadequate.

      b.    <u>Injury</u>

Olson's argument also ignores the fact that all class members in this case suffered the same injury. All class members were the victims of the theft of their personal information and suffered the attendant fear that this information might find its way into the wrong hands on the Internet's black market. The class therefore has an identity of interests not found in the cases on which Olson relies. Moreover, Olson ignores the Eighth Circuit's determination that "[t]he interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they share common objectives and legal or factual positions." <u>Petrovic</u>, 200 F.3d at 1148 (quotation omitted). As in <u>Petrovic</u>, class members here "seek essentially the same things:" compensation for whatever monetary damages they suffered and reassurance that their information will be safe in Target's hands in the future. <u>Id.</u>

c.    <u>Statutory Damages</u>

Although he did not raise this issue in his initial objections to the settlement, and thus did not preserve the issue for appellate review or for purposes of the limited remand, Olson now also contends that the presence of class members from California, Rhode Island, and the District of Columbia results in a fundamental intraclass conflict. These three jurisdictions offer their citizens statutory damages for violations of the jurisdiction's consumer-protection laws. According to Olson, the fact that class members from these jurisdictions have access to additional or different measures of damages mandates subclasses to ensure that these class members' interests are adequately represented.

In Rhode Island, consumers may recover actual damages or statutory damages of $200 for a violation of the state's unfair trade practices law. R.I. Gen. Laws § 6-13.1-5.2(a). California's citizens may recoup statutory damages of $500, or $1,000 in a class action. Cal. Civ. Code §§ 1780(a)(1), 1798.84(c). And in the District of Columbia, a consumer injured by a violation of the consumer-protection laws can recover treble damages, or up to $1,500, whichever is greater. D.C. Code § 28-3905(k)(2)(A).

The availability of potential statutory damages for members of the class from California, Rhode Island, and the District of Columbia does not, by itself, mean that the interests of these class members are antagonistic to the interests of class members from other jurisdictions. Class actions nearly always involve class members with non-identical damages. <u>See, e.g.</u>, <u>Petrovic</u>, 200 F.3d at 1148 (holding that named plaintiffs' interests "do not have to be identical" to those of every class member); <u>Zalewski</u>, 678 F.3d at 647

(affirming adequacy of representation where interests were "not entirely consistent").

Olson's argument in this regard ignores the substantial barriers to any individual class member actually recovering statutory damages. Class members from these three jurisdictions willingly gave up their uncertain potential recovery of statutory damages for the certain and complete recovery, whether monetary or equitable, the class settlement offered. Contrary to Olson's belief, this demonstrates the cohesiveness of the class and the excellent result named Plaintiffs and class counsel negotiated, not any intraclass conflict.

## 2.      Adequacy of Representation

In addition to the possibility of an intra-class conflict, the Eighth Circuit directed this Court to address whether, if there was such a conflict, the class representatives fairly and adequately protected the class's interest. The Court has determined, after a rigorous analysis, that there is no intra-class conflict here. But even if there was such a conflict, the class representatives and their counsel more than adequately protected the class's interests.

This class suffered the same injury—theft of personal financial information—and the same risk of future injury. The only difference among class members is in the quantifiable damages suffered, not in the underlying injury. There is no danger of arbitrary line-drawing, as the objectors argued in Petrovic. 200 F.3d at 1146. And the settlement is structured to remedy all damages suffered, both actual and future. Thus, there is no danger of an "allocative conflict of interest" that caused the Third Circuit to determine that class certification was improper. Dewey, 681 F.3d at 188.

15

Dewey is instructive.  In that case, the settlement divided the plaintiff class into two groups—those whose vehicles were more likely to have suffered leakage around their Volkswagen vehicle's sunroof, and those whose vehicles were less likely to have suffered leakage—and gave the first group of claimants priority in seeking reimbursement under the settlement, with the remaining claimants receiving payments only if there was sufficient money in the settlement fund (the so-called "residual" group).  The objectors argued, as Olson does here,[7] that the two groups were similar to the past-damage claimants and future-damage claimants found to require subclasses and separate representation in Amchem and Ortiz.  Id. at 185.  The Third Circuit disagreed, finding that "the alignment of interests is not so starkly problematic" as it was in Amchem and Ortiz, because a claimant in the reimbursement group "can continue to suffer injury into the future to the same extent as a future claimant."  Id.  Thus, the reimbursement-group claimants had "an interest in obtaining redress for future damage or avoiding future damage" and that interest aligned with those class members in the residual group.  Id. at 186 (citation omitted).

The court found that the settlement itself and the structure of the negotiations evidenced the reimbursement claimants' adequate representation of residual claimaints' interest.  Id.  As the court stated, and as this Court has noted in this matter, the objectors' contentions regarding a conflict were "unduly speculative."  Id.  Moreover, the court determined that, "even if the representative plaintiffs did value protections for future

---

[7] The Dewey objectors were represented by the same counsel representing Olson in this case, and the objections raised in Dewey are nearly identical to those Olson raises.

claimants less than other members of the class, . . . their different valuations [do not] create a fundamental conflict sufficient to undermine their ability to adequately represent the class." Id.

