# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-3909

_____

In re: Target Corporation Customer Data Security Breach Litigation

-------------------------------

Jim Sciaroni

*Objector - Appellant*

v.

Consumer *Plaintiff*s

*Plaintiff - Appellee*

Target Corporation

*Defendant - Appellee*

_____

No. 15-3912

_____

In re: Target Corporation Customer Data Security Breach Litigation

-------------------------------

Leif A. Olson

*Objector - Appellant*

v.

Consumer *Plaintiff*s

*Plaintiff - Appellee*

Target Corporation

*Defendant - Appellee*

_____

No. 16-1203

_____

In re: Target Corporation Customer Data Security Breach Litigation

-------------------------------

Leif A. Olson

*Objector - Appellant*

v.

Consumer *Plaintiff*s

*Plaintiff - Appellee*

Target Corporation

*Defendant - Appellee*

_____

No. 16-1245

_____

In re: Target Corporation Customer Data Security Breach Litigation

-2-

-------------------------------

Jim Sciaroni

*Objector - Appellant*

v.

Consumer *Plaintiff*s

*Plaintiff - Appellee*

Target Corporation

*Defendant - Appellee*

_____

No. 16-1408

_____

In re: Target Corporation Customer Data Security Breach Litigation

-------------------------------

Leif A. Olson

*Objector - Appellant*

v.

Consumer *Plaintiff*s

*Plaintiff - Appellee*

Target Corporation

*Defendant - Appellee*

-3-

————————

Appeals from United States District Court
for the District of Minnesota - Minneapolis

————————

Submitted: September 19, 2017
Filed: June 13, 2018

————————

Before BENTON and SHEPHERD, Circuit Judges, and STRAND, District Judge.[1]

————————

SHEPHERD, Circuit Judge.

This case is back to us after our reversal of the certification of a class composed of individuals whose payment card information was compromised as a result of the 2013 Target security breach.  See In re Target Corp. Customer Data Sec. Breach Litig., 847 F.3d 608, 613 (8th Cir. 2017).  On remand, the district court[2] re-certified the class after conducting a rigorous analysis.  Class member Leif Olson again objects to the certification on a number of grounds.  In addition, class member Jim Sciaroni objects to the district court's approval of the settlement agreement.  We see no error and affirm.

————————

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation.

[2]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

-4-

I. Background

In 2015, the district court certified a class of "[a]ll persons in the United States whose credit or debit card information and/or whose personal information was compromised as a result of the data breach that was first disclosed by Target on December 19, 2013."  As has become common, the class was certified solely for the purpose of entering into a settlement agreement.  The parties presented such an agreement to the court in short order.

Under the terms of this agreement, Target agreed to pay $10 million to settle the claims of all class members and waived its right to appeal an award of attorney's fees less than or equal to $6.75 million.[3]  For those class members with documented proof of loss, the agreement called for full compensation of their actual losses up to $10,000 per claimant.  For those class members with undocumented losses, the agreement directed a pro rata distribution of the amounts remaining after payments to documented-loss claimants and class representatives.  Additionally, Target agreed to implement a number of data-security measures and to pay all class notice and administration expenses.

There were two primary objectors to the court's certification of the class and approval of the settlement agreement: Leif Olson and Jim Sciaroni.  In the original appeal of this matter, Olson argued that the court failed to conduct the appropriate pre-certification analysis, and Sciaroni objected to the court's approval of the settlement.  We agreed with Olson's argument and therefore remanded to the district court without considering Sciaroni's objections.

---

[3]Under the agreement, the $10 million class fund is entirely separate from any award of attorney's fees and costs.

-5-

On remand, the court again certified the class.  Olson appeals that decision, claiming the district court factually misunderstood the settlement agreement and failed to account for a number of alleged conflicts of interest between class counsel and class members and among competing subgroups of class members.  In addition, Sciaroni's original objections to the settlement are before us.  We first address Olson's claims before moving to Sciaroni's objections.