Olson relies heavily on the opinion in Dewey, because the Third Circuit ultimately determined that the class representatives were not adequate and remanded to the district court for possible certification of subclasses. See id. at 190 (noting that district court on remand could either decide to allow all claimants to seek reimbursement with no difference in priority or could certify subclasses). But Olson ignores the reasons behind the Third Circuit's decision. First, all class representatives came from the reimbursement group, and none from the residual group. Id. at 187. Here, of course, there are some class representatives who suffered quantifiable injuries and some who did not.

In addition, the Dewey representative plaintiffs conducted a sampling of vehicle models, determined which models were more likely to have leakage problems, and then drew a line at an arbitrary midpoint, putting some vehicle models into the reimbursement group and others into the residual group. Id. at 187. It was "this line-drawing exercise that exacerbated the adequacy problem," because "representative plaintiffs had an interest in excluding other plaintiffs from the reimbursement group, while plaintiffs in the residual group had an interest in being included in the reimbursement group." Id. at 187-88.

The line-drawing in Dewey did not reflect the actual injuries any class member suffered, but instead reflected the judgment of class representatives and class counsel regarding which vehicles should receive priority in compensation. Id. at 188-89. This

17

was problematic because all class representatives' vehicles happened to fall into the reimbursement group with accompanying payment priority. In such a situation, Rule 23 requires representation for all plaintiffs' interests, to ensure that the line-drawing is not unduly prejudicial to one group of plaintiffs at the expense of another.

This is a far cry from the situation here, where the settlement draws no lines, much less arbitrary lines. If a class member suffered a monetary loss in the data breach, they are compensated for that loss. All class members' fears of future harm are remedied both by the compensation available for purchase of credit-monitoring/identity-theft protection and by the steps Target agreed to take to secure its customers' data in the future. Unlike in Dewey, there are no conflicts that prevent representative Plaintiffs, some of whom suffered quantifiable damages and others who did not, from adequately representing the class.

### 3. Subclasses and Separate Representation.

Finally, even if Olson is correct that a conflict exists, that conflict is not fundamental and does not require certification of separate subclasses with separate representation. "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1189 (11th Cir. 2003). Olson points to no harm that one group of Plaintiffs has suffered from the settlement's benefits to another group. The settlement is not a limited fund that is inadequate to pay the damages claims, it draws no lines between groups of claimants, and it does not reduce any group's compensation to the benefit of another group's.

As in Dewey, Plaintiffs in this case who have suffered demonstrable damages have the same potential for future injury as Olson and those Plaintiffs with no demonstrable damages. All Plaintiffs therefore had the same incentive to maximize the protections against future injuries. The equitable relief the settlement provides evidences the class's incentive to maximize those future protections. See Dewey, 681 F.3d at 186 ("The 'terms of the settlement [and] the structure of the negotiations' incentivized representative plaintiffs to seriously pursue protections for future claimants.") (quoting Amchem, 521 U.S. at 627). And as Target's counsel described, this relief was not "an easy get for the Plaintiffs and it was not an easy give for Target" but was the product of "days of mediation and negotiation." (Hr'g Tr. (Docket No. 790) at 16.) Indeed, as counsel stated, "No company likes to commit its resources to a five-year future relief" plan in a class action, but Target did so here. (Id.) In agreeing to the substantial equitable relief in the settlement, Target agreed to make "significant investments" that "benefit[] all Target guests, including every member of the settlement class in this case." (Id.) Olson has not established that there is a conflict here, or that any alleged conflict requires subclasses and separate representation.

**CONCLUSION**

The named class representatives in this case "have common interests with the members of the class" and have "vigorously prosecute[d] the interests of the class through qualified counsel." In re Target, 847 F.3d at 613 (quotations omitted). Olson has not established that there are any "conflicts of interest between the named parties and the class

they seek to represent." Id. (quoting Amchem, 521 U.S. at 625). "Again, it is not enough for objectors to point to differences in claims, allocation amounts, or state laws without identifying how such differences demonstrate a conflict of interest." Montgomery Cty., Pa. ex rel. Becker v. MERSCORP, Inc., 298 F.R.D. 202, 212 (E.D. Pa. 2014) (citations omitted). Although Olson is highly critical of the settlement and the representation of named Plaintiffs and class counsel, he has utterly failed to demonstrate any conflict of interest.

In the end, it is insufficient to merely argue that a settlement is not good enough. To establish that the representation of class representatives and the settlement they negotiated is not fair or adequate, Olson must offer actual evidence of the conflict he claims. His failure to do so, or to offer any alternative potential—and reasonably achievable—recoveries shows that the representation was fair and adequate, and the settlement was as good a settlement as any class member could hope. Those who suffered monetary losses will, in the main, be compensated for all of the losses they suffered. Those who did not suffer any monetary loss will benefit from the heightened protections Target agreed to put in place to safeguard its customers' personal information. And any class member whose fear of identity theft compelled them to purchase protection for such theft can seek reimbursement for those costs from the settlement fund. It is difficult to imagine a settlement that more comprehensively addresses all of the harm suffered by a class as the settlement here. And the comprehensive nature of the settlement, in turn, reflects the adequacy, indeed the superiority, of the representation the class received from

its named Plaintiffs and from class counsel.

Accordingly, **IT IS HEREBY ORDERED that** Consumer Plaintiffs' renewed Motion to Certify Class in Accordance with Limited Remand Order (Docket No. 775) is **GRANTED.**

Dated:   <u>May 17, 2017</u>                          <u>*s/ Paul A. Magnuson*</u>
                                                        Paul A. Magnuson
                                                        United States District Court Judge