## II. Olson

On appeal, Olson raises two principal challenges to the district court's certification order.[4]  First, he contends the district court fundamentally misunderstood the structure of the settlement agreement.  Next, he argues that there is an intraclass conflict between class members who suffered verifiable losses from the data breach and those, like Olson, who have not, and that this conflict necessitates separate legal

---

[4]Olson raises two additional arguments that can be quickly disposed of.  First, he contends there are no named class representatives from the zero-loss subclass.  See Fed. R. Civ. P. 23(a)(4) (requiring, as a prerequisite to class certification, that "the representative parties will fairly and adequately protect the interests of the class").  This argument is belied by the record.  Olson concedes in his brief that, as of the time the suit was filed, there were thirteen named plaintiffs who had not submitted claims for reimbursement.  Moreover, as of the moment the district court certified the class, there were four named plaintiffs who had claimed no out-of-pocket losses.  Next, Olson claims that there is an intraclass conflict between those individuals who reside in states that offer statutory causes of action and those who do not.  On this point, Olson asserts that class members from states such as California, Rhode Island, and the District of Columbia are being forced to forego their state-law statutory claims in return for "marginal compensation" under the terms of the settlement.  But Olson—a resident of Texas, which does not offer a statutory cause of action—has no standing to assert a conflict on behalf of residents from states offering such relief.  See In re SuperValu, Inc., 870 F.3d 763, 768 (8th Cir. 2017) ("The requirements for standing do not change in the class action context.");  Huyer v. Njema, 847 F.3d 934, 941 (8th Cir. 2017) ("Njema is not a named plaintiff, so he is not injured by the district court's decision not to award larger sums [to the named plaintiffs].").

-6-

counsel.[3]   We address each argument in turn, applying the deferential abuse of discretion standard.  See Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1145 (8th Cir. 1999).

A.

Olson first launches a factual challenge to the district court's order.  Under the terms of the settlement, the proceeds are first distributed to those individuals who submit proof of actual loss, up to a total amount of $10,000 per claimant.  Next, the class representative awards are paid.  Then any remaining proceeds are distributed in equal amounts to those claimants with undocumented losses.  The district court accurately presented this structure on page 3 of its order, but it later made two comments which form the basis of Olson's attack:

> Plaintiffs who have not suffered any monetary injury likely have no claim to any future payment and thus the equitable relief from the settlement, in addition to the possible pro-rata share of the remaining settlement fund, constitutes all of the relief they could hope to reap from this litigation.
> . . . .
> Plaintiffs who have no demonstrable injury receive the benefit of Target's institutional reforms that will better protect consumers' information in the future, and will also receive a pro-rata share of any remaining settlement fund.

Proceeding from these statements, Olson contends the district court fundamentally misunderstood the settlement structure because it apparently believed that those claimants in the zero-loss subclass would receive a share of remaining settlement proceeds.  Under Olson's view, "that error alone warrants reversal."  We disagree.

---

[3]Olson does not draw such neat lines between his arguments, but we are satisfied that dividing them in this way addresses all of his claims.

Appellate Case: 15-3909     Page: 7     Date Filed: 06/13/2018 Entry ID: 4672165

To be sure, as Olson points out, we have stated that "[t]he district court . . . abuses its discretion if its conclusions rest on clearly erroneous factual determinations." Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005). But here we have no indication that the district court rested its conclusions on the above statements. In fact, the court had already determined that no intraclass conflict existed four pages prior to making the above statements, so it stretches credulity to assert that its conclusion depended on a statement made thereafter. We need not define at what point an erroneous factual statement constitutes reversible error. In this case, it was obvious that the district court did not rely on an erroneous understanding of the settlement, and thus no abuse of discretion occurred.

### B.

Olson next argues that there is an intraclass conflict between class members who suffered verifiable losses from the data breach and those, like Olson, who have not. Olson uses different names for this latter subclass, sometimes referring to it as a zero-recovery subgroup[4] and other times calling it a future-damages subclass. In

---

[4]Littered throughout Olson's materials is his assertion that class members with no proof of loss—documented or undocumented—are barred from receiving anything of value under the agreement. This is, perhaps, why he has chosen to label those class members as the "zero-recovery subgroup." But the injunctive relief offered under the settlement has value to all class members. See Marshall v. Nat'l Football League, 787 F.3d 502, 509 (8th Cir. 2015) ("[T]he financial payment to the third-party organization is not the only, or perhaps even the primary, benefit of the settlement agreement. *All* class members receive a direct benefit from the settlement: the opportunity to license their publicity rights through the established Licensing Agency, as well as the payments by the NFL to the Licensing Agency."), cert. denied, 136 S. Ct. 1166 (2016); see also Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) ("This argument fails to acknowledge the injunctive relief offered by the settlement, however, which is intended to benefit all class members regardless of individual monetary recovery."). As a result, we choose to refer to these class members as the "zero-loss subgroup" because that accurately reflects the reality that these members

-8-

substance, Olson's contention is that under the Supreme Court's asbestos decisions in <u>Amchem</u> and <u>Ortiz</u>, the district court's ruling was legally deficient because, even assuming there were named representatives from the zero-loss subclass, separate legal counsel was required to protect that subclass's interests. <u>See, e.g.</u>, <u>Ortiz v. Fibreboard Corp.</u>, 527 U.S. 815, 856 (1999) ("[I]t is obvious after <u>Amchem</u> that a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.").

We need look no further than the language of <u>Amchem</u> itself to refute this assertion. Describing the then-current state of asbestos litigation, the Court noted:

> [This] is a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s. On the basis of past and current filing data, and because of a latency period that may last as long as 40 years for some asbestos related diseases, a continuing stream of claims can be expected. The final toll of asbestos related injuries is unknown. Predictions have been made of 200,000 asbestos disease deaths before the year 2000 and as many as 265,000 by the year 2015.

---

in fact suffered no monetary injury from the data breach. Citing <u>Dewey v. Volkswagen Aktiengesellschaft</u>, 681 F.3d 170, 187 (3d Cir. 2012), Olson briefly argues that there is an intraclass conflict between the subgroup with losses and the zero-loss subgroup because the latter receives no compensation. But <u>Dewey</u>'s analysis on this point turned on that court's conclusion that there were no named class representatives from a certain subgroup. As we stated above, we have named class representatives from both subgroups present in the current case, <u>see</u> <u>supra</u> note 4, so <u>Dewey</u> is inapplicable. Moreover, even the Third Circuit would recognize that the injunctive relief offered in the settlement has value to all class members. <u>See</u> <u>Sullivan</u>, 667 F.3d at 329.

-9-

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 598 (1997) (alteration in original) (internal quotation marks omitted).  Against this backdrop, the Court was confronted with a class certification and settlement offer that "proposed to settle, and to preclude nearly all class members from litigating against [certain asbestos] companies, all claims not filed before January 15, 1993, involving compensation for present and future asbestos-related personal injury or death."  Id. at 603.

After finding that Rule 23(b)(3)'s predominance requirement was not satisfied by the proposed class, the Court focused on Rule 23(a)(4)'s adequacy inquiry with the goal of uncovering whether there were "conflicts of interest between named parties and the class they seek to represent."  Id. at 625.  Because "named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses," the Court found that such conflicts existed.  Id. at 626.  More specifically, the Court reasoned that "for the currently injured, the critical goal is generous immediate payments[,] [and] [t]hat goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future."  Id.  In the context of a nationwide phenomenon involving "millions of Americans" and "a latency period that may last as long as 40 years for some asbestos related diseases," id. at 598 (internal quotation marks omitted), this conclusion is sound because there was a real expectation that the exposure-only plaintiffs would fall ill after the date specified in the settlement.  As a result of the fact that no exposure-only plaintiff could estimate with any certainty the extent of his or her future injury, the settlement offered no assurance that sufficient funds would remain to protect the interests of that group.

Olson struggles to analogize the present case to Amchem and Ortiz, asserting that class members with verified losses are attempting to maximize their recovery at the expense of those who "might only have future . . . damages."  His attempts are futile.  As the Supreme Court noted, "[i]n contrast to mass torts involving a single accident, class members in this case were exposed to different asbestos-containing

-10-

products, in different ways, over different periods, and for different amounts of time; some suffered no physical injury, others suffered disabling or deadly diseases." Id. at 609 (citing Georgine v. Amchem Prods., Inc., 83 F.3d 610, 626, 628 (3d Cir. 1996)). We therefore believe the present case is more similar to our decision in Petrovic, 200 F.3d at 1146, where we distinguished Amchem and Ortiz by "not[ing] that the injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured."

Here, we have "a discrete and identified class that has suffered a harm the extent of which has largely been ascertained." Id. As Olson himself states, "all class members suffered the same injury, i.e., compromise of their personal and financial information from the data breach." Thus, similar to the mass tort cases the Supreme Court discussed in Amchem, we have one accident here—the data breach—that caused a series of events leading to the plaintiffs' injuries. But all class members had the ability to register for credit monitoring, and all of the compromised payment cards undoubtedly were cancelled and replaced by the issuing banks. Any risk of future harm is therefore entirely speculative, which is perhaps best illustrated by Olson's inability to direct the court—even generally—to a concrete type of future harm that the settlement fails to consider.

Of course, it is hypothetically possible that a member of the zero-loss subclass will suffer some future injury; for example, a line of credit could be opened using the personal information compromised in the breach. But this is just as likely to happen to a member of the subclass with documented losses. Accordingly, the interests of the two subclasses here are more congruent than disparate, and there is no fundamental conflict requiring separate representation. See DeBoer v. Mellon Mortg. Co., 64 F.3d 1171, 1175 (8th Cir. 1995) ("There is no indication that DeBoer's interest was antagonistic to the remainder of the class or that the claims were not vigorously pursued."); cf. Dewey, 681 F.3d at 185-86.

The district court did not abuse its discretion in certifying the class.

-11-

### III. Sciaroni

Having found the district court properly certified the class, we now turn to Sciaroni's challenges to the district court's original order concerning the settlement in this case.  Sciaroni first launches a two-fold challenge to the court's award of attorney's fees, arguing at the outset that the court erred by considering the costs of notice and administration expenses as a benefit to the class and then challenging the overall reasonableness of the award.  Next, Sciaroni contends that the court erred in approving the settlement.

### A.

Sciaroni first urges us to adopt the Seventh Circuit's approach to determine whether administrative fees and costs are a benefit to the class as a whole.  See Redman v. RadioShack Corp., 768 F.3d 622, 630 (7th Cir. 2014) ("[T]he roughly $2.2 million in administrative costs should not have been included in calculating the division of the spoils between class counsel and class members.  Those costs are part of the settlement but not part of the value received from the settlement by the members of the class.").  During the pendency of this case, however, we issued two opinions that reached the opposite conclusion.  See Huyer v. Buckley, 849 F.3d 395, 398 (8th Cir. 2017) ("[T]he district court did not abuse its discretion by basing its fee award on the total settlement fund, which included administrative costs."); In re Life Time Fitness, Inc., Tel. Consumer Prot. Act (TCPA) Litig., 847 F.3d 619, 623 (8th Cir. 2017) ("[T]he district court did not abuse its discretion by including approximately $750,000 in fund administration costs as part of the 'benefit' when calculating the percentage-of-the-benefit fee amount.").  Accordingly, the same is true here: the district court acted within its discretion when it included notice and administrative expenses in its calculation of the total benefit to the class.

-12-

Sciaroni next challenges the reasonableness of the total fee award. "Decisions of the district court regarding attorney fees in a class action settlement will generally be set aside only upon a showing that the action amounted to an abuse of discretion." Petrovic, 200 F.3d at 1156. The court awarded counsel attorney's fees and expenses of $6.75 million, determining that amount was "not unreasonable under either the lodestar or percentage-of-the-fund methodology." Under our precedent, the district court has discretion to use either method, and the ultimate reasonableness of the award is evaluated by "consider[ing] relevant factors from the twelve factors listed in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 719-20 (5th Cir. 1974)." Keil v. Lopez, 862 F.3d 685, 701 (8th Cir. 2017).[5]

Perfunctory as its analysis may have been, we cannot say the district court failed to meet its burden "to provide a concise but clear explanation of its reasons for the fee award." Hensley, 461 U.S. at 437. The court voiced its opinion that this "case has been hard-fought and heavily litigated since its inception" and that the award was "reasonable in light of the complexities and vagaries of this case." Though it did not mention Johnson, the court expressed its view—based on the above statements—that

------

[5]The factors are:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Winter v. Cerro Gordo Cty. Conservation Bd., 925 F.2d 1069, 1074 n.8 (8th Cir. 1991) (quoting Hensley v. Eckerhart, 461 U.S. 424, 430 n.3 (1983)).

-13-

the award was justified by the time and labor required, the difficulty of the matter, the skills necessary to prevail (or to reach the current settlement agreement), and the length of the representation. Additionally, the court noted that "[t]he request amounts to a negative lodestar multiplier of .74, and . . . is 29% of the total monetary payout Target is required to make as part of the settlement." Both of these figures are well within amounts we have deemed reasonable in the past. Cf. Huyer, 849 F.3d at 399-400 (collecting cases and noting "courts have frequently awarded attorneys' fees ranging up to 36% in class actions" and that a lodestar "multiplier [of 1.82] is well within the range of multipliers awarded in this and other circuits"). The court did not abuse its discretion.

## B. Approval of the Settlement

Finally, Sciaroni takes issue with the district court's approval of the settlement, arguing that the court awarded "worthless objective relief," inadequately compensated class members, and ignored "subtle signs of collusion." Looking past the labels he uses, the thrust of Sciaroni's argument is that the settlement was unfair. As a prerequisite to approval, a district court must find that a settlement is "fair, reasonable, and adequate," and we will set aside this finding "[o]nly upon the clear showing that the district court abused its discretion." Prof'l Firefighters Ass'n of Omaha v. Zalewski, 678 F.3d 640, 645 (8th Cir. 2012) (internal quotation marks omitted). On review, "[w]e afford the district court's views '[g]reat weight' because the district court 'is exposed to the litigants, and their strategies, positions and proofs. [It] is aware of the expense and possible legal bars to success." Id. (alterations in original) (quoting Reynolds v. Nat'l Football League, 584 F.2d 280, 283 (8th Cir. 1978)).

In determining whether a settlement agreement is fair, "a district court should consider (1) the merits of the plaintiff's case[] weighed against the terms of the settlement, (2) the defendant's financial condition, (3) the complexity and expense

-14-

of further litigation, and (4) the amount of opposition to the settlement."[6]   In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig., 716 F.3d 1057, 1063 (8th Cir. 2013) (alteration in original) (internal quotation marks omitted).  "The first factor, 'a balancing of the strength of the plaintiff's case against the terms of the settlement,' is '[t]he single most important factor.'"  Keil, 862 F.3d at 695 (alterations in original) (quoting Van Horn, 840 F.2d at 607).  "[M]indful of the limited scope of our review . . . [w]e ask whether the District Court considered all relevant factors, whether it was significantly influenced by an irrelevant factor, and whether in weighing the factors it committed a clear error of judgment."  Marshall v. Nat'l Football League, 787 F.3d 502, 508 (8th Cir. 2015) (alterations in original) (internal quotation marks omitted).

The district court did not abuse its discretion.  Indeed, despite the brevity of its reasoning on other questions, the court gave a carefully reasoned and complete analysis of all four Van Horn factors.  On the first, it accurately noted the uphill battle facing the plaintiffs if this litigation were to proceed: standing issues being the most prevalent given the glaring fact that most of the plaintiffs suffered no concrete injury as a result of the breach.  Weighed against this consideration, the monetary and non-monetary relief offered under the settlement likely offers the plaintiffs "the only conceivable remedies they could expect."  See In re Uponor, Inc., 716 F.3d at 1063.  It thus is unclear why Sciaroni strenuously argues that the non-monetary relief is inadequate, especially in light of his concession that "[w]hile some class members filed a claim, the vast majority of the millions of the class members are entitled only to injunctive relief."  Cf. Marshall, 787 F.3d at 509 ("[W]e have never required that a settlement agreement specifically provide for a direct financial payment to each class member, and the mere fact that some members of a class may not receive a direct payment is not dispositive.").

---

[6]Our precedent collectively refers to these as the Van Horn factors, alluding to their genesis in Van Horn v. Trickey, 840 F.2d 604 (8th Cir. 1988).

-15-

Discussing the second factor, the court noted that Target has ample means to pay the settlement and therefore considered this neutral in the analysis. The court then discussed the third factor, commenting that "[f]urther litigation . . . would undoubtedly be expensive and complex" in light of the impending "voluminous discovery" and the fact that the plaintiffs' consumer-protection claims arise under state law in nearly every jurisdiction in the country. Cf. Keil, 862 F.3d at 698 ("Class actions, in general, place an enormous burden of costs and expense upon parties. Here, the application of numerous states' laws made this a particularly complex case." (citation omitted) (internal quotation marks omitted)). Finally, the fourth factor weighed in favor of the settlement given that only 11 people out of the 80 million class members objected to the settlement. Cf. id. ("[O]ut of a class of approximately 3.5 million households, . . . only fourteen class members submitted timely objections[,] [and] none of the named plaintiffs objected to the settlement. Thus, the amount of opposition is minuscule when compared with other settlements that we have approved.").

Sciaroni argues the worthless objective relief, combined with the presence of "clear-sailing" and "kicker" clauses in the agreement, subtly shows that the settling parties are guilty of collusion. A clear-sailing provision is one where "the defendants agree[] not to oppose the request for attorney fees," Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 243 (8th Cir. 1996), and a kicker provision means that unused assets from the settlement are returned to the defendants instead of being distributed to the class, In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011). Although Sciaroni's principal brief expressly states that both types of provisions are found in the current agreement, his reply brief substantially backs off of those assertions by conceding that the agreement "may not have a 'strict' clear sailing provision" and only "effectively" has a kicker clause. At any rate, Sciaroni's position simply voices generalized grievances with these provisions: nowhere does he explain *how* the clauses, even assuming they are present, operated to the detriment of the class. Sciaroni directs us to no authority that such provisions are per se

-16-

unlawful, and he has likewise failed to provide any clear evidence of collusion. Accordingly, because he has not demonstrated that the settlement was unfair or inequitable, we affirm the court's approval of the settlement agreement.

## IV. Conclusion

For the aforementioned reasons, we affirm the rulings of the district court.

_____

-17-